Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                       12/9/2005

1

1        IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF INDIANA

3               INDIANAPOLIS DIVISION

4
    MIRANDA SHADDAY,              )
5                                 )
                                  )
6            Plaintiff,           )
                                  ) Cause No.
7        vs.                      ) 1:04-CV-1219-JDT-WTL
                                  )
8    OMNI HOTELS MANAGEMENT       )
     CORPORATION,                 )
9                                 )
             Defendant.           )
10                                )

11

12

13          DEPOSITION OF FRED DEL MARVA

14

15                 Phoenix, Arizona
                   December 9, 2005
16

17

18

19              ARIZONA REPORTING SERVICE, INC.
                     Court Reporting
20                     Suite Three
                 2627 North Third Street
21           Phoenix, Arizona 85004-1126

22           By:  JODY L. LENSCHOW, RMR, CRR
                  Certified Reporter
23                Certificate No. 50192

24   Prepared for:

25

**Shadday v. Omni Hotels**           **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**              **12/9/2005**

                                                                    2

1                          INDEX TO EXAMINATIONS

2    WITNESS                                                    PAGE

3

     FRED DEL MARVA
4
          Examination by Mr. Thornburg                          4
5

6

7

8

9

10

11
                           INDEX TO EXHIBITS
12
     NO.          DESCRIPTION              MARKED     IDENTIFIED
13
     1     Notice of Deposition               4          4
14
     2     Complete file materials            7          7
15
     2A    Red binder containing             12         12
16         reference material

17   2B    Testimony at Deposition           49         49
           (Last Four Years)
18
     2C    Deposition summaries             204        204
19

20

21
                        CERTIFIED QUESTION
22                      PAGE     LINE
                        108       18
23

24

25

3

1              DEPOSITION OF FRED DEL MARVA

2    was taken on December 9, 2005, commencing at 10:03 a.m.,

3    at the offices of Arizona Reporting Service, 2627 N. Third

4    Street, Phoenix, Arizona, before JODY L. LENSCHOW,

5    Certified Reporter No. 50192 for the State of Arizona.

6

7

8    APPEARANCES:

9

10   For the Plaintiff:
     (Via telephonic communications)
11
          TOWNSEND & MONTROSS
12        By Mr. John F. Townsend, III
          and Ms. Carol Townsend
13        230 E. Ohio Street
          Indianapolis, Indiana  46204
14

15

16   For the Defendant:

17        LOCKE REYNOLDS, LLP
          By Mr. Robert B. Thornburg
18        201 N. Illinois Street
          Suite 1000
19        Indianapolis, Indiana  46244-0961

20

21

22

23

24

25

4

1          (Deposition Exhibit No. 1 was marked for

2      identification.)

3

4                        FRED DEL MARVA,

5      called as a witness herein, having been first duly sworn

6      by the Certified Reporter to speak the truth and nothing

7      but the truth, was examined and testified as follows:

8

9                        EXAMINATION

10

11     BY MR. THORNBURG:

12         Q.    Good morning, sir.  Would you please state your

13     full name for the record?

14         A.    My name is Fred Del Marva.  Fred common

15     spelling.  Del Marva is capital D-E-L, capital M-A-R-V, as

16     in Victor, A.

17         Q.    Thank you.  Mr. Del Marva, I'm an attorney

18     that's been hired by the Omni Hotel to represent it in a

19     lawsuit that's been filed against it by Miranda Shadday,

20     and we're here today to take your deposition.  I know

21     you've given depositions before, so I don't need to

22     dispense -- I'll dispense with giving you the rules and

23     the ground rules.

24              I submitted or forwarded a notice of deposition,

25     which asked you to bring with you various materials.  You

5

```
 1    did receive a copy of the notice of deposition; is that

 2    correct?

 3         A.    Yes.

 4         Q.    And have you brought with you the materials that

 5    we identified there in the paragraphs numbered 1 through

 6    12?

 7         A.    Whatever was available, yes.

 8         Q.    Are there things that were not available that

 9    you did not bring; or excuse me, are there things that

10    were unavailable that you didn't bring with you?

11         A.    Anything that was relevant I brought with me.

12    Correspondence between myself and Mr. Townsend I don't

13    have.  It's just a practice of mine not to save them.

14    There's just no probative value to them.  It's just extra

15    paper.  So I don't have those.

16              I'm in compliance with this.  I don't have any

17    authoritative treatises.  Everything else I believe I do

18    have.

19         Q.    As it relates to authoritative treatises, did

20    you consult any in reaching your opinions in this case?

21         A.    No.

22         Q.    Did you rely on your review of them in the past

23    to reach any of the opinions in this case?

24         A.    Over the 20 years, yes.

25         Q.    Am I correct you did not bring correspondence
```

6

1    because it's your practice that when you receive

2    correspondence from counsel, you just throw that away?

3        A.    Yes.

4        Q.    So there would not be -- so if we would go to

5    your office, for example, we would not be able to find any

6    correspondence from Mr. Townsend as it relates to this

7    case?

8        A.    No.

9        Q.    Meaning, no, we couldn't find any because it had

10   been discarded, correct?

11       A.    Correct.

12       Q.    Let's go ahead then, and you have sort of laid

13   out here in front of you various materials.  What I would

14   like to do -- and I'll kind of defer to you on what's the

15   best method to do this, but what I would like to do is

16   either have the court reporter make copies of this or

17   however you typically like to handle it, but I would like

18   to get a copy of your complete file, which is here with

19   you today, correct?

20       A.    Correct.

21            MR. TOWNSEND:  Rob, do you just want to have it

22   made as an exhibit?

23            MR. THORNBURG:  That's fine with me, John.  In

24   fact, that's what I was thinking to do, is have it marked

25   as one exhibit and let's just globally call it Exhibit 2,

7

1    for example; and then as I pull stuff out, we'll maybe

2    call it 2A, 2B, what have you, if I pull anything out.

3    But I just generally want to review it.  Is that okay with

4    you?

5             MR. TOWNSEND:  Yeah, that's fine.  Why don't we

6    make the entire thing an exhibit, and then as you get more

7    specific, you can make the exhibit -- you know, you can

8    make the designations more specific.

9             MR. THORNBURG:  Okay, that's fine.

10   BY MR. THORNBURG:

11        Q.   Is that okay with you, Mr. Del Marva?

12        A.   That's fine with me.

13        Q.   Let's first go ahead, we'll just -- our next

14   number is 2; is that correct?  We'll mark the whole file

15   as Exhibit No. 2.

16             (Deposition Exhibit No. 2 was marked for

17   identification.)

18   BY MR. THORNBURG:

19        Q.   I guess first what I would like to do is, let's

20   survey what we have.

21        A.   I have the notice of deposition.  There is an

22   Exhibit 1 of Officer Barnett's deposition, which is the

23   Omni Shoreham Hotel Manual.  There are 8 by 10 photographs

24   of the lobby of the hotel.  I believe these were taken by

25   a representative of Mr. Townsend.

8

1           Do you want to go over the discovery

2    individually or -- this is all the discovery that -- okay,

3    let's do it this way.  Do you want to itemize all these?

4        Q.    Yeah.

5        A.    Okay, fine.

6           I have the request to nonparty for the

7    production of records and documents.

8        Q.    Who is that directed to, sir?

9        A.    That's to Howard University Hospital.  There's a

10   subpoena in civil case also to Howard University Hospital.

11   There is an authorization for release of protected health

12   information to Howard University Hospital.

13          There is a Meridian Psychological Associates

14   confidential psychological evaluation of the plaintiff

15   dated September 20th, 2004.  There is the same dated

16   June 7th, 2004.  There is a handwritten statement of the

17   plaintiff dated 11-03-04; the same dated 9-29-04.  Let me

18   rephrase that.  This is a handwritten statement of the

19   plaintiff.  I don't know if it's of the plaintiff now.

20          This looks like notes for psychological testing,

21   handwritten notes for psychological testing of the

22   plaintiff.  There are dates of 11-04, 11-8-04, 11-10-04,

23   11-17-04, 9-29-04, 10-6-04, 10-13-04, 9-1-04, 9-15-04,

24   9-22-04, 9-21-04, 9-26-04, 8-2-04, 7-8-04, I believe this

25   is 7-12-04, 7-14-04, 7-19-04, 6-29-04, 6-30-05, 7-5-04,

9

1     6-7-04, 6-21-04, 6-23-04, 6-28-04.  It seems, probably, it

2     is the notes of the psychologist with regard to his

3     examination of the plaintiff.

4          Q.     The notes that you were just referring to,

5     looking at and giving us the dates, did you review those?

6          A.     As much as I could try to understand them, yes.

7          Q.     Was there anything of significance to you in

8     reaching your opinions contained in what appear to be the

9     handwritten notes from Ms. Shadday's psychotherapy

10    sessions?

11         A.     No.

12         Q.     What else do you have there?

13         A.     I think some of these are duplicates.  June 7th,

14    that's a duplicate, that's a duplicate, that's a

15    duplicate.  Correspondence from Locke Reynolds' office to

16    Dr. Malinoski, a release from Dr. Malinoski for records.

17         Q.     If I can interrupt you for a second.

18    Mr. Del Marva, would there be any reason why you would

19    keep correspondence from my office, but not correspondence

20    from Mr. Townsend's office?

21         A.     Yours is more correspondence; there were some

22    documents attached with it that I reviewed as far as my

23    review to render an opinion.  There was nothing in

24    Mr. Townsend's correspondence that had anything to do with

25    reviewing.

1        Omni Hotel Management Corporation's Response to

2    Plaintiff's Request for Production of Documents,

3    Plaintiff's Response to Defendant's Request For

4    Production, Request for Production of Documents and

5    Records Nonparty and Subpoena Duces Tecum to the

6    Metropolitan Police Department.

7    Q.    That would appear to be the subpoena, actually,

8    to Metro PD?

9    A.    Okay, that would be the subpoena.

10       Correspondence from Mr. Townsend's office to

11    Superior Court of District of Columbia Criminal Division

12    and a Request for Production of Documents and Records as a

13    Subpoena Duces Tecum, the Plaintiff's Complaint for

14    Damages, Plaintiff's Answer to Defendant's

15    Interrogatories, Omni Hotel Management Corporation's

16    Answer to Plaintiff's Interrogatories, the folio or the

17    room charges for Ms. Shadday at the Omni.

18       This is some sort of a directory from a database

19    having to do with Peter Malinoski.  I basically don't know

20    what this is referencing at all.

21       Metropolitan Police Department incident-based

22    event reports, pre and post incident.  The Police

23    Department file of -- excuse me, this is the hospital file

24    for the plaintiff.  An Exhibit B from someone's deposition

25    having to do with the insurance company, TRT Holding, Inc.

11

1          Then I have the deposition transcript of the

2    plaintiff; deposition transcript of Francis Carmello,

3    hotel manager; deposition transcript of Mr. Del-Cid, hotel

4    security officer; deposition transcript of Mr. Barnett,

5    hotel security officer; the deposition of Todd Scartozzi,

6    the defendant's vice president of operations, resident of

7    the Shoreham Hotel; the deposition transcript of Mario

8    Jarquin, security officer; the deposition transcript of

9    Ralphaello McKeython, who was the director of security.

10         In addition, I have in front of me a bound

11   red-covered book, for lack of a better word, which is what

12   I will be using during the deposition as reference.   In

13   the book there is a table of contents, Nos. 1 through 20.

14         1 would contain my current CV fee schedule and

15   retainer agreement.   2 would be my client's billing and

16   signed retainer agreement.   3 is my September 15th, 2005

17   opinions report and supplement.   4 is my affidavit used

18   for the opposition to the motion for summary judgment.   5

19   is the deposition summary of Ms. Shadday, the plaintiff.

20   6 is the deposition summary of Mr. Carmello, the hotel

21   manager.   7 is the deposition summary of Mr. Del-Cid,

22   security.   8 is the deposition summary of Mr. Barnett,

23   hotel security.   9 is the deposition summary of

24   Mr. Scartozzi, resident vice president of operations.

25   10 is the deposition summary of Mr. McKeython, director of

12

1    security.  11 is the deposition summary of Mr. Jarquin.

2    That was the missing security guard.  12 is the Omni

3    incident report.  13 is the Omni Tourwatch wand data

4    policy.  14 is the Omni security policy.  15 is an Omni

5    security policy.  16 is an Omni security policy.  17 is an

6    Omni security policy.  18 is the Metro Police Department

7    crime data, 2001 to 2004, regarding a 2,000 foot radius of

8    premises.  No. 19 is a crime demographic I implemented

9    having to do with -- called CAP Score and a CAP Index.

10   And No. 20 is the Plaintiff's Brief in Response to the

11   Motion for Summary Judgment.

12          In addition, I have a list of depositions and

13   trials that I have testified to in the last four years and

14   six or seven pages of some pertinent testimony from

15   discovery which I have based my opinions on.  I believe

16   that's the file.

17      Q.    Very good.

18          Can we have your red book marked as Exhibit 2A,

19   please?

20          (Deposition Exhibit No. 2A was marked for

21   identification.)

22          THE WITNESS:  Being that Mr. Townsend was unable

23   to be here, I had faxed him this morning a copy of the

24   table of contents and the last page of the report with the

25   supplemental opinion, the last paragraph.

13

```
 1   BY MR. THORNBURG:

 2       Q.     Which leads me to my next question.  When did

 3   you prepare the opinion supplement in this case?

 4       A.     Last night during my file review.

 5              MR. TOWNSEND:  I assume you have that opinion

 6   supplement?

 7              MR. THORNBURG:  Yeah, I'm reading it right now.

 8              We're going to do some file surveying now.

 9   BY MR. THORNBURG:

10       Q.     The first binder clip here we see, we've got

11   Barnett Exhibits No. 1, 2, 3, 4, 6, 7, 8, 9, 10, and 11.

12       A.     Part of 5 is contained in my Exhibit 2A.

13       Q.     As it relates to the exhibits I just mentioned

14   here, there are some sticky notes and highlighting, and

15   I'm going to come around here because I'm going to ask you

16   some questions.

17              On Barnett what's been labeled -- or what is

18   contained within Exhibit 2, which is your file, Deposition

19   Exhibit Barnett 4, there's a sticky note, and highlighted

20   on the first page of Barnett 4 is "Seven stationary

21   cameras, five panning cameras."  What is the significance

22   of the highlighting and the sticky note on this page, if

23   any?

24       A.     As far as my opinion today, none.

25       Q.     Do you recall, Mr. Del Marva, why it is you put
```

14

1    the highlighting on Barnett Deposition Exhibit 4 contained

2    within your file?

3        A.    During my review of all the documents, I'll

4    highlight things, and it had some interest at that time,

5    but it does not now.

6        Q.    Do you have any opinions in this case about the

7    number of cameras in the facility or their placement?

8        A.    I do.

9        Q.    And what would those be?

10        A.    I think there should have been cameras in the

11    elevators.

12        Q.    Are you aware of any property in the United

13    States that's a four-star or four-diamond or higher that

14    has cameras in the elevators?

15        A.    The Omni is not a four-star, four-diamond.  So

16    you're looking for something higher than a four-star?

17        Q.    What do you believe the Omni is?  Is it a

18    three-star or is it --

19        A.    I think it's a three-star, four-diamond or

20    four-diamond, three-star, according to testimony.

21        Q.    Are you aware, sir, of any hotels with a similar

22    rating in the United States that would have cameras in the

23    elevators?

24        A.    Four Seasons normally do.

25        Q.    Four Seasons.  Are they -- what do you believe

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

1    the Omni is?

2         A.    What I believe it is?

3         Q.    Yeah, four-diamond or three diamond?

4         A.    According to the testimony -- I'll have to look

5    back.  According to the testimony, it's not a four and

6    four.  It's a three and four, and I believe this was

7    testified to by Scartozzi.

8         Q.    Is it a four-diamond or three-diamond?

9         A.    I would have to go back into his deposition.

10             It's a four-diamond, three-star.  And,

11   truthfully, the four-diamond, three-star really would have

12   nothing to do with the amount of security cameras.  AAA

13   nor Mobil really gets into that in their rating.  So that

14   has no relevance to -- the rating of AAA and Mobil has no

15   relevance to the level of security or the amount of

16   security cameras there should be.

17        Q.    Are you aware of any four-diamond properties in

18   the country that have security cameras in their elevators?

19        A.    I've seen them.  Can I list, give you a list

20   now, no.  But I know the Four Seasons has them.  Where I

21   saw them, I can't remember.  I make is a habit, when I go

22   into a hotel, to see if they're in the lobbies, in the

23   elevators.

24        Q.    Are you aware of any hotels in the Washington,

25   D.C. metropolitan area that's a four-diamond property that

16

1    has an elevator that has a camera in the elevator?

2        A.    Number one, I'm not aware of that; and number

3    two, it really doesn't make a difference to me whether

4    they have it or not.  It depends on my opinion as far as

5    what the individual premises should have had.

6        Q.    There's a Marriott property right across the

7    street from this hotel.  Do you know whether or not that

8    Marriott property has a security camera in its elevator?

9        A.    No, sir.

10       Q.    Are you aware of any three-star properties in

11   the country that have security cameras in the elevator?

12       A.    I can't give you any names at this time.  There

13   are a lot of three-star that have security cameras.

14       Q.    My question, sir, is, are you aware of any

15   three-star properties that have cameras in the elevators?

16       A.    Any three-star casino would have cameras inside.

17       Q.    Would you agree that a casino and a hotel

18   property like we're talking about are two different

19   things?

20       A.    Two different things meaning --

21       Q.    Meaning that the way casinos are run and the

22   types of cameras that they have are vastly different than

23   a hotel?

24       A.    Well, the casino security is divided into casino

25   security and hotel security, and the same standard exists

17

1      in the hotel portions as would exist at the defendant's

2      premises.  It's just a determination of whether or not

3      they felt necessary to use security cameras in their

4      elevators.  The standards don't differ.

5          Q.    Are you aware of any casinos that would be

6      considered a four-diamond property by the hotel rating

7      industries that would have cameras in their elevators,

8      security cameras?

9          A.    They might not be -- they might not -- as I

10     said, again, there's a separation between gaming and

11     lodging.  I know the Four Seasons in Las Vegas, which is

12     associated with the Mandalay Bay, has nothing to do with

13     gaming, but they do have cameras in their elevators, and

14     it's not considered a casino.

15         Q.    And you believe that the Four Seasons in

16     Las Vegas has security cameras in its elevators?

17         A.    Yes.

18         Q.    Do you know why they have security cameras in

19     their elevators?

20         A.    To monitor what goes on in the elevators.  I

21     mean the same way, in my opinion, that Omni -- Omni is not

22     a Marriott, and especially the one that we're speaking of,

23     it is not a Radisson; and they deal, according to their

24     director of security, with high-profile people and

25     dignitaries and so on and so forth and presidents and CIA

18

1    and FBI and Secret Service, and I believe that a

2    reasonable precaution for these dignitaries would be to

3    monitor them inside the elevators, also.

4         Q.    Why do you say that?  What's the basis for that

5    opinion?

6         A.    Just as a security procedure.  They're not

7    dealing with the average person.  They want to have a

8    level of security that, in my opinion, would be higher

9    than, as you said, the Marriott across the street.  They

10   cater to a different clientele.  They need a level of

11   security which would be greater than the Marriott across

12   the street or possibly another hotel in close proximity

13   that doesn't cater to those people.

14        Q.    When I read the report that you served on --

15   that was provided to me in September of this year and your

16   supplement, cameras are not mentioned in there --

17        A.    Correct.

18        Q.    -- the lack of cameras; is that correct?

19        A.    That's correct.

20        Q.    So your opinion about the cameras, that's

21   something that's not been disclosed until this morning,

22   when I took your deposition; would that be a fair

23   statement?

24        A.    You brought the question up, and reconsidering

25   everything now, that would be an opinion that I'm going to

19

1    render in this deposition as a discovery deposition.

2         Q.    I'll go back and ask my question again.  My

3    question, sir, is, fair to say that in your report, either

4    the one that was served in September when it was due or

5    your supplement that I was provided with 30 minutes ago,

6    cameras are not mentioned anywhere in that report?

7         A.    That's correct.

8         Q.    And you believe that cameras -- the Omni

9    Shoreham should have had cameras in its elevators,

10   correct?

11        A.    After further consideration, I would consider

12   that a reasonable step, yes.

13        Q.    Why should the Omni have had cameras in its

14   elevators?

15        A.    I believe I answered the question.  Based on the

16   clientele that they solicit.  You were making a comparison

17   between Omni and Marriott and other hotels, and we can't

18   make a comparison.  The comparison -- there is no

19   comparison.  I mean they stand out alone.  They cater,

20   again, to a clientele that, after reconsideration, I feel

21   that surveillance cameras inside the elevator would be a

22   reasonable step to increase the security.

23        Q.    And specifically the clientele you're referring

24   to are the VIPs, the foreign ambassadors, the dignitaries,

25   the President, the Vice President, Heads of State, those

**Shadday v. Omni Hotels**          **Fred Del Marva**
1:04-CV-1219-JDT-WTL                12/9/2005

1    types of folks, correct?

2        A.    Yes.

3        Q.    Do you know whether these individuals even use

4    the elevators in the lobbies?

5        A.    I have no idea.

6        Q.    Would it surprise you to find out that they

7    don't use the main elevators?

8        A.    It wouldn't surprise me.

9        Q.    Would it surprise you to find out that, in fact,

10   they use the service elevator?

11       A.    That wouldn't surprise me.  Does it change my

12   opinion?  No.

13       Q.    I guess what you're saying is, the hotel would

14   also need security cameras then in their service elevator

15   because that's what these folks would be using, correct?

16       A.    This is the first time I found out that they use

17   the service elevators, and I really have no opinion on

18   that.

19       Q.    I want you to assume that the dignitaries don't

20   use the main elevators.  They use the service elevator,

21   and it's privately operated by the hotel, by either the

22   director of security or the security officers or one of

23   the managers.

24            Would there be a need then to have cameras in

25   the main elevators, for example the elevator where this

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

21

1     assault took place?

2          A.    I still say that cameras should have been in the

3     main elevators, based on the clientele that they solicit.

4          Q.    And that clientele, again, is the dignitaries

5     and the VIPs and the Heads of State, correct?

6          A.    And their assistants and whoever comes with

7     them, their entourage.

8          Q.    Assume that the Omni Shoreham had a camera in

9     the elevator.  What would you say the camera should be; in

10    other words, what kind of camera?

11         A.    It would be just a regular closed-circuit

12    television with a wide-angle lens.  It doesn't have to be

13    a pan, tilt and zoom.  Something that's sufficient enough

14    to cover the entire elevator.

15         Q.    Assume that the Omni had a camera in the

16    elevator.  Would it have affected what happened in this

17    case in any way?

18         A.    In this case it wouldn't have, because there was

19    nobody downstairs monitoring the surveillance cameras,

20    which according to policy, there is supposed to be

21    somebody there.

22         Q.    Where is the policy, sir, that says that

23    someone's supposed to be monitoring the security cameras

24    at all times?

25         A.    Inside the depositions there's testimony that

22

1    the three security guards, one would be in the lobbies

2    area, one would be roving, and one would be in the office

3    looking at surveillance cameras, at the surveillance

4    monitors.

5        Q.    Whose depositions?

6        A.    Officer Del-Cid, Page 11, 13 through 21, while

7    not patrolling on his shift, he is located in the lobby,

8    one is stationed at the security office monitoring

9    cameras.

10        And on 12, 1 through 22, and 13, 1 through 10,

11    there was no one in the lobby.  They both were doing

12    patrols and no one was in the security office.

13        Page 15, 14 through 22, he can see down the

14    hallway to the west elevators when standing at the lobby

15    post.  Both the east and west elevators, they can see

16    both.  Part of their job responsibility includes

17    monitoring the video monitors in the security office.

18        Q.    My question, going back, sir, you said it was

19    a --

20        A.    Page 16, 1 through 21, there is someone always

21    monitoring the videocameras, even if there aren't any

22    incidents, and someone posted in the main lobby.

23        Q.    My question, sir, is, you earlier said it was a

24    policy of the Omni to have somebody constantly monitoring

25    videocameras.  Where do you get the opinion or what's the

**Shadday v. Omni Hotels**        **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**        **12/9/2005**

23

1    basis of the opinion that it's a policy?

2        A.    I believe I just read it.  Page 16, 1 through

3    21.

4        Q.    The security officer, the lowest ranking

5    official, sets the policy of the hotel is what you're

6    saying?

7        A.    Well, that's what -- well, this is his opinion.

8    This is what he believes his job description is; and under

9    those circumstances, that, to me, is a policy.

10        Q.    Okay.  So --

11        A.    If he is not following the policies, then

12    there's another problem.

13        Q.    Where is it a hotel policy that someone must be

14    stationed watching the videocamera?

15        What you're telling me is, Mr. Del-Cid said

16    someone does it, and because he said that and he believes

17    that's one of his job responsibilities, that's a hotel

18    policy?

19        A.    Correct.

20        Q.    So in your opinion, the lowest-ranking employee

21    sets the hotel policy; is that a fair statement?

22        A.    No, that's not a fair statement.  This is the

23    policy that he believes was implemented and in place at

24    the time he was working there.  Where he got that

25    information from, I can't tell you that.

24

1        Q.    We kind of got off on a tangent, and I do want

2   to get to your opinions, but I want to kind of close the

3   loop on cameras.

4              Other than placing cameras in the elevators in

5   the hotel, do you have any other opinions as to the number

6   or placement of surveillance cameras at this property?

7        A.    In any consulting that I've ever done, I've

8   always made suggestions that elevator banks be monitored,

9   and which would call for a surveillance camera outside the

10  elevator banks, which they didn't have at the time of the

11  incident.

12       Q.    So it would be another opinion that you have

13  that, first of all, you should have cameras in all the

14  elevators, correct?

15       A.    Correct.

16       Q.    And those cameras should be monitored 24/7,

17  correct?

18       A.    According to their policies, that was the

19  requirement.  According to my opinions, yes, in that

20  particular type of a hotel.  I'm not talking about any

21  other hotel.  That particular hotel.

22       Q.    What is -- when you say that particular type of

23  hotel, what do you mean by that particular type of hotel?

24       A.    Again, with the clientele that they solicit.

25       Q.    Which is what we've talked about?

**Shadday v. Omni Hotels**          **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**               **12/9/2005**

```
 1        A.     Correct.

 2        Q.     The dignitaries, the Heads of State?

 3        A.     Correct.

 4        Q.     Okay.

 5        A.     The crime demographic of the area.  It's not an

 6   uncommon practice for street people to walk into the

 7   lobby, as testified to by security, and it would be

 8   foreseeable that if there's no security guard inside the

 9   lobby area and a street person walks in, that they can

10   walk into the elevator; and that's the reason for

11   monitoring by surveillance the elevator banks and inside

12   the elevator.

13        Q.     In this case the person who committed the sexual

14   assault, we know who the person is, correct?

15        A.     Correct.

16        Q.     He was not a wanderer, correct?

17        A.     Yes.

18        Q.     He was, in fact, one of the members of the

19   Guatemalan President's entourage, correct?

20        A.     Correct.

21        Q.     And the Guatemalan President was staying in the

22   hotel at the time?

23        A.     That's what I understand, yes.

24        Q.     So we've got two new opinions this morning:

25   We've got cameras in the elevator monitored 24/7; we've
```

26

1    got cameras monitoring the elevators banks 24/7.  Any

2    other opinions as to the placement or location of cameras

3    in this property?

4         A.    No.

5         Q.    In your opinion, would cameras have prevented

6    this incident?

7         A.    Based on the protocols and the policies, yes.

8         Q.    Why do you say that?  How would the presence of

9    cameras have prevented this incident?

10        A.    They would have saw the incident outside the

11   elevator.  They would have saw the incident inside the

12   elevator.

13        Q.    And how would that have prevented it?  In other

14   words, they're on the elevator, according to Ms. Shadday.

15   You have her medical records, correct?

16        A.    Correct.

17        Q.    The record from Howard University says they had

18   oral, anal and vaginal sex, correct?

19        A.    That's what the records say, yes.

20        Q.    How would being able to see that on a

21   videocamera, someone monitoring in the security office,

22   how would that have prevented the assault?

23        A.    It would have been prevented.  Any action that

24   happened inside the elevator would have been prevented by

25   the observations of what happened outside the elevator.

27

1    So inside the elevator would have never happened if they

2    had monitoring on the outside of the elevator and they had

3    enough security guards and they would have responded in a

4    reasonable amount of time.

5        Q.    Do you have any idea how far the security office

6    is from the elevator?

7        A.    The security office had nothing to do with

8    preventing something.  I mean he would have dispatched

9    some message to the front desk or dispatched a message to

10   a security officer, and the front desk would be the most

11   likely person, the manager on duty at the front desk that

12   night.

13       Q.    Okay.  You've read Ms. Shadday's testimony,

14   correct?

15       A.    Yes.

16       Q.    How does she describe the length of this

17   assault?

18       A.    I don't recall.

19       Q.    In fact, doesn't she refer to it as very quick?

20       A.    I don't recall her wording.

21       Q.    So you believe that had there been a camera in

22   the elevator or outside of the elevator, this would have

23   been prevented?

24       A.    More likely than not.  I mean everything could

25   happen; nothing is perfect.  But more likely than not, and

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                        **12/9/2005**

 1    they would have acted, in my opinion, reasonably to have

 2    those cameras there.

 3        Q.    Would you also agree, sir, that if Ms. Shadday

 4    would have returned to the lobby, this incident would have

 5    been prevented?

 6        A.    There's a lot of hypotheticals that you can

 7    use --

 8        Q.    Yes or no.

 9        A.    -- to show that --

10        Q.    If she had returned to the lobby, would this

11    incident have been prevented?

12        A.    I don't know what you mean by return to the --

13    when; what time; at what point?

14        Q.    Tell me what your understanding is of this

15    incident.  What do you believe happened?

16        A.    She was on her way to the elevator.

17    Mr. Rodriguez followed her, assaulted her outside the

18    elevator, and I guess the elevator came, opened up, and

19    they went into the elevator and he assaulted her inside

20    the elevator.

21        Q.    You've read her deposition, correct?

22        A.    Yes.

23        Q.    In her deposition she said there were people in

24    the lobby, just patrons in the lobby, correct?

25        A.    I don't believe she said there were people in

29

1    the lobby.  I mean they were sitting with somebody, they

2    were sitting with some people there.  I don't know the

3    proximity from where they were sitting to the elevator

4    bank, if that could have been observed or not.

5        Q.    Have you ever --

6        A.    Mr. Townsend was supposed to bring a video with

7    him today, which was going to try and clarify that for me,

8    which obviously he can't attend and I'm unable to do that.

9    However, prior to trial I will do an on-site of the

10   premises.

11       Q.    Well, that was going to be my next question.

12   Have you ever visited this property?

13       A.    No.

14       Q.    Have you ever spoken with anyone from Washington

15   Police Department about the area this hotel was in?

16       A.    Haven't spoken to anybody, no.

17       Q.    Talked to Ms. Shadday?

18       A.    No.

19       Q.    Anything prevent you from talking to Washington

20   Police Department?

21       A.    At this point I didn't think it was necessary,

22   based on the documents that I received from them and based

23   on the crime demographic that I conducted.

24       Q.    Anything preventing from you talking to

25   Ms. Shadday about what happened in the incident?

                                                              30

1        A.    There was nothing missing in her statement or

2    what I've read that I think that I could glean anything

3    further from her.

4        Q.    Other than the CRIMECAST work you did on the

5    internet, did you go and do any outside research or

6    investigation on this case?

7        A.    Yes.

8        Q.    What did you do in addition to doing the

9    CRIMECAST?

10       A.    What do you mean, CRIMECAST?

11       Q.    Well, let me ask it a different way.  All the

12   information that you've looked at, all the paper stuff,

13   what was the source of that information?

14       A.    Some of it -- well, some of it came from

15   Mr. Townsend.  As far as the Tab 18, which is the

16   Metropolitan Police Department Central Crime Analysis

17   Unit, their crime demographic from May 20th, 2001 to

18   May 2nd -- excuse me, May 2nd, 2001 through May 2nd, 2004.

19   So that's theirs.  That's within a 2,000-foot radius.

20            Tab 19 is my crime demographic for the date of

21   the incident, which identifies 2500 Calvert Street,

22   Northwest as the center point of a three-mile radius and

23   the foreseeability of crime at that area compared to the

24   national score, comparing that area to the national and to

25   the state and to the county score.  This has to do with

31

1    homicide, rapes, robberies, aggravated assault, crimes

2    against persons, burglaries, larceny.

3         Q.    My question, Mr. Del Marva, and I don't mean to

4    be difficult, but my question is, other than doing the

5    CRIMECAST, what is the source of the information?  Did all

6    this come from the plaintiff's attorney?

7         A.    Everything came from the plaintiff's attorney

8    with the exception of Tab 19.

9         Q.    Okay.  Which is the CRIMECAST form?

10        A.    It's a CAP Index, yes, crime demographic.

11        Q.    You did not talk to anybody, obviously, from the

12   hotel, correct?

13        A.    Well, you know I'm not allowed to do that.

14        Q.    You did not -- you've not visited the hotel,

15   correct?

16        A.    At this time, yes.

17        Q.    Have you ever been to the area, not in

18   conjunction with this case, but have you ever visited the

19   area around this hotel?

20        A.    Many times.

21        Q.    When was your last trip to D.C. where you were

22   in the area of this hotel?

23        A.    I don't recall.

24        Q.    Has it been in the last year?

25        A.    No, probably last four years.

32

```
 1        Q.    Was it in conjunction with a case or was it a
 2   business visit, like pleasure, you know, or business?
 3        A.    It was another case I was working on down there.
 4        Q.    Do you remember what that case was about or what
 5   hotel property was involved?
 6        A.    I don't believe it was a hotel.  I believe it
 7   was a murder outside a club.
 8        Q.    Do you remember the name of the club or the
 9   area?
10        A.    No, but I stayed -- I mean the club was outside
11   the area, but I stayed in the Georgetown area; as a matter
12   of fact, not far from the Omni.
13        Q.    Do you remember where you stayed?
14        A.    No, I don't.
15        Q.    Is the Georgetown area, is that a higher crime
16   area than the 2500 Calvert Street, Northwest area?  Do you
17   know?
18        A.    I don't know.  I'm looking at the last four
19   years of testimony, and it was on -- I was deposed in that
20   case on April of 2000, and that had to do with Club
21   Diversity.
22        Q.    What number is that on your sheet there?
23        A.    No. 20.
24        Q.    You don't remember the name of the hotel you
25   stayed in at that time in conjunction with that case?
```

33

1          A.     It was a block or so away from the Four Seasons.

2     I don't remember.

3          Q.     Do you remember whether that hotel in

4     Washington, D.C. had video surveillance cameras in the

5     elevator?

6          A.     I don't recall.

7          Q.     Do you remember whether that property had video

8     surveillance cameras monitoring the elevator banks?

9          A.     I don't recall.

10         Q.     I think I know the answer to this question, but

11    other than the placement of surveillance cameras in the

12    elevators and then monitoring the elevators, do you

13    believe -- do you have any other opinions as to the

14    placement or number of videocameras at the Omni Shoreham

15    Hotel?

16         A.     No.

17         Q.     And it is your opinion that had they had

18    videocameras, this incident would have been prevented?

19         A.     It's my opinion that if they had videocameras,

20    that would have been a reasonable step to take, which was

21    not taken by them, and more likely than not it could have

22    been prevented or deterred.

23         Q.     Earlier you told me it would have been

24    prevented.  Now you've added deterred to that.  So you

25    believe it would have been prevented or deterred?

34

1      A.    I said more likely than not it might have been

2   prevented, and more likely than not it would have been

3   deterred.

4      Q.    Before we started down this path, the question

5   that I asked you was, if Ms. Shadday had returned to the

6   lobby, would that have prevented or deterred the assault

7   on the elevator?

8      A.    If she returned to the lobby?  Most likely,

9   sure.

10      Q.    Now, I want to make sure we're talking about the

11   same thing, okay, because you've not been there, so in

12   fairness to you.

13          Just so we're on the same page, I've shown you

14   Deposition Exhibit Barnett 9, which is contained within

15   Exhibit 2 to your deposition.  When I refer to the lobby,

16   I'm referring to the main lobby, okay.  You also have here

17   what they call the west lobby and an east lobby.

18   Generally, the hotel folks call it the west or east

19   promenades.

20          Ms. Shadday -- and correct me if I'm wrong --

21   has testified that the assault occurred somewhere in the

22   west -- began somewhere in this west promenade and then

23   continued on the elevator.  Is that your understanding of

24   what happened?

25      A.    That's the word she used.  I mean as far as me

35

1    determining where it happened, I can't, unless I would

2    actually have to be there with her showing me the exact

3    placement of where it started.  So I really can't answer

4    your question.

5         Q.    You read her deposition.  There were people back

6    in the main lobby here, out in front of the front desk in

7    the Marquee Lounge, correct?

8         A.    I believe that's what she testified to, yes.

9         Q.    In fact, some of the people she had been

10   visiting with that evening were still seated there; is

11   that correct?

12        A.    I don't know where they were seated.  I mean and

13   that's another -- that's another problem that I have until

14   I actually go there.  I can't tell you where they were

15   seated.

16        Q.    You've read her deposition.  There were bellman

17   out there; is that correct?

18        A.    I believe she testified to that.

19        Q.    And there were doorman out there, also?

20        A.    I don't remember that.

21        Q.    There were people at the front desk?

22        A.    Obviously there would be, yes.

23        Q.    Would you agree that it's more likely than not

24   that had she merely returned to the main lobby, this

25   incident would have been prevented?

36

```
 1        A.     Inside the elevator?

 2        Q.     Yes, sir.

 3        A.     Under a hypothetical, yes.

 4        Q.     Would you agree -- you've read her deposition,

 5   and she did not yell out help, stop, anything like that,

 6   before she got on the elevator; is that true?

 7        A.     Nothing in a tone that could have been heard,

 8   yes.

 9        Q.     Would it be fair to say that had she merely

10   yelled stop or help, that might have actually prevented

11   this assault on the elevator, also?

12        A.     I don't know.  You would have to get into

13   Rodriguez's head.

14        Q.     Might it also have alerted some of the hotel

15   employees back in the lobby or some of the patrons sitting

16   in the lobby, the main lobby?

17        A.     Depends how loud she was.  I don't know.

18        Q.     No other opinions on cameras besides monitoring

19   the elevator banks and cameras inside the elevators?

20        A.     No, sir.

21        Q.     Both of which should have been monitored 24/7?

22        A.     According to testimony of their security guards,

23   yes.

24        Q.     I'm not talking about -- I'm asking for your

25   opinions, Mr. Del Marva.  Do you believe there should have
```

37

1      been videocameras inside the elevators?

2          A.     Yes.

3          Q.     Do you believe there should have been

4      videocameras monitoring the elevator banks?

5          A.     Yes.

6          Q.     And do you believe that those should have been

7      monitored 24/7?

8          A.     I don't know 24/7.  Certain hours I don't

9      believe there should be a need for monitoring, 3:00, 4:00,

10     5:00, 6:00 in the morning.  So it would have needed to be

11     monitored at times that foreseeable problems could occur.

12         Q.     So the early morning hours would not be a time,

13     in your opinion, that the cameras would need to be

14     monitored?

15         A.     Early morning after 3:00 a.m.

16         Q.     Why after 3:00?

17         A.     Bars have closed down already, people who were

18     drinking are gone already.  Somebody checking into the

19     hotel at 3:00 in the morning, it's really unlikely.  You

20     know, an hour or two hours after the bar scene, there

21     would be no need, in my opinion, to monitor after that.

22         Q.     Would that hold true for just this property or

23     any property?

24         A.     Just this property I'm speaking of.

25         Q.     Obviously if you have a person that's assigned

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                        **12/9/2005**

38

1      to sit down and stare at a video screen, that person is

2      not out patrolling and walking the grounds; would that be

3      a fair statement?

4           A.    That would be a fair statement.

5           Q.    Would it ever be reasonable for that person who

6      is assigned to monitor those videos to leave to respond to

7      a call or to go patrol?

8           A.    Depending on the circumstances.

9           Q.    And what types of circumstances would it be

10     reasonable for a person who's assigned to monitor

11     videocameras to leave his station?

12          A.    Emergency, if an extra person is needed.

13          Q.    What kind of emergency?

14          A.    Something that would require an extra security

15     guard to respond.  I really have no -- I mean I can't --

16     I'm not prepared as of this minute to give you what type

17     of emergency.  Something that would require security.

18          Q.    Have you spoken to Mr. Rodriguez?

19          A.    No.

20                He's a defendant in the case, isn't he?

21          Q.    No, he's not.

22          A.    Oh.  I haven't spoken to him.

23          Q.    Have you made attempts to locate him or to speak

24     with him?

25          A.    No.  I mean there's no reason that I have to

39

1     speak to him.

2         Q.    Why is that?

3         A.    He pleaded guilty to rape and --

4         Q.    It's your testimony he pled guilty to rape?

5         A.    He pled guilty or plea bargained or whatever,

6     but he confessed.  So it's not like it didn't happen.

7         Q.    Do you know how long it takes for the elevator

8     at the Omni to get from the lobby level to the first

9     floor?

10        A.    No, sir.

11        Q.    Let's sort of go back to where we should have

12    started, which is with your background.  We've kind of

13    gone through your file.  Well, you know what, let me

14    finish your file first, and then we can do that.

15              There's a couple other highlightings here --

16        A.    Just hand it to me.  That's fine.

17        Q.    -- within Exhibit 2, which is your file.

18    Deposition Exhibit Barnett 6, the second page of that,

19    there's highlighting under the phrase "No CC TV system:

20    Camera selection, playback/recording, pan controls."

21        A.    Has to do with the job description of security

22    officers, that they have to know the security systems.

23        Q.    What is the significance of the highlighting and

24    the sticky on that page?

25        A.    Again, it's something that I initially

40

1     highlighted.  It might be a point of interest.  As I

2     continue to make my review down the line, it might become

3     a point of interest.  At this point it's not.

4          Q.     And then you've got --

5          A.     The next one is under Job Description, also.

6          Q.     Hang on.  This is Barnett 7, third page.  It's

7     highlighted "Conduct monthly safety committee meetings."

8     What's the significance of the highlighting there?

9          A.     Again, that's something that I highlighted

10    initially.  According to the job description, they have to

11    conduct a monthly safety committee meeting, which is

12    normal in the lodging industry, and I don't -- there's

13    nothing in that that is a cause of my concern.

14         Q.     The next one is --

15         A.     The same Barnett.

16         Q.     Perhaps it's the same Barnett exhibit.  What's

17    the significance of the highlighting under No. 21 there,

18    "Operate CC TV surveillance equipment"?

19         A.     This is basically a form filled out by each

20    security officer establishing what they have knowledge of;

21    and 21, it says that they have knowledge of operating a CC

22    TV surveillance equipment, that they are aware of how to

23    operate those cameras.

24         Q.     When were you provided with the depositions of

25    Mr. Scartozzi, Mr. Jarquin and Mr. McKeython?

41

```
 1        A.    I don't have a date that I received theirs.

 2        Q.    When you drafted your initial report, you did

 3   not have those; is that true?

 4        A.    I don't believe so.

 5        Q.    Did you bring with you a CV today?

 6        A.    Yes.

 7        Q.    Let's go -- I would like to go through that with

 8   you.  It's one of the tabs, I think, in your 2A.  That's,

 9   what, Tab 1?

10        A.    Tab 1.

11        Q.    The first paragraph in your CV says that you are

12   a court qualified expert.  When you say court qualified,

13   what do you mean by that, sir?

14        A.    I've qualified at trial about 35 times.

15        Q.    You've testified at trial about 35 times?

16        A.    Yeah, in about 15 different states.

17        Q.    And the 35 times you've testified in court?

18        A.    Yes.

19        Q.    Do you remember, were those for the plaintiff or

20   for the defendant?

21        A.    All 35 times?

22        Q.    Yes, sir.

23        A.    I don't know.  I don't recall.  Primarily my

24   percentage is about 70 percent plaintiff, 30 percent

25   defense.  The last couple of months it probably is more
```

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

42

1    defense than plaintiff.

2         Q.    Have you ever been subject to a Daubert

3    challenge?

4         A.    No.

5         Q.    Do you know what Daubert is?

6         A.    Yes.

7         Q.    Has anyone ever filed a motion to disqualify you

8    as an expert in the case?

9         A.    No.

10        Q.    You also say that you specialize in acts of

11   violence, slips/trips and falls, liquor liability and

12   overall industry standards compliance?

13        A.    Yes.

14        Q.    What do acts of violence mean?

15        A.    An assault on somebody.

16        Q.    Would this case be considered an act of

17   violence, in your opinion?

18        A.    Sexual assault is an act of violence, yes.

19        Q.    It could also be a battery, a murder, somebody

20   mugging somebody, something like that?

21        A.    Can be.

22        Q.    Slips/trips and falls, that's pretty

23   self-explanatory; just people falling down?

24        A.    Correct.

25        Q.    Liquor liability, what do you mean by liquor

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

                                                                    43

1     liability?

2          A.     I'm a dram shop expert.

3          Q.     When you say dram shop, that suggests that you

4     have some legal knowledge of what that is.  Explain for me

5     what you mean by dram shop.

6          A.     States that have a dram shop law, where the bar

7     and sometimes the employee of the bar could be held liable

8     for injuries sustained to a person.  If it had an

9     alcohol-related incident where somebody got drunk and hurt

10    or killed themselves or somebody got drunk and hurt or

11    killed someone else, the bar could be held liable for

12    those.

13         Q.     Basically, situations where a bar has overserved

14    somebody?

15         A.     Irresponsibly.

16         Q.     And they go on and hurt themselves or someone

17    else?

18         A.     That's correct.

19         Q.     You also list overall industry standards

20    compliance in the lodging and foodservice industry.  What

21    do you mean by overall industry standards compliance?

22         A.     Overall industry has to do with the operation

23    of, in this particular circumstance, hotels, everything

24    from checkin to checkout, housekeeping.  I mean I have

25    cases where people were severely bitten by bed bugs or

44

1    have to do with maintenance and cleaning, everything that

2    has to do with a hotel.  Basically, whatever standards

3    would exist in a hotel, whatever operational procedures,

4    I'm qualified to render an opinion on those areas.

5         Q.    You also listed here that you have been retained

6    in over 500 cases for the plaintiff and defense.  That

7    would be still 70 percent plaintiff, 30 percent defense?

8         A.    On an average, yes.

9         Q.    Have you ever been retained in a case in Indiana

10   besides this case?

11        A.    I'm sure I have.

12        Q.    Can you recall one?

13        A.    I can only go through my federal CV.  If it's

14   there, that's the only way I can recall.

15              Doesn't show any testimony that I've given in

16   the last four years in that state, but I'm sure I've been

17   retained in the state.

18        Q.    Look here on the first page, there's actually

19   Sturm versus Slippery Noodle in Indianapolis.

20        A.    Is there?  Okay.

21        Q.    No. 17.  Tell me about that case, if you

22   remember.

23        A.    I can't recall anything about that.

24        Q.    Do you recall the name of the plaintiff?

25        A.    No.

**Shadday v. Omni Hotels**            **Fred Del Marva**
1:04-CV-1219-JDT-WTL                12/9/2005

45

```
1      Q.    Or the defense attorneys in that case?

2      A.    No.

3      Q.    Is it a case for the plaintiff or the defendant,

4    if you know?

5      A.    I don't recall.

6      Q.    Just looking at your depositions this year --

7    it's No. 79 through 89 in your CV -- you've got Butcher

8    versus Town Pump in Billings, Montana.  That was in

9    January.  Do you recall that case?

10     A.    That was a dram shop case.

11     Q.    Were you for the plaintiff or defense in that

12   case?

13     A.    Plaintiff.

14     Q.    The next one you've got listed, No. 80, is

15   Foradori versus Captain D's in Tupelo, Mississippi?

16     A.    Yes.

17     Q.    Was that for the plaintiff or defense?

18     A.    Defense.

19     Q.    Do you recall who retained you in that case?

20     A.    I can't recall sitting here.

21     Q.    Was that a slip and fall?

22     A.    No, that was an assault.

23     Q.    Do you know what happened?

24     A.    Mr. Foradori was a patron, 16, 17 years old.  He

25   was in Captain D's, which is a fast-food type of, like a
```

46

1    fish Burger King.  He had friends in there and a bunch of

2    kids that worked there, they all know each other.  They

3    went outside and one of the off-duty employees who had

4    punched out already, they were horseplaying and he pushed

5    Mr. Foradori and Mr. Foradori went over an embankment and

6    became a quadriplegic.

7         Q.    No. 81 is Taylor versus Caesars Palace.  Are you

8    for the plaintiff or the defense in that case?  It says

9    it's in Atlantic City, New Jersey.

10        A.    Yeah, that was an underlying case.  It was a

11   security case at Caesars.  I believe Taylor was injured or

12   somebody assaulted.  The attorney -- her attorney never

13   did anything on the case and the day before trial there

14   was no discovery and another attorney took it over, and it

15   was a malpractice lawsuit and I was hired as the under

16   case on it.

17        Q.    Who were you hired by?  The person prosecuting

18   the malpractice case against her attorney --

19        A.    Yes.

20        Q.    -- or the person --

21        A.    Yes.

22        Q.    Looks like No. 82 is Xie, X-I-E, versus New

23   Station Restaurant.  Plaintiff or defense in that case?

24        A.    I believe plaintiff.

25        Q.    What kind of case is that?

1     A.    I think it had to do with a lazy Susan with a

2    pot of tea and a child.

3     Q.    No. 83 is Brinkmeyer versus Grand Casino in

4    Cincinnati?

5     A.    Yes.

6     Q.    Plaintiff or defense in that case?

7     A.    Plaintiff, dram shop case.

8     Q.    No. 84, Piper versus Microtel, Inc., or excuse

9    me, Microtel Inn.  Plaintiff or defendant in that case?

10     A.    Plaintiff.  That was where a six-year-old boy

11    fell out the window of the Inn and the mother dove out

12    after.

13     Q.    No. 85 is Woods versus TGI Friday's in

14    Los Angeles, California.  Plaintiff or defense in that

15    case?

16     A.    Plaintiff.  That's an inadequate security case.

17     Q.    What happened?

18     A.    Somebody was assaulted inside TGI Friday's.

19    This is a TGI Friday's that's different from any other

20    that I've ever seen.  Fifteen security guards at this TGI

21    Friday's.  It's owned by Magic Johnson in a pretty high

22    crime area.

23     Q.    Fifteen wasn't enough security guards in that

24    one?

25     A.    Not based on the circumstances.

48

1        Q.      No. 86, Peterson versus Ground Round.  Plaintiff

2   or defense?

3        A.      Plaintiff.  That was an assault outside the

4   Ground Round in a mall, death case, wrongful death.

5        Q.      No. 87 is Vaughn versus Harrah's?

6        A.      That's an assault, plaintiff.  That was an

7   assault by a porter on the plaintiff.

8        Q.      And you were retained by the plaintiff in that

9   case?

10       A.      Yes.

11       Q.      And No. 88 is Lisobee versus Southern Exposure

12  State.  Plaintiff or defense?  It's in Salt Lake, Utah.

13       A.      Plaintiff.  That's an assault in the parking lot

14  of a gentleman's club.

15       Q.      And Shadday versus Omni you've got listed here,

16  which is obviously what we're here on today.

17       A.      Yes.

18       Q.      In looking back, though, I see there's one,

19  No. 78, which was November 28 of '04, it's McGowan versus

20  Marriott in Oklahoma City, Oklahoma.  Was that a plaintiff

21  or defense case, if you remember?

22       A.      I don't recall.

23       Q.      Do you remember what happened in that?

24       A.      No.

25       Q.      The past 10 we've got, I asked you about --

49

1    actually, 11 if we count this one.  The last 11

2    depositions you've given, 10 of them were for -- you were

3    retained by the plaintiff and testified on behalf of the

4    plaintiff and one of them, which is the Captain D's case,

5    the Foradori versus Captain D's, was for the defense; is

6    that fair?

7        A.    That's correct.

8        Q.    In looking at this, it's pretty clear to me this

9    is pretty current, since you've got, actually, the

10   deposition today already on it?

11       A.    Yes.

12       Q.    So we'll mark this as 2B.

13            (Deposition Exhibit No. 2B was marked for

14   identification.)

15   BY MR. THORNBURG:

16       Q.    Earlier I asked you about what you specialize

17   in, and you said acts of violence, slips/trips and falls,

18   liquor liability, and overall industry standards

19   compliance.  The percentage of work that you do, how much

20   of it deals with, quote/unquote, acts of violence?

21       A.    Majority.

22       Q.    That can mean a lot, because majority is more

23   than 50 percent.

24       A.    Yeah.  Well --

25       Q.    What I'm going to ask you to do is sort of give

50

1    me a quantification of acts of violence, slips/trips and

2    falls, liquor liability and overall industry standards

3    compliance, if you can.

4         A.    Take 100 cases as a basis.  Out of 100 cases, I

5    would probably be retained in 60 dram shop, 35 acts of

6    violence/inadequate security, and the rest in slips/trips

7    and falls, food poisoning, any other incident.

8              However, a lot of the dram shops cross over into

9    acts of violence, also.  So probably acts of violence

10   would be the majority of work that I would do, 60 percent

11   of the work; but that would, again, have to do with dram

12   shop litigation, so I really can't separate it for you.

13        Q.    Is there a dram shop aspect in this case?

14        A.    There's no claim of dram shop, no.

15        Q.    In the second paragraph of your CV, you talk

16   about association with prominent law firms, Gerry Spence

17   and Melvin Belli, to name a few.  Those probably would

18   have been for plaintiffs in those cases, I assume,

19   correct?

20        A.    Yes.

21        Q.    And it says you did consulting expert work in

22   the Hilton Tailhook case in Las Vegas.  I assume that was

23   for the plaintiff, also?

24        A.    Yes.

25        Q.    I Can't Believe It's Yogurt murders in Austin,

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                      **12/9/2005**

51

```
 1    what was your involvement in those?

 2         A.    That was the plaintiff.

 3         Q.    Harris murder in Houston?

 4         A.    Plaintiff.

 5         Q.    Giant Stadium?

 6         A.    Plaintiff.

 7         Q.    Verni versus Aramark, 135 million dram shop

 8    verdict, I'm guessing you were for the plaintiff, because

 9    if you're for the defense, you probably wouldn't put that

10    on your CV?

11         A.    Yes.

12         Q.    Yosemite murders in California?

13         A.    Plaintiff.

14         Q.    And McDonald murders in Nova Scotia?

15         A.    Defense.

16         Q.    I'll get to work experience in a minute.

17               Okay, you've got in your fourth paragraph down

18    here, your company -- you say these companies, but I

19    assume that you're referring to FBI, Del Marva Corp.,

20    Special Events Security, et cetera, correct?

21         A.    Correct.

22         Q.    Your companies are retained by the country's

23    leading hotel and restaurant chains.  What leading hotel

24    chains in the United States have retained you?

25         A.    Well, retained me as a consultant?
```

**Shadday v. Omni Hotels**                     **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                          **12/9/2005**

52

```
 1      Q.    As a consultant --

 2      A.    In nonlitigation you're talking about?

 3      Q.    Correct.

 4      A.    Okay, nonlitigation, we've done work for

 5   Marriott, Sheridan, Holiday Inn, Wyndham, Weston,

 6   Radisson, Ramada, Embassy Suite, Doubletree.  Probably

 7   every major hotel chain in the country I've consulted for

 8   them or they've attended some of my workshops.

 9      Q.    Your resume says, "These companies are retained

10   by the country's leading hotel and restaurant chains."  I

11   want to stay on not when you might have spoken at a

12   seminar.

13      A.    Okay.

14      Q.    What I want to talk about is which of the

15   leading hotel chains have retained you or one of your

16   companies?

17      A.    Every one that I have just mentioned.

18      Q.    I'm going to look.

19            The companies you listed are Marriott, Sheridan,

20   Holiday Inn, Wyndham, Westin, Radisson, Ramada, Embassy

21   Suites and Doubletree.  What has the Marriott hired you to

22   do?

23            And I'm just going to use you, because it's

24   easier, and I'm going to kind of talk about you as the

25   companies that you've got listed on your CV.
```

**Shadday v. Omni Hotels**              **Fred Del Marva**
1:04-CV-1219-JDT-WTL                  12/9/2005

1       A.      We've provided a variety of services for

2    Marriott, and I'm not talking about Marriott Corporation.

3    I'm talking about individual managers from each Marriott

4    or management companies.  We've provided shopping services

5    where we would be retained to go into bar and restaurant

6    areas and identify any cash handling integrity problems,

7    bar and restaurant employees compliance with company,

8    corporate or local policies and procedures.  We've been

9    retained by them to do operation survey reports, where we

10   would check in as a guest for two, three days, four days,

11   depending on the size of the premises, and make

12   observations of everything that's going to be associated

13   with a patron's experience, from the groundskeeping to

14   lighting in the parking lot, to safety and security issues

15   from when you check in to when you check out, restaurants,

16   bars, housekeeping, rooms, catering, valet service,

17   concierge service, every aspect of the hotel, almost a

18   400-page report.

19       Q.      I'm correct this was not by Marriott

20   Corporation, correct?

21       A.      I'm sorry?

22       Q.      This was not by Marriott Corporation, by the

23   hotel company; it was by a local operator or owner?

24       A.      Some corporately operated and some franchised.

25   Can I differentiate them?  No, I really don't know which

54

1    is which.

2         Q.    When were these services performed?

3         A.    Oh, over the last 20 years.  I couldn't give you

4    dates.  There were numerous.

5         Q.    When's the last time you ever did any work for

6    Marriott, any Marriott hotel, as you just listed, cash

7    handling integrity problems, bar and restaurant,

8    employee --

9         A.    Probably five years ago.

10        Q.    Do you recall where these properties were?

11        A.    The one five years ago was in California.  The

12   rest of them are all over the country.

13        Q.    One of the things that you mentioned that you

14   did for Marriott was safety and security.  Are we talking

15   like development of safety and security policies or just

16   merely part of your operational survey reports?

17        A.    As part of the operation survey report, what we

18   do is, we go in in subrosa for two or three or four days,

19   and then after that, depending on what our client wants,

20   we could meet with management the final day and give them

21   a verbal of what the observations were and what our

22   suggestions are.  That could be followed by a written

23   report and, also, the three, 400-page check sheet.  In

24   certain circumstances we would examine their security

25   policies and procedures, examine their manuals, to see if

Shadday v. Omni Hotels                          Fred Del Marva
1:04-CV-1219-JDT-WTL                              12/9/2005

55

 1    we feel they are reasonable and will make suggestions to

 2    update them.

 3        Q.    In any of the services that you have provided

 4    for a hotel, for, as you describe them, leading hotel

 5    chains, did you ever make a recommendation that they

 6    install cameras inside their elevators?

 7        A.    When the circumstances required it, yes.  I mean

 8    we do consult --

 9        Q.    You have made that recommendation?

10        A.    Yeah, we do consulting in CC TVs and

11    surveillance equipment.

12        Q.    Do you recall what hotel chains you would have

13    recommended that they install closed-captioned

14    televisions?

15        A.    Closed-circuit.

16        Q.    I'm sorry.  That was stuck in my head.

17    Closed-circuit televisions inside their elevators?

18        A.    I believe Starwood was one of the corporations

19    we made suggestions to, one of their properties.

20        Q.    Starwood would include, for example, the Westin?

21        A.    The Westin, the W.

22        Q.    The Wyndham, Sheridan?

23        A.    Sheridan.

24        Q.    Who did you work for at Starwood?  Were you

25    actually employed by Starwood or was it by a local?

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                        **12/9/2005**

56

```
 1        A.     By local.

 2        Q.     Where was that done?

 3        A.     All I can tell you would be California.  That's

 4   the only information that I'm going to divulge as far as

 5   my clients are concerned.

 6        Q.     When was this work done?

 7        A.     A couple of years ago, two years ago, three

 8   years ago maybe.

 9        Q.     What were you hired by Starwood to do?

10        A.     Why we were hired?

11        Q.     What were you hired by them to do?

12        A.     We were hired to evaluate their surveillance

13   equipment.  Now, we weren't hired by Starwood.  We were

14   hired by a Starwood property.

15        Q.     What kind of hotel it was?  Was it a Westin,

16   Wyndham, Sheridan?

17        A.     It was a W.

18        Q.     And you made a recommendation that they should

19   put cameras inside of their elevators?

20        A.     No.

21        Q.     I might have misunderstood you.  You said that

22   you were hired to evaluate their surveillance equipment;

23   is that correct?

24        A.     To evaluate their securities and their

25   surveillance equipment.
```

57

1        Q.    Do you recall how many square feet this property

2    was?

3        A.    No.

4        Q.    Do you recall the kind of crime in the area?

5        A.    That was a consideration for our evaluation, and

6    I don't recall.

7        Q.    Was it in a high crime, low crime or moderate

8    crime area?

9        A.    I don't recall.  I'm sure we did a crime

10   demographic of the area, but I don't recall the numbers.

11       Q.    Similar to what you did here, this CAP Index

12   with the CRIMECAST program?

13       A.    Similar to that, yes.

14       Q.    Did you obtain records from the Police

15   Department in that case?

16       A.    I believe we did, yes.

17       Q.    And am I correct that you -- did you recommend

18   that they purchase more surveillance equipment?

19       A.    I don't remember what the recommendation was,

20   but I know we didn't recommend surveillance cameras inside

21   the elevators.

22       Q.    Did you recommend cameras to monitor the

23   elevators?

24       A.    I don't remember in this particular incident,

25   but that is a recommendation that we normally would make

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

1    depending on the circumstances.

2         Q.    That's going to be -- I guess where I'm going

3    with this is, what I need to know is -- where was this?

4    You believe this hotel was a W; is that correct?

5         A.    I know it was a W, yes.

6         Q.    Do you recall where it was located?

7         A.    I can't -- I won't -- I can't give you that

8    information.

9         Q.    You also listed Sheridan?

10        A.    Yes.

11        Q.    Well, first, I would be correct that you've

12   never been hired by Starwood; is that true; just by

13   properties that were affiliated with Starwood?

14        A.    Affiliated is a word that's bothering me.   I

15   don't know if they were licensees or franchisees or

16   corporately operated, so I don't know.   If they were

17   corporately operated, then I would have been hired by

18   them.

19        Q.    So you would be hired by the local guy, like the

20   general manager of the hotel or the hotel manager, to do

21   the work?

22        A.    Most of the time or the director of security.

23   But they would have to get approval from the corporate

24   office before they could retain me.

25        Q.    When did you last do any work for Sheridan?

59

```
 1        A.     I think we did a Sheridan property about five

 2   years ago.

 3        Q.     How about Holiday Inn?

 4        A.     Probably around the same time.

 5        Q.     What did you do for Sheridan when they hired you

 6   about five years ago?

 7        A.     Again, we did a multiple -- we could have worked

 8   at ten different Sheridans around the country, and we

 9   would do this.  Can I tell you exactly what we did?  No.

10   But if we did their work, the only thing we would do is

11   mystery shopping and operation survey reports and security

12   consulting.

13        Q.     Would it be a fair characterization to say that

14   most of the work that you've done for these hotels is more

15   in the alcohol purchasing/service kind of side of it?

16               And what I mean by that is monitoring the hotels

17   for -- at the restaurants and the bars and places like

18   that, to make sure they're not overserving and doing cash

19   and customer service is good in those locations?

20        A.     No, I wouldn't -- I don't think that would be

21   fair.  I mean if we were hired to do a mystery shopping

22   service, yes.  Most of our work would have to do with

23   quality assurance inspections and safety and security

24   surveys for the hotel chains.

25        Q.     Are you able to give me any location for a
```

60

```
1    Sheridan that you would have done, performed like a

2    quality assurance and a surveillance or a safety and

3    security inspection?

4         A.    We have confidentiality agreements with these

5    hotels that our reports or our findings are not going to

6    be disclosed.  I can't give you any locations.

7         Q.    We need to take your word on it that you've done

8    these things then; is that what you're telling me?

9         A.    Unfortunately, you're going to have to.  I can't

10   do anything else.

11        Q.    When's the last time you -- okay, I asked you

12   about Holiday Inn.  You told me about five years ago?

13        A.    Yes.

14        Q.    When's the last time you did any work at a

15   Wyndham?

16        A.    I don't recall.

17        Q.    It's been five years or more, probably?

18        A.    Could be.

19        Q.    How about a Radisson; when was the last time you

20   did anything for a Radisson?

21        A.    Probably also in the same period of time.

22        Q.    Five years or more ago?

23        A.    Yeah.

24        Q.    Same type of things that you've described for

25   the Wyndham and Radisson?
```

**Shadday v. Omni Hotels**          **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**               **12/9/2005**

61

```
 1        A.    Yes.

 2        Q.    Mystery shopping?

 3        A.    Yes.

 4        Q.    Quality assurance.  How did you refer?  I think

 5   it's quality assurance.  I'm not using the right phrase.

 6        A.    Mystery shopping, quality assurance and safety

 7   and security surveys.

 8        Q.    Ramada?

 9        A.    About the same time.

10        Q.    Embassy Suites?

11        A.    Maybe a little longer.  I don't recall.

12        Q.    And Doubletree?

13        A.    Probably longer than five years.

14        Q.    Those are both Hilton properties?

15        A.    Not at the time.

16        Q.    The Embassy Suites and Doubletree were not

17   affiliated with Hilton at the time?

18        A.    No.  Embassy Suite was Promise.

19        Q.    In any of your surveys that you've done in your

20   work for local Marriotts or local Sheridans, Wyndhams,

21   Westins, Holiday Inns, Wyndham, Radisson, Ramada, Embassy

22   Suites, Doubletree, have you ever recommended any of those

23   properties install cameras inside of their elevators?

24        A.    I don't recall on my recommendations.

25        Q.    When you visited --
```

**Arizona Reporting Service, Inc.**        **www.az-reporting.com**          **(602) 274-9944**
**Court Reporting & Videoconferencing Center**                                **Phoenix, AZ**

62

1        A.     They could have.  You know, I don't remember my

2     recommendations.  They could have had them.  I don't

3     recall.

4        Q.     In the last month, last calendar month, how many

5     hotels have you visited?

6        A.     As in what capacity?

7        Q.     In any capacity, whether it be for lunch,

8     whether it be to actually go do some type of work at a

9     hotel or work in conjunction with a litigated case.

10       A.     Five, six.

11       Q.     And in any of the hotels, the five or six hotels

12     that you visited in the last month, did any of those have

13     cameras inside of their elevators?

14       A.     I never took notice of it.  I didn't look.

15       Q.     In any of the five or six hotels that you

16     visited in the last month, do you recall video

17     surveillance cameras monitoring the approach to the

18     elevators or the elevator banks?

19       A.     I didn't look.

20       Q.     Are you able to name any hotel that has cameras

21     other than a casino hotel and you mentioned the Four

22     Seasons in Las Vegas?  Anything beside the Four Seasons

23     that has cameras inside the elevators?

24       A.     As I sit here today, can I name one?  No.  Do I

25     know there are?  Yes.  Do I recall them?  No.  It's not

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

63

1    uncommon.

2         Q.    It's not uncommon to have --

3         A.    It's not uncommon, no.  In a high-scale hotel,

4    in a Class A hotel, in a high-priced hotel, it's not

5    uncommon.

6         Q.    You believe it's more likely that a hotel -- a

7    higher class hotel will have cameras inside the elevators

8    or less likely that they'll have cameras inside the

9    elevators?

10         In other words, if we surveyed the hotels across

11   the country that are higher end hotels, let's say

12   three-diamond, three-star and up, what percentage of those

13   would have cameras inside the elevators?

14        A.    I have no idea.

15        Q.    Would most of them?

16        A.    I have no idea.

17        Q.    You believe that's common in the industry,

18   though, for hotels higher class or -- higher class hotels

19   to have cameras in the elevators?

20        A.    Again, depending on the circumstance and

21   depending on the clientele and depending on the location

22   of the premises, depending on incidents on the premises.

23   It's not unusual.

24        Q.    In the fifth paragraph of your CV, you say that

25   you're a lecturer, educator and trainer and you're a

**Shadday v. Omni Hotels**            **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**            **12/9/2005**

1    nationally acclaimed industry expert.  From whom have you

2    received I guess national acclaim?

3        A.   That's a good question.  I might even change

4    that national acclaim one day.  But I guess if -- I guess

5    when you're asked to speak on subjects throughout the

6    nation, when you've been retained in all of the 48

7    contiguous United States plus Alaska, Hawaii, Australia,

8    Dominican Republic, the Cayman Islands, Puerto Rico, you

9    have gained national acknowledgment.

10        Q.   Have you received any awards from any national

11    organizations for your work in the hospitality industry?

12        A.   I don't believe there are any.

13        Q.   Do you hold any designations or certifications

14    by any hospitality or security industry, trade group or

15    association?

16        A.   I'm a California licensed private investigator.

17    I'm a California licensed security guard company operator

18    and owner.

19        Q.   You saw that in Mr. McKeython's deposition he is

20    a certified lodging security director.  Do you hold such a

21    designation; are you a certified lodging security

22    director?

23        A.   You have to be a director of security in order

24    to get that, and once you're a director of security,

25    that's no big deal.  The American Hotel & Lodging

1    Association gives you that certification.

2        Q.   I suspect Mr. McKeython may disagree with you on

3    that statement.  But do you hold a certification as a

4    certified lodging security director?

5        A.   I'm not a director of security in the lodging

6    industry.  I'm not --

7        Q.   So the answer is no?

8        A.   I'm not employed by them.  That's why I don't

9    hold it.  And you have to be --

10       Q.   Have you ever --

11       A.   Excuse me.  You have to be employed by them in

12   order to hold it.

13       Q.   Have you ever worked as a security director at a

14   hotel?

15       A.   No.

16       Q.   Have you ever worked in security at any hotel?

17       A.   As an employee?

18       Q.   As a security officer, as a director?

19       A.   As an employee of a hotel?

20       Q.   Yes, sir.

21       A.   No, I've never been employed by a hotel.  I've

22   been self-employed for the last 35 years.

23       Q.   And did I hear you correctly you've never been

24   employed by a hotel?

25       A.   Never been employed as an employee by a hotel,

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                        **12/9/2005**

66

```
 1    correct.
 2         Q.    I want to talk about the statement in your
 3    resume that you're a nationally acclaimed industry expert,
 4    and you talk about speaking throughout the nation.  In the
 5    last year, where have you spoke?
 6         A.    In the last year I haven't spoke.  I've
 7    conducted lectures in over 35 hotel and restaurant
 8    associations throughout the country, colleges and
 9    universities, hotel and restaurant departments.
10         Q.    In the last year you've not spoken?
11         A.    No.
12         Q.    How about in 2004, did you speak anywhere?
13         A.    I think in 2000 I made a determination not to go
14    and travel anymore and do any speaking engagements.
15               Excuse me.  I'm sorry.  I think in 2003 I spoke
16    at the national convention for the American Trial Lawyers
17    Association of America in Canada on premises security,
18    casino security and liquor liability.  That was my last
19    speaking engagement.
20         Q.    In 2003?
21         A.    I believe it was 2003.
22         Q.    In the national convention of the American Trial
23    Lawyers Association -- you're a member of the American
24    Trial Lawyers Association?
25         A.    Am I a member?
```

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

 1        Q.     Yes, sir.

 2        A.     No, I'm not a member.

 3        Q.     The American Association of Trial -- or the

 4   American Trial Lawyers Association, that's a plaintiffs'

 5   organization, is it not?

 6        A.     Yeah, I believe it is, yes.

 7        Q.     You spoke at their national convention?

 8        A.     Yes.

 9        Q.     Who invited you to speak?

10        A.     An attorney who I guess is the chairman of the

11   security, liquor liability and casino division, if that's

12   the right word.  I don't know.

13        Q.     One of the things you have listed a few pages

14   back in your CV under Education is ATLA, which is the

15   American Trial Lawyers Association, which is an

16   organization of plaintiffs' attorneys, College of Advocacy

17   Seminar.  Did you attend an advocacy seminar program put

18   on by the American Trial Lawyers Association?

19        A.     Where is that, again?  I'm sorry.

20        Q.     Under Education.  It's the fourth item listed

21   under Education on Page 5 of your CV.  It reads "ATLA,"

22   which is American Trial Lawyers Association, "College of

23   Advocacy Seminar (Premises Liability & Premises

24   Security)."

25        A.     Right.  I attended it, and I also was a speaker

68

1    at that one, also, which was different than the other one.

2        Q.    So you attended advocacy training put on by

3    plaintiffs' lawyers?

4        A.    Correct.

5        Q.    And you spoke at it?

6        A.    And I spoke at that, also, on security issues.

7        Q.    Since we're talking about education and about

8    speaking, the last time you spoke was in 2003; is that

9    correct?

10       A.    I believe so.

11       Q.    Before that, when was the last thing you would

12   have spoken?

13       A.    Probably 2001.

14       Q.    And what was that?  Do you recall?

15       A.    And that was the ATLA.

16       Q.    Where did you speak at then?

17       A.    That was out here in Scottsdale, Arizona, maybe

18   '99.  No, couldn't be '99.

19       Q.    Another seminar put on -- national type seminar

20   put on by ATLA?

21       A.    Yes.

22       Q.    Prior to that, when was the last time you spoke?

23       A.    I think in '96.

24       Q.    And where did you speak at?

25       A.    That was the Missouri Restaurant Association and

69

1 the Ohio Restaurant Association.

2   Q. The last five years you've spoken twice; both

3 times were to groups of plaintiffs' attorneys, correct?

4   A. I don't know for sure.  Possibly, yes.

5   Q. Mr. Del Marva, I've asked you for the places

6 that you've spoken, and you've told me that you spoke in

7 2001 to an ATLA convention in Scottsdale, I think you

8 said, and then in 2003 you spoke at another ATLA

9 convention, which we've established is an organization of

10 plaintiffs' attorneys; and then before that you said the

11 last time you believe you spoke was in '96.

12   So, in fact, it's in the last, really, eight or

13 nine years that you have spoken.  You've identified two

14 times you've spoken, both of which were to groups of

15 plaintiffs' attorneys; is that correct?

16   A. That's correct.

17   Q. And you can think of no other places you've

18 spoken in the last nine years?

19   A. Not that I can recall, no.

20   Q. You also say that you're an acknowledged

21 authority on standards of care, management training, guest

22 security, responsible service of alcohol, et cetera,

23 et cetera.  The same type of rationale for that is that

24 you've been invited to speak and you've worked in cases

25 and things such as that?

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                       12/9/2005

70

 1        A.    Yes.

 2        Q.    In the sixth paragraph of your CV, you mention

 3   that you were an executive advisory board member at two

 4   distinguished colleges?

 5        A.    Yes.

 6        Q.    Where were you an executive board member,

 7   executive advisory board member; what were the colleges?

 8        A.    I believe it states right on Page 5, Executive

 9   Advisory Board Member, Hotel and Restaurant Department,

10   San Francisco City College; Advisory Board Member, Hotel

11   and Restaurant Department, Diablo Valley College; Chairman

12   of the Selection Committee for the Hotel and Restaurant

13   Department of San Francisco City College.

14        Q.    I apologize, I didn't see that.

15        A.    Okay.

16        Q.    So San Francisco City College and Diablo Valley

17   College?

18        A.    That's correct.

19        Q.    San Francisco City College is pretty

20   self-explanatory where that probably is, San Francisco,

21   California?

22        A.    Right.

23        Q.    Diablo Valley is where?

24        A.    It's in Mount Diablo.  It's not far from

25   Lafayette, California.  It's on the East Bay.

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                         **12/9/2005**

71

1      Q.     You list, also, that you've been published in

2   hospitality trade journals.  Do you have a listing of your

3   publications?  Is that on Page 5, also, at the bottom?

4      A.     Yes, it is.

5      Q.     What hospitality trade journals -- or I guess I

6   should say which hospitality trade journals have you been

7   published in?

8      A.     These four articles were in the National

9   Restaurant News, and these are articles that I've

10  published.  I mean as far as my opinions and as far as

11  other statements, they've been in various magazines and

12  newspapers throughout the country.

13     Q.     There are other publications that are not

14  contained on your CV here?

15     A.     Nothing that I've published as an article, but

16  just as being interviewed.

17     Q.     Somebody might call you and say what do you

18  think?

19     A.     Exactly.

20     Q.     I omitted to ask you this earlier.  When you

21  were an advisory board member for San Francisco City

22  College, when was that?

23     A.     I would say early '90s, possibly.  Late '80s,

24  early '90s.

25     Q.     How long did you serve in the capacity as an

72

1    executive advisory board member?

2        A.    Couple of years.

3        Q.    Chairman of the selection committee for the

4    Hotel/Restaurant Department at San Francisco City College,

5    how long?

6        A.    About the same time.  That, I think, was just

7    one term.

8        Q.    And then at Diablo Valley College, when you were

9    on their advisory board member?

10       A.    I don't remember if it was one or two terms.

11       Q.    Do you remember when it was?

12       A.    Late '80s, early '90s.

13       Q.    You list that you have been in the industry for

14   over 45 years.

15       A.    Yes.

16       Q.    We've established earlier that you've never

17   worked for a hotel?

18       A.    As an employee, that's correct.

19       Q.    You've got 25 of those years as an employee,

20   manager, 20 as an industry consultant, and 19 years as a

21   liability consultant.  When you say 25 of your 45 years

22   experience as an employee, who were you an employee of?

23       A.    Who was I an employee of?

24       Q.    Yes, sir.

25       A.    I don't remember my employers.

73

```
 1        Q.    You don't remember who you worked for?
 2        A.    The names of the persons?  No.  I mean they were
 3   all in the bar/restaurant business.  I think at the age of
 4   21 -- no, the age of maybe 25 or 26 I became
 5   self-employed, and I've been self-employed ever since
 6   then.
 7        Q.    I guess my question is, you say -- you list here
 8   25 of your 45 years as an employee, manager; and so I
 9   guess that's my question, is, in those 25 of those years,
10   who were you an employee of, who were you a manager of?
11   That's kind of --
12        A.    Various restaurants and bars and nightclubs.
13   Names, that goes back a long time.  I don't remember any
14   of those names.
15        Q.    Can you name -- when did you first enter the
16   industry?
17        A.    When I was about 15 years old, as a dishwasher.
18        Q.    Where?
19        A.    Part time in Long Island.
20        Q.    Do you remember the name of the place?
21        A.    It was a diner.  I don't recall the name.  It
22   was Town and County, Town and Country.  I don't recall.
23        Q.    I can maybe short-circuit this a little bit.
24   Hospitality industry is a pretty broad term.  It includes
25   hotels, resorts, you know, all kinds of things,
```

74

1    restaurants.  I would like to know what you've done in the

2    hospitality industry as an employee or a manager.  You

3    told me that you started at 15 as a dishwasher.  So kind

4    of run me forward.

5         A.    I've been a dishwasher, I've been a waiter, I've

6    been a bartender, I've been a cook, I've been a chef, I've

7    been a bar/restaurant owner, I've been a nightclub owner,

8    I've been a bar owner, I've been a restaurant, bar, hotel

9    consultant for over 20 years.

10        Q.    Before we get to that, I want to take it in

11   steps so I can -- we'll get to the 20 years as an industry

12   consultant in a minute.

13        A.    Okay.

14        Q.    I want to stay focused first on the 25 year as

15   an employee and manager.  You told me that you've worked

16   25 of your years as an employee, manager.  You've done

17   dishwashing, waiter, bartender, cook, chef, restaurant

18   owner, nightclub owner and a bar owner?

19        A.    Correct.

20        Q.    Anything else?

21        A.    I believe that's it.

22        Q.    And that time frame would have gone from --

23        A.    Catering.  I believe that's all.

24        Q.    That would have started when you were 15 and

25   would have been continuous up to about, what, 35ish, 40?

75

1        A.      No, less than that.  About 30, 28, 30.

2        Q.      If I do my math, that's only going to be about

3    15 years.  It says 25 of those years as an employee,

4    manager; and you've just told me that was 15.

5        A.      I guess it is.  I guess I would have been older.

6    I would have been older.  Whatever the math is.

7        Q.      So from 15, if you add 25 to that, that would

8    take you to 40?

9        A.      No, that would be wrong then, because I know I

10   started -- I believe in 1970 I came to California and --

11   well, no, I'm sorry, that would be right, yes.  That would

12   be right.

13       Q.      So you worked in the industry as an employee or

14   manager --

15       A.      And owner.

16       Q.      -- and owner, as a dishwasher, waiter,

17   bartender, cook, chef, restaurant owner, nightclub owner,

18   bar owner and in catering, you say, up until the time --

19       A.      Bouncer, I mean security issues.

20       Q.      Up until the time you were 40 years old?

21       A.      About 40.  That's close.

22       Q.      I'm not trying to trip you up, but your CV says

23   25 years, and if we do the math, 15 and 25 would come out

24   to be 40.

25       A.      Okay, that's fine.

Shadday v. Omni Hotels                Fred Del Marva
1:04-CV-1219-JDT-WTL                  12/9/2005

                                                              76

1        Q.     Is it correct?

2        A.     It sounds right, because I think in 1980 --

3   that's fine.  I think that's about right.

4               Yeah, that's right on the money.

5        Q.     You said you started when you were about 15.

6   What year would that have been, approximately, or exactly,

7   I guess?

8        A.     1955.

9        Q.     And you worked then up until you were how old?

10       A.     1980, I would have been 40 years old.

11       Q.     Okay.  Now, in your work life, and I use that

12  term in quotes, you know, as a -- when you were employed

13  by someone else, you never worked in hotel security; is

14  that correct?

15       A.     Never worked in hotel security, that's correct.

16       Q.     Yes.  Okay.  All of your work was -- you've

17  identified, you told me, waiter, bartender, a cook, a

18  chef, a restaurant owner, a nightclub owner, a bar owner,

19  catering and a bouncer, basically?

20       A.     Yes.

21       Q.     What are the names of the restaurants that you

22  owned?

23       A.     The only ones that I could remember, I believe,

24  are all itemized on Page 3 of my CV, where it goes 1971 to

25  1986 and 1993.

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                       12/9/2005

1      Q.    Are there other bars, lounges and restaurants

2    that you would have owned, operated and managed that you

3    didn't list here?

4      A.    There could have been.  I just don't remember

5    the names of them.

6      Q.    Are there other places that you owned that

7    aren't listed here?

8      A.    Not from 1971 to the present time, no.

9      Q.    Are there places that you owned before 1971 that

10   wouldn't be included here?

11     A.    There are some places that I was unidentifiable

12   owner or partner.  I was not on the record.  I was just a

13   silent partner, put it that way, prior to 1971.

14     Q.    What are some of the places that you would have

15   owned where you would have been -- prior to 1971 that you

16   would have been an unidentifiable or a silent partner?

17     A.    Where were they?

18     Q.    Well, what were the names?

19     A.    I can't even remember the names.

20     Q.    You can't remember the names of places that you

21   owned?

22     A.    Correct.

23     Q.    I'm assuming that to own them, you probably had

24   to put up some money to get an ownership interest in them?

25     A.    Not necessarily; just my experience.  At that

78

1    time I didn't have any money, so they just made me -- gave

2    me a piece of the action for operating and putting my

3    experience into it.  They had no experience in the

4    industry.

5        Q.    How many places were you an unidentifiable or

6    silent partner before 1971?

7        A.    Just maybe two of them.

8        Q.    And you cannot recall the names of either one of

9    the places?

10       A.    I don't remember the names.

11       Q.    Do you remember where they were located?

12       A.    They were located in New York.

13       Q.    City or State?

14       A.    State.

15       Q.    Do you recall the City that they were located

16   in?

17       A.    In Brooklyn.

18       Q.    What kinds of restaurants?

19       A.    One was a nightclub and one was a restaurant.

20       Q.    And you don't remember the name of the

21   nightclub?

22       A.    No.

23       Q.    Don't remember the name of the restaurant?

24       A.    No.

25       Q.    Have you ever been an owner, whether it be in

79

1    name or maybe unidentifiable silent partner, in any type

2    of a hotel property?

3         A.    No.

4         Q.    How about any type of a hotel management or

5    holding company?

6         A.    As an owner, no.

7         Q.    Just out of curiosity, did any of the

8    restaurants that you owned, were they in places where they

9    had elevators?

10        A.    One.  Two.

11        Q.    Did either of the elevators in those locations

12   have cameras, either in the elevators or looking at the

13   approach to the elevators?

14        A.    One was in a hotel, and I don't believe at that

15   time they had any surveillance equipment at all.

16        Q.    At the hotel?

17        A.    Yes.

18        Q.    Do you remember what kind of hotel it was or

19   what the name of the hotel was?

20        A.    It was the Hotel California.

21        Q.    Which restaurant was it?

22        A.    La Scala.

23        Q.    Which one?  Because there are several listed

24   here.

25        A.    It was La Scala 1.

80

 1        Q.      The Turf Club, does that still exist?

 2        A.      Yes.   The Turf Club, the Jockey Club and the

 3   Club House, I owned or leased and managed all of the food

 4   and beverage and catering at Bay Meadows Race Track.

 5        Q.      Where is that?

 6        A.      In San Francisco.

 7        Q.      So you owned -- so you leased the space to

 8   operate the restaurant and you --

 9        A.      Restaurant, bars and catering facility, yes.

10        Q.      And so you leased the space and you ran the

11   restaurant, bar and catering facility at the track?

12        A.      Correct.

13        Q.      The La Scala No. 3 here from 1980 to '85, does

14   that restaurant still exist?

15        A.      No.   None of the restaurants still exist.

16        Q.      Did you own, operate or manage La Scala No. 3?

17        A.      I owned everything under that section.

18        Q.      La Scala No. 3, La Scala No. 2, Silver Rose

19   Saloon, La Scala No. 1, Stage Delicatessen & Theatre

20   Lounge, and Eatcetera?

21        A.      Yes.

22        Q.      You owned operated and managed all of those

23   properties?

24        A.      Yes.

25        Q.      And none of the restaurants still exist; is that

81

 1    correct?

 2         A.    That's correct.  Well, I believe the Turf Club,

 3    the Jockey Club and Club House still exist.

 4         Q.    Fair enough.  You did say that earlier.

 5               Did you sell them to people, or did they go out

 6    of business?  What happened?

 7         A.    They were all sold.

 8         Q.    Where was the La Scala No. 3 located?

 9         A.    San Francisco.

10         Q.    Where in San Francisco?

11         A.    Cow Hollow.

12         Q.    Where is that?

13         A.    San Francisco.

14         Q.    I'm sorry.  Is it an area, is it a street; what

15    is it?

16         A.    It's not far from the marina.

17         Q.    Was it a stand-alone building, or was it

18    contained within something else?

19         A.    It was contained within something else.

20         Q.    What was La Scala No. 3 contained in?

21         A.    Other shops, a shopping area.

22         Q.    Okay.  Retail, retail shopping area?

23         A.    Yeah.

24         Q.    La Scala Restaurant No. 2, where was that

25    located?

1      A.      That was a self-contained building in Marin

2  County, not far from Napa.

3      Q.      Silver Rose Saloon?

4      A.      That was in San Francisco in the Polk Street

5  section.

6      Q.   La Scala No. 1?

7      A.      In the Hotel California.

8      Q.      Stage Delicatessen & Theatre Lounge?

9      A.      That was in the theater district in

10  San Francisco.

11      Q.      In a hotel or just in the district there?

12      A.      That was in a hotel.

13      Q.      Do you remember the name of the hotel?

14      A.      No.

15      Q.      Did that hotel have cameras monitoring the

16  elevators or inside the elevators?

17      A.      I don't believe they even have elevators.  It's

18  an old walk-up hotel.

19      Q.      Eatcetera, where is that located?

20      A.      In the financial area in San Francisco, in an

21  office building.

22      Q.      I'm not trying to trick you with this question,

23  but as I was thinking back when we talked about your

24  working as a restaurant owner and nightclub owner, a bar

25  owner, catering, bouncing, and dishwashing, waiter,

**Shadday v. Omni Hotels**              **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                    **12/9/2005**

83

1    bartending, cook and chef, you told me that you did that

2    up until the time you were 40, which is about 1980; but if

3    we look here, these are '71 to '86 and then '93.

4        A.    They overlap.  You see in 1980 I started my

5    hotel security company.

6        Q.    Uh-huh.

7        A.    So there's overlapping years.  It's not that I

8    went from one thing to another to another.

9        Q.    I got you.

10        A.    It just overlapped.

11        Q.    So your first 25 years weren't spent doing

12    restaurant owner, nightclub owner, bar owner, catering,

13    bouncer, waiter, dishwasher; there were some gaps there

14    where you would have opened your own company, and then

15    maybe gone back to that; is that what you're telling me?

16        A.    Correct.

17        Q.    You've got 20 years as an industry consultant.

18    You started doing industry consulting in 1986?

19        A.    1980.

20        Q.    1980?

21        A.    1980 I opened up Bottom Line Hospitality

22    Consulting.

23        Q.    What was Bottom Line Hospitality Consulting?

24        A.    It provided consulting services to hotels and

25    restaurants, specializing in management training,

84

1    management work, manual development, departmental

2    policies, procedures, safety and security evaluations and

3    hiring and firing procedures.

4         Q.    That's contained there on Page 3 of your resume,

5    correct, or your CV?

6         A.    Correct.  Yes.

7         Q.    You operated that from 1980 to 1985?

8         A.    Correct.  But in 1985 Del Marva Corporation --

9    the name changed to Del Marva Corporation, or in 1986 it

10   changed.

11        Q.    From 1980 to 1985, did your work in Bottom Line

12   Hospitality Consulting, did it tend to focus on anything

13   in particular?  The name Bottom Line, the reason I ask is,

14   that would suggest that maybe you were focused more on

15   shrinkage issues and things such as that?

16        A.    No.  It focused on exactly what it -- safety and

17   security evaluation, hiring, firing, overall operational

18   procedures of the hotel industry.

19        Q.    How much of your work for Bottom Line was done

20   for hotels and how much was done for restaurants?

21        A.    I would say 95 percent was hotels.

22        Q.    And of the 95 percent of the work that you say

23   you did at Bottom Line for hotels, what percentage of it

24   would be management training?

25        A.    I don't have a percentage.  I couldn't tell you.

85

1    The whole thing started at La Scala No. 1, which was

2    located in the Hotel California.  The owner of the Hotel

3    California had other properties, and he asked me to work

4    with him as a consultant on his other properties, dealing

5    with hotel operations, and that's where Bottom Line

6    started.

7        Q.   Did that work focus more on the restaurant side?

8    Because it would seem that would seem to be more of a

9    natural fit, if you're running a restaurant in the hotel,

10   that he would ask you to help him with the restaurants,

11   and then it might grow from there?

12       A.   It would seem that way, but it wasn't, because

13   La Scala No. 1 was a discotheque and nightclub and the

14   hotel was located in an area called the tenderloin, and we

15   had a lot of security procedures at our discotheque, and

16   he wanted me to bring some security into the hotel and

17   that's basically how it started.

18       Q.   What kind of security procedures did you have at

19   the restaurant?

20       A.   We had bouncers, I mean any security that you

21   would normally have in that type of an environment, in a

22   discotheque environment.

23       Q.   Were there any -- I think I might have asked you

24   this, but did any of these properties that you owned and

25   operated, did any of them have surveillance cameras?

86

```
 1        A.    No.  They were old properties.

 2        Q.    The Omni Shoreham is an old property, too; would

 3   you agree with that statement?

 4        A.    I wouldn't agree with that.  You have to look up

 5   the definition of old.  I mean the bricks might be old,

 6   but as far as the operational procedures and what the

 7   place looks like.  I'm talking old, I'm talking hotels

 8   that had no elevators.

 9        Q.    Do you know when the Omni Shoreham was built?

10        A.    Did I see it someplace?  Yes.  Maybe not even

11   related to this case.  But I don't recall.  Probably in

12   Scartozzi's deposition.

13              Could I just ask you -- I'm here, I mean it

14   doesn't make a difference to me -- how long you think

15   you're going to be?

16              MR. THORNBURG:  We can go off.

17              (A recess was taken.)

18   BY MR. THORNBURG:

19        Q.    We were talking about Bottom Line Hospitality,

20   which morphed into Del Marva Corporation; is that correct?

21        A.    Yes.

22        Q.    And that is a consulting company, or no?

23        A.    Del Marva Corporation?

24        Q.    Yes, sir.

25        A.    Del Marva Corporation is a hotel consulting
```

87

1    company and the entity in which I am testifying today

2    under.

3        Q.    And that does work as an expert for hire in

4    cases like we're here on and also does consulting work if

5    a restaurant, a bar, a hotel wanted to call and hire you,

6    you would do that work, too?

7        A.    Correct.

8        Q.    The work that you do as Del Marva Corporation,

9    what percentage of that work is done in consulting from

10   the standpoint of where you are providing work for the

11   hospitality industry, as opposed to testifying in --

12       A.    Legal consulting?

13       Q.    -- or legal consulting?

14       A.    I don't know.  I mean that question is asked

15   every deposition.  If you take the different entities,

16   Food & Beverage Investigations, Del Marva Corporation,

17   Special Events Security, Del Marva Investigative Group,

18   those are my four companies.  On an average month, if I

19   book in 12 to 15 jobs, out of the 12 to 15 jobs, 2 or 3

20   might be as a legal consultant.  The rest of them would

21   fall into the other entities.

22       Q.    Okay.  So that would leave somewhere between 9

23   to 10 jobs a month in the other entities, which is Food

24   and Beverage Investigations, for example?

25       A.    Special Events Security, Del Marva Investigative

Shadday v. Omni Hotels                      Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

88

1    Group or consulting under Del Marva Corporation, but not

2    as a legal consultant; as an industry consultant.

3        Q.    Just start from the top and work down here.  On

4    Page 3 of your CV, 1985 to the present you've worked for

5    Food & Beverage Investigation and you're the owner of FBI.

6    It's a California licensed investigative firm.  What does

7    FBI do?

8        A.    As it says, we specialize in clients that have

9    bars, restaurants, hotels, casinos, sports complexes,

10   convention centers, cruise ships.  Again, it's a variety

11   of services, from mystery shopping programs to quality

12   assurance surveys to security evaluations, anything that

13   deals with the operation of any entity that falls into the

14   hospitality industry.  And the same thing with Special

15   Events Security.  I just specialize in the hospitality

16   industry.  We don't do parking lots, we don't do office

17   buildings; just hospitality.

18       Q.    You brought up Special Events Security.  Does

19   SES provide security guard services, security guard

20   training, program development, et cetera, et cetera, does

21   it do that for hotels?

22       A.    Yes.

23       Q.    Has it done it for any hotels?

24       A.    Yes.

25       Q.    Which hotels?

89

1       A.      Again, we'll get into the same list; Marriott,

2    Ramada, Holiday Inn.  But I have to clarify.  It's a

3    security guard company.  We don't provide contract

4    security per se that we're going to have uniformed

5    security guards on the premises.  It's for special events

6    and it's only undercover.  It's all covert.  It's all

7    covert operations.

8       Q.      Okay.  When you say special events, what are you

9    talking about?  Are you talking like concerts?

10      A.      Dealing with hotels, if you just want to deal

11   with hotels, it's special conventions in hotels,

12   dignitaries at hotels, if there's functions.  About a year

13   ago we provided security for a funeral that had a

14   reception at a hotel after.  It's not just a general

15   contract security guard.

16      Q.      And you said these folks are all covert and

17   undercover; is that correct?

18      A.      Correct.

19      Q.      Don't wear any type of uniform?

20      A.      No.

21      Q.      Why not?

22      A.      Because, basically, we don't want to be

23   identified as being security.  I mean there are other

24   security.  The majority of the times there's police

25   officers there and there's hotel security there.  We're

Shadday v. Omni Hotels           Fred Del Marva
1:04-CV-1219-JDT-WTL           12/9/2005

90

```
 1    just retained for other reasons.

 2         Q.    What types of conventions have you been retained

 3    or has SES been retained to do work for?

 4         A.    Silicon Valley companies, when they have

 5    meetings or conventions at certain hotels.

 6         Q.    I guess that's my question.  Are you providing

 7    security for persons or for locations?

 8         A.    For the companies at locations.  Somebody is

 9    having something to do at a hotel; they'll ask us to come

10    in and be an additional security factor over and above the

11    hotel security.

12         Q.    So you might, for example, just to use Silicon

13    Valley, say the president, CFO and some of the higher-ups

14    might call you and say can you escort me, and you'll

15    accompany them to the conference or convention and provide

16    security?  That's what I hear you saying.

17         A.    No, it's not really an escort.  We're not an

18    escort service or an escort security.  It has to do with

19    securing the property, make sure that the property is

20    safe, make sure that the property has enough security.

21              I guess it's almost similar to what the director

22    of security in the Omni, I think he testified that

23    sometimes people come in with their own security and work

24    with him to make sure that the security at the hotel is

25    adequate for this particular event.
```

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

1      Q.     What types of dignitaries have you provided

2   security services for with SES?

3      A.     That would be mostly Silicon Valley.  I really

4   can't name the dignitaries or the companies, because we

5   also do -- we do phone sweeps and bugging device sweeps

6   and things like that, to ensure that the premises is

7   bug-free.

8      Q.     SES provides work at functions?

9      A.     That's a pretty good generic word, I guess.

10     Q.     Who works for SES?  Is it just you or do you

11  hire people?

12     A.     They're independent contractors on an as-need

13  basis, depending on what is needed and the skills required

14  for us.

15     Q.     Typically, who would a person work --

16     A.     Everybody that works with us would have to be

17  licensed as a private investigator.

18     Q.     Do you have any special police officers or

19  retired police officers --

20     A.     No.

21     Q.     -- or anything like that?

22     A.     No.

23     Q.     Former military folks?

24     A.     No.

25     Q.     How is SES different from the Del Marva

92

1    Investigative Group?

2         A.    Del Marva Investigative Group is a licensed

3    private investigator firm that provides assistance to a

4    select group of attorneys in criminal and civil

5    litigation.

6         Q.    How does one become in that select group of

7    attorneys?

8         A.    Just attorneys that I've known for years.  I

9    don't have time to do it for anybody else, so I mean if

10   they call me up, which they do, and ask me to do work for

11   them, I do it.

12         Now that we know each other, you can become part

13   of the select group.

14         THE WITNESS:  John, do you want to be in the

15   select group?

16         MR. TOWNSEND:  Sure, sure, sounds good to me.

17   BY MR. THORNBURG:

18        Q.    All right.  I want to go through Page 2, the

19   last paragraph there.  This sort of ties into what we had

20   done before.  On your CV there, you've got a listing of

21   various entities?

22        A.    Yes.

23        Q.    Hilton Hotels & Casinos, when you did work for

24   them, that was for the plaintiff or defense?

25        A.    Both.  I have had numerous occasions to be

93

```
 1    associated with Hilton.  I've defended them and I've

 2    worked on the other side with them, also.

 3         Q.   Isle of Capri?

 4         A.   Plaintiff.

 5         Q.   Grand Casino?

 6         A.   Plaintiff.

 7         Q.   Casino Magic?

 8         A.   Plaintiff.

 9         Q.   Sands Hotel & Casino?

10         A.   Defense.

11         Q.   Caesar's Palace Hotel & Casino?

12         A.   Plaintiff and defense.

13         Q.   Stardust Hotel & Casino?

14         A.   I think defense.

15         Q.   Sands Hotel & Casino?

16         A.   That's repeated.

17         Q.   That's just a double listing?

18         A.   Right.

19         Q.   Trump Castle Hotel & Casino?

20         A.   Plaintiff.

21         Q.   Bally's Hotel & Casino?

22         A.   Defense.

23         Q.   MGM Hotel & Casino?

24         A.   Plaintiff.

25         Q.   Resorts Hotel & Casino?
```

94

1      A.    Plaintiff.  The rest are all plaintiff.

2      Q.    So Mirage Hotel through the end are all

3   plaintiffs?

4      A.    Yes.

5            It's not that I'm not asked the same from

6   plaintiff and defense firms.  It's just a decision that I

7   make after speaking to the lawyer to determine whether or

8   not I can take the case or not.

9      Q.    You've got major speaking engagements.  I don't

10  want to go through all of these.

11     A.    Yes.

12     Q.    But you've got University of San Francisco.

13  When did you speak at the University of San Francisco?

14     A.    Late '80s, early '90s.

15     Q.    Do you remember what you spoke about?

16     A.    Had to do with hospitality-related security

17  issues.

18     Q.    Washington State University, when did you speak

19  there?

20     A.    Probably early '90s, also, and the same issue.

21     Q.    Which is?

22     A.    Hospitality industry, security-related issues.

23     Q.    When you say hospitality industry and

24  security-related issues, that's a pretty generic, not very

25  descriptive topic.  What was the focus or what did you

95

1    speak about?

2        A.    The exact content I don't recall, but I speak on

3    no other issues other than that.  I really can't tell you

4    what the subject was.

5        Q.    When you say hospitality security-related

6    issues, what does that mean to you?

7        A.    Safety and security issues.

8        Q.    And, again, that's a very amorphous description.

9    What does it mean?  Are we talking dram shop stuff; are we

10   talking having lights out in the parking lot.

11       A.    Combination of all.

12       Q.    Anything to do with safety and security of a

13   guest?

14       A.    Yes, definitely.

15       Q.    For example, that could mean, you know, lights

16   being out in a hallway?

17       A.    That could be part of an issue, yes.  Anything

18   to provide a safe and secure environment for that entity.

19       Q.    Could also mean making sure that things aren't

20   left on the floor, too, for example?

21       A.    In the hallways, yes.

22       Q.    People don't trip on them and that type of

23   stuff?

24       A.    Correct.  But it would be a combination of

25   everything, not just one issue.

96

```
 1        Q.     Of major hotel corporations, you have listed

 2   Holiday Inn Corporation as a major speaking engagement.

 3   When was that?

 4        A.     Probably in the early -- late '80, early '90s I

 5   was retained by the corporation.  I think they had all the

 6   controllers from all the properties around the country

 7   come, and that had to do with cash integrity.

 8        Q.     Aircoa Hotel Corporation?

 9        A.     Aircoa at that time was the largest independent

10   hotel operating company in the country, and that two or

11   three-day seminar had to do with hotel security.

12        Q.     In what fashion?

13        A.     Security, security guards, policies and

14   procedure development, implementation, areas of liability

15   regarding security issues.

16        Q.     You have got Security Associations, you're a

17   member of the American Society of Industrial Security?

18        A.     Yes.

19        Q.     Are there other security associations that would

20   apply to the hospitality industry?

21        A.     This is the largest or the main security

22   association in the country, ASIS; and I spoke to the

23   Lodging Division of the American Society of Industrial

24   Security, and that had to do with security guards and

25   security issues and policies and procedure development.
```

**Shadday v. Omni Hotels**          **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**          **12/9/2005**

97

1     Q.    When was that?

2     A.    Oh, I would also say probably early '90s.

3     Q.    Are there any trade group or industry groups out

4  there that have put out standards or have developed

5  standards that would apply to hotels and hotel security?

6     A.    No.

7     Q.    Do you know whether any of those are being

8  developed currently?

9     A.    I don't think anyone wants to take the

10  responsibility.  I mean I would expect that the American

11  Hotel & Lodging Association years ago would come up with

12  some sort of a standard, but they don't want -- I guess

13  they don't want to become liable for it, so it's just

14  suggestions; it's not a standard.

15     Q.    Are you a member of the AHLA?

16     A.    No.  I used to be years ago.  I've dropped it.

17     Q.    You have on your CV, also, that you did some TV,

18  radio, and print media, appearances and interviews.

19  You've got the Geraldo Rivera Show, "Deadly Discos."  When

20  was that?

21     A.    Also probably in the early '90s.

22     Q.    The Reporters, "Beware of Bouncers," I've never

23  heard of The Reporters.

24     A.    The Reporters is or was a show that was like

25  Current Affair.

**Shadday v. Omni Hotels**                    **Fred Del Marva**
1:04-CV-1219-JDT-WTL                              12/9/2005

1       Q.      Is it a local or national show?

2       A.      It was national.

3       Q.      Do you remember when you would have been on The

4    Reporters show?

5       A.      Again, it would be probably the early '90s.

6       Q.      San Francisco Channel 2 Morning Talk and KSFO

7    Talk Radio, you've got listed "Hotel Security."  What, was

8    it kind of -- was it like a call-in type format, or what

9    was that all about; do you remember?

10      A.      There had been some security issues at hotels in

11   the San Francisco area, and I was asked to come on and, I

12   guess, be a caller commentator, for lack of a better word,

13   and just explain how hotel security operates.

14      Q.      Wall Street Journal.  Strike that.

15              When were you on the San Francisco Channel 2

16   Morning Talk and KSFO Talk Radio?

17      A.      Early '90s.

18      Q.      How about the Wall Street Journal?

19      A.      I don't remember when that came out.

20      Q.      Why were you in the Wall Street Journal?

21      A.      Had to do with security.  I was interviewed for

22   my opinions regarding some security issues.  I don't

23   remember what security issues they were.

24      Q.      Did it have to do with a hotel, a bar, a disco?

25      A.      I don't recall what it was.

99

1      Q.     Do you remember when it was?

2      A.     No.  Again, probably in the early '90s.

3      Q.     You've got trade publications.  What trade

4    publications?

5      A.     I couldn't even list them.  I mean there must be

6    50 different publications that I've been interviewed

7    through over the years having to do with security issues

8    at restaurants, bars and hotels.

9      Q.     Do you keep copies of these materials?

10     A.     No.

11     Q.     You've got ABC News, the Glenn Campbell

12   incident?

13     A.     Yes.

14     Q.     Was this national or local?

15     A.     I think this was local.

16     Q.     Do you remember where?

17     A.     Scottsdale, Arizona.

18     Q.     What happened?

19     A.     He was driving and he hit a vehicle and he left

20   the scene.  They followed him to his house, and he was

21   visibly intoxicated.

22     Q.     What was your, I guess, role in that?

23     A.     They interviewed me on television; had to do

24   with some dram shop issues and about bars overserving

25   people.

Shadday v. Omni Hotels                      Fred Del Marva
1:04-CV-1219-JDT-WTL                          12/9/2005

100

1        Q.      Do you remember when that was?

2        A.      Maybe last year.

3        Q.      Have you been featured or have you been on a

4    television show, radio or print, either appearance,

5    interview, what have you, other than the Glenn Campbell

6    incident min the last ten years?

7        A.      No.

8        Q.      Have you published anything in a trade -- when

9    was the last time you published an article?

10       A.      Probably early '90s.

11       Q.      When was the last time you were interviewed for

12   a trade publication?  Has that been more than ten years

13   ago?

14       A.      Oh, it could happen once a month up until, I

15   think, a couple of weeks ago.  Somebody called me from

16   Hotel Security.  I don't remember what it was.

17       Q.      What was the name of that trade publication?

18       A.      I think it was called Hotel Security.

19       Q.      Do you remember -- that was within the last few

20   months?

21       A.      I think it was about two or three months ago,

22   yeah.

23       Q.      What was the gist of the call?

24       A.      Had to do with women traveling alone, what

25   special precautions the hospitality should take for women

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

101

```
 1   traveling alone.

 2        Q.    Did you get a copy of that article?

 3        A.    No.

 4              (An off-the-record discussion ensued.)

 5              (Mr. John Townsend exited the deposition via

 6   telephonic communication.)

 7              (Ms. Carol Townsend entered the deposition via

 8   telephonic communication.)

 9              (A lunch recess was taken from 12:50 p.m. to

10   1:09 p.m.)

11   BY MR. THORNBURG:

12        Q.    Mr. Del Marva, do you recall when you were first

13   contacted by the plaintiff's attorney in this case and

14   retained?

15        A.    You mean as far as first contacted, I wouldn't

16   have that information; but on Tab 2 I have a retainer

17   agreement from Mr. Townsend dated 5-19-05 and a copy of a

18   check dated 5-20-05.

19        Q.    So the contact would have occurred sometime,

20   obviously, before that.  Whether it's a day or a month or

21   two months, you don't recall?

22        A.    That's correct.

23        Q.    Thank you.  What do you recall about your first

24   conversation; in other words, what was your scope of

25   engagement?
```

102

1        A.      Verbatim, I couldn't tell you.  Basically, that

2    he had a client who was assaulted in the elevator at the

3    Omni Hotel; that the assault took place outside the

4    elevator prior to inside the elevator; and I don't recall

5    any other information.

6            I guess we discussed the standard of care in the

7    industry or we discussed some security procedures,

8    possibly; or more likely than not we did, and at that time

9    I faxed him or e-mailed a CV, fee schedule, and retainer

10   agreement, and I heard back from him on the 20th.

11       Q.      Were any limitations placed upon what you were

12   allowed to do in this case?

13       A.      No.

14       Q.      And what were you asked to do?

15       A.      I was asked to review the documents and

16   determine whether or not I could render an opinion one way

17   or the other on whether the conduct of the defendant

18   contributed to the injuries sustained by the plaintiff.

19       Q.      We were provided with a report in this case and

20   then a supplement attached to the bottom of that this

21   morning and an affidavit.  The opinion report that was

22   initially dated September 15, 2005, I think that's Tab --

23   what is it -- 5?

24       A.      Tab 3.

25       Q.      Tab 3 in Exhibit 2A.  Did you create any drafts

103

1    of this report?

2         A.    I don't know.  I don't know if you mean -- what

3    draft?  I mean I do it on the computer, I'll change it and

4    I'll keep on working on it until it's done.  So I mean did

5    I fax or provide Mr. Townsend with any copies prior to

6    this, is that what --

7         Q.    No, I'm asking about when you drafted it, did it

8    go --

9         A.    Oh, when --

10        Q.    When you actually authored it, did it go through

11   a drafting process?

12        A.    It goes through a drafting process until I'm

13   through.  I mean I spent almost seven and a half hours on

14   the report.  So within that seven and a half hours, it

15   went through a drafting process over a couple of days.

16        Q.    You didn't keep any of your drafts?  You kept

17   working and revising until it was in a final form, which

18   is what we see today, correct?

19        A.    On the computer, yes.  Correct.

20        Q.    Did you ask for materials from Mr. Townsend that

21   he was unable to provide?

22        A.    No.  I think he provided everything that I

23   requested of him at that time.

24        Q.    And do you recall what you requested at the

25   time?

104

1      A.      I wanted him to get a crime demographic of the

2      area, contact the police to find out 911 calls in the

3      area, an overall view of the crime statistics of the area,

4      incident reports; and I don't believe I asked him anything

5      else at that time.

6      Q.      Have there been follow-up requests that you've

7      made to provide additional or more materials?

8      A.      After my file review over the last couple of

9      days --

10     Q.      When you say the last couple of days, you mean

11     the last past few days or --

12     A.      Past few days.  And in my file review for my

13     deposition, I come across the Omni Shoreham Hotel Manual

14     at Tab 13 having to do with specific tasks.  It has to do

15     with a download Tourwatch wand, W-A-N-D; and basically

16     what that is, it's like a detects clock, where security

17     officers walk around and they wand a certain computer

18     thing on the wall, and that times them in at what time

19     they passed that station.

20             And after reviewing this, I believe this

21     morning, I spoke to Mr. Townsend and asked him if he could

22     obtain that information for me.

23     Q.      The significance of that would be?

24     A.      To see how frequent the rounds were, to see

25     where the security guards were on the night of the

105

1    incident, how long they spent that time in that area.

2         Q.    What do you believe would be a reasonable amount

3    of patrols or reasonable amount of time to spend in an

4    area?

5         A.    I don't know.  It would have to do with a lot of

6    different circumstances.  I just want to see what they

7    had.

8         Q.    As you sit here today, you don't have any idea

9    what would be reasonable as to patrols and the amount of

10   time spent in a given area?

11        A.    Not for that hotel, no.

12        Q.    Obtaining the Tourwatch, how would that help you

13   formulate your opinion?

14        A.    I don't know until I have -- until I see it.

15   Just something of interest to me.  I don't know if it's

16   going to make a difference one way or another, but just

17   something of interest.

18        Q.    Is there a certain amount of patrols you would

19   expect a hotel of this size to do on an hourly or nightly

20   or shift basis?

21        A.    I couldn't tell you that.  I would have to visit

22   the hotel first in order to determine that.

23        Q.    When you were retained, were you told that you

24   could not visit this property?

25        A.    No, I wasn't told I couldn't.  I just didn't

106

1    have the time to do so.

2         Q.    And what about visiting the property would help

3    you to determine the number of patrols that would be

4    needed?

5         A.    I understand it's a million square foot

6    property, and I would have to basically walk around the

7    hotel to see what areas and how long it would take to get

8    to those areas and what would be a reasonable amount of

9    time to reach those areas, and then you have to take into

10   consideration the event that was occurring at the time of

11   the incident and how often they should be in a lounge when

12   the bar was open, when the bar closes.

13        Q.    Are your opinions complete as we sit here today?

14        A.    I would like to reserve the right to supplement

15   my opinions upon the reviewing of opposing counsel's

16   security expert, if one so happens to be designated.

17        Q.    Are there folks out there, other security

18   experts, who you think are good or bad?  In other words,

19   you know, hey, I've worked with, you know, Joe and Joe is

20   a good guy or Joe knows what he's doing, or I've worked

21   with Sam and Sam's a joke, he doesn't know anything?

22        A.    There's a limited amount of security experts

23   dealing with hotels and the industry, and I say that

24   because these are people that I come up across all the

25   time in similar type of cases.

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                         **12/9/2005**

107

     1        Q.      Who would those types of --

     2        A.      I don't feel comfortable in addressing it.

     3        Q.      You don't feel comfortable telling me who you

     4    think is decent or who you think is not so good?

     5        A.      Not at this time.

     6        Q.      Would there be a time that you might be able to

     7    do something like that?

     8        A.      Possibly after you disclose your expert.

     9        Q.      You can reserve the right to say whoever I hire

    10    is not so good, huh?

    11        A.      Yeah.

    12        Q.      Well, let's just talk about the universe then.

    13    Not saying whether they're good or bad, who are some of

    14    the guys that you say you routinely come up against?

    15        A.      Right.  I wouldn't -- I don't feel comfortable

    16    in addressing their names, honestly.

    17        Q.      Why is that?

    18        A.      Just I don't think it's right or I don't think

    19    it's fair.

    20        Q.      Not fair to mention their names?

    21        A.      Well, exactly, I mean who I think is good, who I

    22    think is bad, who I think I come up with.

    23        Q.      Well, that's not -- I've stepped back from who

    24    you think is good or bad.  Just people who you come up

    25    against.

108

1        A.     Yeah, I would rather not answer that question.

2        Q.     Well, I hate to be difficult, but that's

3    something that you have to answer, actually.  It's not a

4    privileged question.  It's not an inappropriate question,

5    in my opinion.  So if you refuse to answer it, I'll have

6    to certify it and take it up with the judge, perhaps.

7        A.     Maybe I'll answer it at that time.

8        Q.     Are you refusing to answer my question then?

9        A.     I don't think it has any probative value to my

10   opinion, and, therefore, I'm not going to -- there's no

11   need for me to answer that question.

12       Q.     You are refusing to answer my question?

13       A.     I would -- under these circumstances, I would

14   defer to Mr. Townsend.  Since he's not here, then I -- I

15   will defer to him, I will speak to him.  In the event he

16   says I should, then on the correction sheet on the

17   deposition, I will do so.

18       Q.     Okay.  I think that's a fair way to deal with it

19   then, and so we'll just certify the question; and the

20   question that we're certifying for you to consult

21   Mr. Townsend, which is fair, is just the name of the folks

22   that you routinely come up against.  Again, not saying

23   who's good or who's bad; just who are some of the guys you

24   routinely encounter.

25       A.     That's fair.

Q. Let's go ahead now and talk about the methodology, if you will, that you employed to reach your opinions.

How did you get to your opinions?

A. The methodology is and has to be always the same. I read all of the documents that are generated in discovery, all the responses to discovery, investigations that are conducted by other parties, investigations that are conducted by myself, inquiries that are made to other parties. That, along with my 20-some-odd years as a safety and security consultant working on hundreds of security-related cases, reading thousands of depositions from different security guards, taking into consideration the type of a hotel, the location, the clientele, the level of security, the level of training; and at that point I put all this information together and render an opinion on whether the methodologies and principles employed by the defendant were consistent with those that would be employed by a reasonable operator given the same circumstances and whether or not the policies and procedures were adequate and reasonable, whether they were complied with; and make a final determination as to whether the conduct of the defendant, again, contributed to the injuries sustained by the plaintiff.

Q. Let's just talk about these things for a minute.

110

1    You reviewed documents, you said, is one of the things

2    that you've done; and we've identified all of the

3    documents you've reviewed, correct?

4        A.    That's correct.

5        Q.    And, in fact, there's a list of them which you

6    provided at the time that you issued your original report;

7    do you recall doing that?

8        A.    Yes, and since then I've amended that.  Well, I

9    didn't amend that document, but in addition to that

10   original document on the Table of Contents on my

11   Exhibit 2A, it lists other depositions that I didn't have

12   at that time.

13       Q.    In the documents you reviewed in your initial

14   report, you've listed 12 items, and now in your report

15   you've got 20.  If I do the math, that makes 8.  That

16   makes 8 different things?

17       A.    Some of the 20 are taken out from the original

18   documents, so they're part of those original 12.  The only

19   other documents that I've reviewed that are not on that

20   report I would believe would be the deposition of Mario

21   Jarquin, the deposition of Ralphaello McKeython and the

22   deposition of Todd Scartozzi.

23       Q.    Okay.  So you reviewed all of those, correct?

24       A.    Correct.

25       Q.    And you've actually done some summaries and

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

111

 1    brought those along in your binder with you?

 2         A.    Correct.

 3         Q.    As I looked through your Exhibit 2A on break, I

 4    noticed that some of the writing is in black and some of

 5    it is in red and some of it is even highlighted?

 6         A.    Correct.

 7         Q.    What's the significance of the different colors?

 8         A.    Are you talking about typewritten colors?

 9         Q.    Yes, sir.

10         A.    The significance are, the red is the most

11    pertinent facts of the case, as far as I'm concerned.  A

12    lot of it has -- most of those have to do with the bases

13    for my opinions, the most important things that I've

14    gleaned from these depositions.

15         Q.    The summaries that are contained in your file

16    that you brought with you today, did you prepare those, or

17    were those prepared by some other person?

18         A.    I prepared them.

19         Q.    Did you actually do the typing, or did someone

20    else do the typing?

21         A.    I do the typing.

22         Q.    You told us you reviewed the discovery responses

23    of the parties; is that correct?

24         A.    Yes.

25         Q.    You mentioned investigations that were done; you

112

1      looked into the investigations done in the case?

2          A.    Yes.

3          Q.    You also mentioned other party inquiries.  What

4      do you mean by other party inquiries?

5          A.    Inquiries made by Mr. Townsend to Metro Police.

6          Q.    And one of the things that you did was, you

7      looked at -- you said you considered -- well, just go to

8      your analysis real fast.  It's on Page 2 of your report.

9              The first thing in the analysis, "Hotel

10     operators are not guarantors or insurers of the safety of

11     their guests."  What do you mean by that statement?

12         A.    It is something that is understood or should be

13     understood in the industry; that we, as operators, I mean

14     hotel operators, are not going to be responsible for

15     anything that happens to a guest at any time.  There are

16     accidents that can't be prevented.  There are

17     circumstances which can't be prevented.  The only thing

18     that an operator has a duty to do is just to provide

19     reasonable care, period.

20         Q.    So, for example, somebody could fall down in a

21     hotel, to use a bad example, and it really not be the

22     hotel's fault?

23         A.    Exactly.

24         Q.    A person could suffer a crime at a hotel and it

25     could be that it's not the hotel's fault, for example?

113

1        A.     Under certain circumstances, definitely.

2        Q.     The next thing you say then under your analysis

3    is that they, meaning hotel operators, have a duty,

4    nondelegable, to provide reasonable care.  That's just a

5    continuation of your thought, correct?

6        A.     That's correct.

7        Q.     To me, that sounds a lot like legalese when you

8    say nondelegable.  What was the source of the phrase

9    "nondelegable" and what does that mean to you?

10       A.     I don't know what the source is.  I mean I've

11   been using this format since I began to write reports.  I

12   think it started with, I think, a proposition.  I think I

13   started realizing things with Proposition 51, I think, in

14   California where somebody sued a hotel.  I'm not sure of

15   the circumstances, but it had to do with somebody suing

16   the hotel; the hotel said that the security guard company

17   was responsible for it; and, basically, they said that the

18   hotel is going to be responsible.  You can't delegate

19   those duties to a contract security guard company.

20   They're going to be your responsibility.

21              So when management, corporate management, local

22   management try to delegate responsibilities, it's not a

23   delegable duty.  It's the hotel is going to be responsible

24   for the conduct of their employees.

25       Q.     Do you know what Washington, D.C. law is in

Shadday v. Omni Hotels                          Fred Del Marva
1:04-CV-1219-JDT-WTL                            12/9/2005

114

1    regard to innkeepers?

2         A.    No, I don't.  I'm not here to testify on legal

3    issues, and I don't know.

4         Q.    So --

5         A.    I mean I'm testifying onto an industry standard

6    and not a local or state standard.

7         Q.    Do you know what the law is in Indiana, for that

8    matter, on what an innkeeper's duty of care is?

9         A.    I have no idea what the law is, no.

10        Q.    The statement "nondelegable duty to provide

11   reasonable care," that comes from California?

12        A.    Well, no, that comes from me.  I mean it doesn't

13   come from -- there was an issue in California, but that

14   comes from me.  That is something known throughout the

15   industry.  A hotel operator cannot say, well, the security

16   guards did wrong and, therefore, it's their duty and not

17   my duty.  I mean under respondeat superior, you do have a

18   duty for the conduct of your employees.

19        Q.    You say the crime statistics is one of the

20   things that you used in your analysis, correct?

21        A.    That's correct.

22        Q.    And you used, if I'm understanding this, 439, is

23   that correct, as the CAP Score that you came up with?

24        A.    No.  I believe the report says based on my

25   research, I've concluded the Omni Hotel is in a moderately

Shadday v. Omni Hotels                            Fred Del Marva
1:04-CV-1219-JDT-WTL                              12/9/2005

                                                                    115

1      high crime area with a CAP Score of 395, compared to 100

2      which is the national average.  The CAP Score for

3      robberies in that area is 439 as compared to a national

4      average of 100.  So it's --

5          Q.    Where is that data in your Exhibit 2A?

6          A.    On Tab 19.

7          Q.    You select the parameters to run the CAP Index;

8      is that correct?  In other words, when you go to the web

9      site, you buy the service; is that correct?

10         A.    That's not a web site.  This is a company that

11     I've been using for 15 years.

12         Q.    But you can get to there from the internet,

13     true?

14         A.    You know something, I don't know.  They might,

15     they might be internet-wise.  I don't know.  I call them

16     personally.

17         Q.    You contacted them and you set the parameters

18     for the search; is that true?

19         A.    The only parameters I set is that I need a score

20     at 2500 Calvert Street, Northwest, Washington, D.C., 20008

21     for the year 2004.  That's the only parameter I give them.

22         Q.    And flip a couple pages back and look at that.

23         A.    This?

24         Q.    Explain to me the significance under Tab 19 of

25     the different colors.

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

116

1        A.      The different colors, basically, on the bottom

2    there's a CAP Index for the year 2004; and green is from

3    zero to 99, and that would be considered the national

4    average; yellow is 100 to 199; pink is 200 to 399; another

5    color pink is 400 to 799; and red would be 800 to 2000.

6        Q.      My question is, when you look at these tables,

7    there's an X there at 2500 Calvert Street, Northwest; is

8    that correct?

9        A.      That's correct.

10       Q.      If you look in the table, that's in a yellow

11   area; is that correct?

12       A.      That's correct.

13       Q.      Which would be in an area that's in the 100 to

14   199 range, true?

15       A.      That's correct.  But that doesn't go out -- no,

16   the range would be in a three-mile radius, which would be

17   up into the 439.

18       Q.      That's why I was asking you the question.  The

19   radius that is selected, that's something that you select,

20   correct?

21       A.      No, this is a standard with this company.

22       Q.      CAP uses 3?

23       A.      Everyone uses 3.  Most security consultants use

24   3, I've used 3, a lot of the Police Departments use 3.

25       Q.      And what that takes into account is crime that

117

```
 1     is three miles away, correct?

 2          A.     Within a three-mile radius, correct.

 3          Q.     You've not been to this property; is that true?

 4          A.     I have not been inside this property.

 5          Q.     And you've not looked at the geographic

 6     boundaries that might exist, like interstates or highways

 7     and things such as that?

 8          A.     I know the -- for this case, no.  I mean I know

 9     the area.  I've been in the area many, many times, so I'm

10     familiar with the area.  I have had cases a couple of

11     blocks away from that.

12          Q.     For example, the Vice Presidential residence is

13     just a few blocks from this property; is that correct?

14          A.     That's correct.

15          Q.     The owner of the Washington Redskins is directly

16     behind this property, correct?

17          A.     I believe so, yes.

18          Q.     And if we look at that map, the area -- when

19     Mr. McKeython, for example, testified that the area the

20     hotel is in is pretty safe and quiet, this immediate area

21     around the hotel, this CAP Score would tend to support

22     that opinion, wouldn't it?

23                 It's only when you project out three feet away

24     that you get into the red -- or excuse me, three miles

25     away, that you get into the red and pink areas where it's
```

118

```
 1    relatively high crime?

 2         A.    Well, no, in less than a mile you still get into

 3    the pink, on 18th Street, on Ontario Road, on Rock Creek

 4    Parkway, Hillyer Place, Corcoran.  So --

 5         Q.    Up around Georgetown, for example, higher crime

 6    areas?

 7               As you look at that map, do you know where the

 8    Georgetown area is when you look at that map?

 9         A.    I really don't know where it is, no.

10         Q.    The Rock Creek Parkway, for example, down around

11    Dupont Circle, you don't know -- I mean those very well

12    could be different areas of the city that might be a

13    little bit higher crime than the area -- I'll use an

14    example.  We're here in Phoenix, Arizona, aren't we?

15         A.    Yes.

16         Q.    You would agree that the area around the

17    Biltmore Estates is a pretty nice area; is that right?

18         A.    Well, then we have to say what do you mean by

19    around; what was your determination of around?

20         Q.    As you go down to, say, 24th Street and start

21    going south, gets a lot rougher, doesn't it?

22         A.    Yes.

23         Q.    And would you consider like the area around the

24    Biltmore Shops or the Biltmore Hotel to be a high crime or

25    moderately high crime area?
```

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                       12/9/2005

1        A.     I don't know.  I never did a crime demographic

2    of the area.

3        Q.     What are the value of the homes around the

4    Biltmore; million-dollar-plus homes?

5        A.     Yes.

6        Q.     And if we use sort of that general area and take

7    a three-mile radius, then we would pull in some relatively

8    high crime areas, wouldn't we?

9        A.     Yes.

10       Q.     I suspect that the people who live in the

11   Biltmore area that's gated when you drive up to the

12   Biltmore, they probably wouldn't consider them to live in

13   a high or moderately high crime area, would they?

14       A.     I don't know what they would consider, but I

15   think logically they would say no.

16       Q.     So, for example, when we -- if we talked to the

17   owner of the Washington Redskins, would he maybe consider

18   that he lived in a moderately high crime area?

19       A.     I don't know.

20       Q.     Maybe the Vice President of the United States,

21   who just lives a few blocks from this hotel, do you think

22   his folks would think he lived in a moderately high crime

23   area?

24       A.     I don't think his folks are alive.

25       Q.     The Vice President?

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

1        A.     Cheney's?

2        Q.     I don't mean folks in that term, parents.  I

3    mean the people that work for him.

4        A.     Oh, I don't know what they would think.  I mean

5    is D.C. in that area considered an extremely, extremely

6    safe place by everybody in the country?  No.

7        Q.     What I'm asking, though, is, if we look in the

8    area sort of around this hotel going around Calvert Street

9    and all that, basically, if we go the other side of

10   Connecticut to the top of the page as we look at this

11   page, if we go towards --

12       A.     That would be the middle of the page.

13       Q.     I'm doing it in its portrait fashion, if we hold

14   it in a portrait fashion.

15       A.     Okay, go ahead.

16       Q.     We'll just orient it correctly, okay.

17       A.     Okay.

18       Q.     If we look to the right of this, we see that the

19   crime is higher to the right; is that true?

20       A.     Yes.

21       Q.     In fact, we see an area down here in the bottom

22   right that's 1,467?

23       A.     Correct.

24       Q.     That's very high?

25       A.     And you see an area close to the one-mile

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                       12/9/2005

121

1    perimeter is 896.

2         Q.    That's correct.  But if we look then in the area

3    that sort of surrounds the hotel, that's immediately

4    around the hotel --

5         A.    Yes.

6         Q.    -- it's generally in the zero to 99 or the 100

7    to 199 area?

8         A.    According to this survey, that's what it shows,

9    yes.

10              And if you look at the crime demographics in a

11   2,000-foot radius of the hotel which is provided to us,

12   that's a moderately high crime area, with all the mansions

13   and the owner of the Redskins and the Vice President and

14   everything else.

15        Q.    Why do you say that's a moderately high crime

16   area?  You've got the incident reports; is that right?

17        A.    Yeah, Tab 18.  This is from the Metropolitan

18   Police Department Central Crime Analysis Unit, and in a

19   three-year period of time, in this wonderful area, as

20   you're trying to describe it to be, there was --

21        Q.    Well, in all fairness, sir, you have never been

22   to this hotel, correct?

23        A.    I could have been to the hotel.  Do I remember

24   it?  No.  But in this area that you're describing, there

25   was --

1    Q.    Well, it would seem to me -- I mean I don't want

2    to argue with you, but it would seem to me that if you're

3    going to call it a moderately high crime area, you might

4    want to visit it; would you agree with that?

5        A.    No, and I'll tell you why.  Because the

6    methodology that security experts use is to take data like

7    this and determine whether or not.  They don't have to

8    visit the hotel.

9        Q.    So it's better to judge the security level of a

10    hotel without even visiting it?

11        A.    That's the facts.

12        Q.    You look at statistics and say, ah-hah, we got

13    to do this, right?

14        A.    The facts show that it's a moderately high crime

15    area.  In this wonderful area, 2,000 square feet, there

16    was over 200 cars stolen.

17        Q.    Now, do you know whether that data is reports or

18    actual incidents?

19        A.    I don't know what it is.

20        Q.    Because you never talked to Washington, D.C.

21    Metro Police, true?

22        A.    Correct.  This is the information that according

23    to them, this is what they think the area consists of.

24        Q.    Might a good source of information about the

25    relative level of crime in the area, which is considered

**Shadday v. Omni Hotels**                          **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                              **12/9/2005**

123

1    District 2, might a good source of that information be the

2    police commander who is in charge of District 2?

3         A.    And that would be the gentleman that the

4    director of security speaks to every once in a while?

5         Q.    Commander Contee, I believe is his name.

6         A.    Contee, right.  This is the same Contee that the

7    director of -- vice president of operations never spoke

8    to?  Would that be a great source?  Possibly.  I don't

9    know what they speak to.  I mean they go have lunch.  I

10   don't know what they speak about.  According to testimony

11   from the director of security, their conversations had

12   nothing to do with crime in the surrounding area, but only

13   had to do with 9/11 and different color alerts.

14        Q.    According to the director of security?

15        A.    Yeah.  That's what I gleaned from that, is that

16   it had to do with -- they would meet whenever there was a

17   different alert or red alert.

18        Q.    It's your testimony that the security director

19   at the Omni Shoreham Hotel, based on your review of the

20   depositions, would only meet with Commander Contee or

21   speak with Commander Contee when the terror alert level

22   changed; is that true?

23        A.    I mean that's what I read in his wording.

24        Q.    You don't recall Mr. McKeython saying that he

25   spoke with him weekly?

124

1       A.      On what issues?

2       Q.      On security in the hotel or in the area.

3       A.       It was very vague about what their conversation

4    was.  It was very distinct as far as the level of security

5    was with their meetings.

6       Q.      And you don't believe they speak weekly on

7    security?

8       A.      I have no idea.

9       Q.      That's not in the deposition?

10      A.      I don't remember reading it.  It could be, but I

11   just can't remember.

12      Q.      And this is the deposition you just read last

13   night, I think you said?

14      A.      No, I didn't say that.

15      Q.      When did you read it?

16      A.      I read these depositions when I first got them

17   from Mr. Townsend, maybe two weeks ago.

18      Q.      So within the last two weeks, you read it,

19   though?

20      A.      Yes.

21      Q.      You have got a summary of the deposition of

22   Mr. McKeython there somewhere; is that correct?

23      A.      That's correct.

24      Q.      Would you take a look at that; find it for me,

25   if you would, and take a quick look at it?

1      A.    Yes.

2      Q.    In your summary of Mr. McKeython, do you make a

3   note anywhere as to the frequency of his contacts with

4   Commander Contee or the subjects that they discuss when

5   they meet or talk?

6      A.    I don't think it's in my summary.  It is

7   probably addressed in his transcript.

8      Q.    What is the purpose of doing research on crime

9   statistics?  Why do you do that?

10      A.    I'm sorry, can you repeat your question?

11      Q.    What is the purpose of looking at crime

12   statistics?

13      A.    The purpose of looking at them is the reason why

14   thousands of companies around the country retain a company

15   like CAP Index to do a crime foreseeability, to determine

16   what the crime foreseeability is in the area; and in doing

17   so, then they are able to develop a level of security

18   that's going to be reasonable under those circumstances.

19      Q.    Simple answer to that question would be to find

20   out the level of crime in the area; agree with that

21   statement?

22      A.    To find out the level of crime in the area and

23   use that to determine the level of security that's going

24   to be needed.

25      Q.    I want you to assume that Mr. McKeython has

1    testified and will testify that he talks and meets with

2    Mr. Contee, Chief Contee, daily, if not weekly, and they

3    discuss the security at the hotel and crime in the area.

4          A.    Okay.

5          Q.    Does that change your opinions in any way?

6          A.    No.  I mean every day he's going to meet with

7    him and discuss the crime in the area?

8          Q.    No, I said that he will testify that either

9    daily or weekly he speaks with Mr. Contee, Chief Contee,

10   about what's going on in the area, crime, crime trends and

11   security at the hotel.

12         A.    If that's his testimony, that's his testimony.

13   I'm not going to rebut that.

14         Q.    Does that change your opinion in any way?

15         A.    No, not at all.

16         Q.    In any case that you've worked in before or

17   worked on before, has the hotel been a hotel like the one

18   at the Omni Shoreham in Washington, D.C.?  And what I mean

19   by that, is it a hotel where Presidents have Inaugural

20   Balls or where foreign dignitaries stay on a routine

21   basis?

22         A.    Not as routine as the Omni.

23         Q.    In fact, if we watched the news last week,

24   President Bush actually spoke at the Omni Shoreham Hotel;

25   do you recall that?

Shadday v. Omni Hotels                      Fred Del Marva
1:04-CV-1219-JDT-WTL                         12/9/2005

127

1       A.      Yes.

2       Q.      In your review, did you take into account or did

3   you notice that the Secret Service meets with the folks at

4   the Omni Hotel and security director to review and audit

5   the security procedures at the hotel?

6       A.      I think that's a little vague and ambiguous.

7   The security procedures at the hotel?  I don't think they

8   do.  I don't think they meet there to find out the

9   security procedures.  I think they just meet with them to

10  determine the amount of security that's going to be needed

11  for that particular event, not to evaluate their security

12  procedures.

13      Q.      And why do you say that, sir?

14      A.      Because I know that that's what -- they wouldn't

15  do that.  They wouldn't go in to look for their policies

16  and procedures manual.

17      Q.      They wouldn't go in and check to see, for

18  example, how many security guards work at the place?

19      A.      They would see how many security guards worked

20  at the place, yes.

21      Q.      Wouldn't check on how many doors are locked and

22  secured, the level of cameras, those types of things?

23      A.      I don't know if they would do the level of

24  cameras.  Doors locking, yes, I would agree with that.

25      Q.      Do you believe the Secret Service would be a

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

128

1      good source of information about the relative level of

2      crime and the security policies and procedures that exist

3      at a given location?

4          A.    You're not going to like this answer, but, no, I

5      don't think they're a good source for that.

6          Q.    And why is that?

7          A.    They have their work that they have to do.

8      They're not going to go in and do crime demographics of

9      the area.  I mean there's other people that do that for

10     them.  I mean the Secret Service can be flawed, also.

11     They're not -- I mean there's things that they do that

12     sometimes cause problems, too.  It's not that they're

13     the -- you can't say they're the perfect agency that could

14     prevent anything from happening.  I mean President Reagan

15     was shot, wasn't he?

16         Q.    Yes, and --

17         A.    Among all these trained Secret Service agents,

18     right?

19         Q.    Do you know what the Secret Service does when

20     they go to the Omni Shoreham Hotel and they meet with

21     Mr. McKeython to audit the security at the hotel and plan

22     to bring in a dignitary or a President or a Vice President

23     or someone like that?

24         A.    I couldn't give you the program of exactly what

25     they do.  I know when I had restaurants, when I was in the

129

1    restaurant business, we were doing some luncheons for some

2    dignitaries and the Secret Service came in and they looked

3    at the premises and they checked it out and they did their

4    own evaluation on what level of security they felt was

5    right for that particular situation.  So I can't tell you

6    what they did at the hotel.

7        Q.    One of the things you looked at as part of your

8    analysis is the qualification of management.  Do you feel

9    that Mr. McKeython is adequately qualified to be a

10   security director at this property?

11       A.    I don't have a problem with that.

12       Q.    He is finely qualified, with the experience and

13   training and the whole nine yards?

14       A.    From what I've read, yes, I mean from his

15   testimony, yes.

16       Q.    One of the things that you looked at was the

17   training of employees.  Do you have any problems with the

18   way the Omni security staff or the hotel staff were

19   trained in regard to security?

20       A.    The only problem I have is the -- Scartozzi, who

21   was the vice president of operations, and the other

22   general manager, they testified they have 400 eyes that

23   look out for security, every employee looks out for

24   security.

25            There's not one person who was ever trained in a

1   security issue, not even including the manager on duty

2   that evening.  They use the janitorial service to watch

3   for security issues.  These people have no walkie-talkies

4   or any way to communicate with security.  So I have a

5   problem in using nonsecurity personnel for security

6   issues.

7       Q.    So you don't think that Omni's policy that the

8   400 -- the hotel employees should be the eyes and ears of

9   the hotel and report suspicious activity, you don't think

10  that's a good policy?

11      A.    No, I don't have a problem with that policy.  I

12  have a problem with that there's just a total lack of

13  training to teach them what to look for under what

14  circumstances.  I'm not asking them to train housekeeping

15  and anybody else.  At least the manager on duty, at least

16  that person.

17      Q.    Telling them to look out for suspicious

18  activity, you don't think that's specific enough

19  direction?

20      A.    What might be suspicious to one person might not

21  be suspicious to another person.

22      Q.    Isn't it fairly common in the hotel industry to

23  have a policy similar to the Omni's, where they basically

24  say that the hotel staff, everybody has a role in

25  security; that's fairly common in the industry, isn't it?

131

1    A.    I don't have a problem with that statement, yes.

2    Q.    It's fairly common in the industry, is it not?

3    A.    Yes.

4    Q.    It's fairly common in the industry to tell all

5    the associates that they have a -- hotel associates that

6    they do have a role in security; that's true, is it not?

7    A.    I don't know if that's fairly common.  I mean I

8    don't know if that's fairly common.

9    Q.    It's also --

10   A.    Would you expect them to do it?  Yes.  We have

11   no testimony from anybody that shows that the hotel went

12   over to them and said, listen, I want you to watch for

13   this and I want you to watch for that.  There's not one

14   shred of evidence addressing that point.

15   Q.    You have been provided with a copy of the Omni

16   Shoreham -- Omni Hotel's employee manual, correct?

17   A.    Yes.  Well, I don't know if this is the only

18   copy of a manual that they have, but I have been provided

19   with Barnett's exhibit.

20   Q.    And it says "What You Should Do" and there's a

21   page called "Your Role in Security."  Did you pull that

22   page out and include it in your important materials?

23   A.    I don't believe so.

24   Q.    It says, "What You Should Do.  If you notice

25   someone who appears to be acting suspiciously, immediately

132

1    report that person to your supervisor or the manager on

2    duty.  Suspicious activity by an individual would include

3    loitering in an area not designed for that purpose, such

4    as a guest hallway or in a meeting area that is not being

5    used.  If you come upon an individual who looks surprised

6    or nervous to see you, report him/her.  Also, if you see a

7    nonassociate in an area designated for associates only,

8    he/she should also be reported.  For your own safety, do

9    not attempt to confront suspicious individuals."

10        That's one paragraph, and there's more.  Do you

11   have a problem with any of that; in other words, when they

12   talk about seeing something suspicious, they tell you what

13   that means, do they not?

14        A.   There's not one shred of evidence in any of the

15   documents that I reviewed to say that any of the employees

16   receive this manual, anybody from rooms division, from

17   housekeeping, the bellman, nobody.  There's not one shred

18   of evidence to say that they received that manual and read

19   that policy.

20        Q.   You were provided with Mr. Carmello's

21   deposition, were you not?

22        A.   Yes.

23        Q.   And in his deposition he does not -- you do not

24   recall him testifying that every employee gets this and

25   has to sign off that they've got it and received it; you

**Shadday v. Omni Hotels**                                       **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                                          **12/9/2005**

133

1   don't recall reading that?

2          A.     And every employee understands English at the

3   hotel and they read this?  I dispute that testimony, that

4   every employee -- that 400 employees receive this manual

5   and understand it and see this policy.

6          Q.     What is the basis for your opinion that the

7   employees don't get this manual?

8          A.     I've not seen any shred of evidence that said

9   that they received it.

10         Q.     Beyond Mr. Carmello saying -- beyond the

11  witnesses who have testified, saying that everyone gets it

12  and has to sign off receiving a copy, beyond that there's

13  no evidence?

14         A.     Provide me with the sign-off sheets and then

15  I'll change my testimony with regard to my feelings and my

16  opinions.

17         Q.     Goes on to talk about, "If you hear loud and

18  unusual noises, such as mechanical noises, alarms or loud

19  yelling, report them."  That would also be a relatively

20  specific guideline, wouldn't it?

21         A.     Yes.

22         Q.     "Never give out a key or key card or open a

23  guest room door without positively identifying the guest,

24  i.e. by means of a driver's license or similar document."

25  That would also be a specific guideline, wouldn't it?

1      A.     Yes, specific guideline to this particular

2   hotel, yes.

3      Q.     Then it goes on from there.

4      A.     And it also goes on to say that secure all of

5   the lobby, under specific tasks on evening shift.  It also

6   says that in the manual.  I don't -- this is what I took

7   out from that manual.

8      Q.     Do you have any indication that this lobby

9   wasn't secure, or do you even know what securing the lobby

10   means?

11      A.     Well, the deposition testimony shows the lobby

12   was not secure.  There was nobody in the lobby from 11:00,

13   when Jarquin went home at -- came in at 11:00, he went

14   home at 12:30.  There was nobody stationed in the lobby.

15   There was nobody posted in the lobby, and it says, "Secure

16   the lobby."  So that's in the manual, also.

17      Q.     What does secure the lobby mean, Mr. Del Marva?

18      A.     It means to have somebody present, to have

19   somebody monitoring it, to have somebody supervising it;

20   and that would be a security issue.

21      Q.     So you believe that some security guard should

22   be posted, meaning standing like a sentry in the lobby at

23   all times?

24      A.     It's not what I believe.  It's what the

25   testimony says, is that there's somebody in the lobby.

1    Q.    Well, in fairness, that's not what the testimony

2    says, because if you read the depositions closely, they

3    talk about posting meaning moving around, because I

4    noticed in your summaries you didn't include that as part

5    of your summaries.

6    A.    Well, I guess it's going to -- who's going to

7    make the determination of what that sentence means.  From

8    what I've read from the security guards' testimony, is

9    that somebody is in the lobby, and I can't express

10   anything more than that; and that this particular night

11   the person who left, his job was to be in the lobby, and

12   he wasn't there, so nobody was in the lobby.

13   Q.    And that's the big issue in this case.  Let's

14   just kind of cut to the chase here.  Was it appropriate to

15   have three security guards working that night, or should

16   they have had more?

17   A.    According to their policies and procedures --

18   Q.    I'm asking you, Mr. Del Marva.  Put aside the

19   Omni's policies and procedures.  Was it appropriate for

20   the hotel, for the Omni Shoreham Hotel, to have three

21   security guards working that night, or should they have

22   had more?

23   A.    I can only defer to what I've read, and three

24   would be what would be acceptable to them and what would

25   be reasonable to them, is to have three.

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                        **12/9/2005**

136

1       Q.      And you say three.  You like to refer to it as a

2    policy and procedure.  In fact, if we read the depositions

3    closely, no one says it's a policy or procedure, do they?

4       A.      Well, I guess --

5       Q.      What they say is, it's usual or it's routine.

6       A.      And it's a practice, so policy, procedure,

7    practice --

8       Q.      Are different things, are they not?

9       A.      I do not consider them different.  A practice is

10   part of a policy.  If you have a policy, you practice the

11   policy.  If you have a procedure, you have to comply and

12   practice the procedure.

13      Q.      My question to you is, is it appropriate, in

14   your opinion, to have three security guards working the

15   Omni Shoreham the night of this incident, or should they

16   have had more?

17      A.      I don't know the occupancy of the hotel at that

18   time.  Based on what I've read, based on your description

19   of the director of security as being -- and mine -- as

20   being adequately trained and experienced, three was what

21   he programmed for that particular evening, and I would say

22   that three would be sufficient, based on his testimony and

23   experience.

24      Q.      Well, in fact, the hotel director of security

25   didn't make the schedule.  Do you recall him saying that

137

```
 1    his security --

 2         A.    Supervisor.

 3         Q.    -- supervisors make it, and that person is

 4    Richard Barnett?

 5         A.    Barnett.

 6               I wouldn't expect the director of security to

 7    have Mr. Barnett as a supervisor unless he felt that he

 8    was qualified to make an opinion or make a decision in the

 9    absence of his superior.

10         Q.    And so Mr. Barnett, he was the guy that was in

11    charge that night?

12         A.    Correct.

13         Q.    Do you have any indication that Mr. Barnett

14    didn't have adequate training or experience to be a

15    supervisor?

16         A.    There's very little information about

17    Mr. Barnett in his deposition as far as his background is

18    concerned.  Let me take a look at that.

19         Q.    In fact, if we look at it closely, he has some

20    of the same experience you do, in that he's a certified

21    private investigator?

22         A.    I don't know if he has the same experience as I

23    do.  I've been doing this for 25 years.

24               He doesn't have much experience in security,

25    from what I remember, but I'm not doubting his
```

138

1    qualification.

2        Q.    Okay.  And that's really my question.

3        A.    Yeah, I'm not doubting his qualifications.

4        Q.    Do you have any indication that his training or

5    experience or education makes him inappropriate or

6    unqualified to be a security manager?

7        A.    I haven't seen anything that I could render an

8    opinion yes or no about.

9        Q.    What would you need to know to be able to render

10   that opinion?

11       A.    At this point it doesn't make a difference,

12   because I'm not going to render an opinion in that area.

13       Q.    Okay.  Fair enough.

14             Is it appropriate for a person like Ralphaello

15   McKeython, who is the director of security, to allow his

16   shift managers, if you will, a person like Mr. Barnett, to

17   make the schedule, in other words, say we're going to need

18   two guys this night, ten guys this night; would that be an

19   appropriate thing for a security director to do?

20       A.    I don't have a problem with that, no.  That's

21   fine.

22       Q.    Would it be appropriate for a security director

23   to tell a person, one of his supervisors, that they have

24   authority on their shifts, if they need to call somebody

25   in to replace somebody or send somebody home, could they

139

1    do that?

2            Does that question make any sense to you?

3    Because it wasn't very good.

4        A.    It makes sense.  It's fine.

5            I can't answer that question.  Depends on the

6    circumstances.  It depends on how this director of

7    security feels about the qualifications of his supervisor,

8    and he can say, "Before you do anything, contact me."  But

9    it's 1:30 in the morning, and I can't answer your

10   question.

11       Q.    It would be appropriate, however, for a

12   supervisor or somebody in a supervisory capacity, if

13   someone got sick, to make a decision to either replace

14   that person and call somebody else in or say, you know,

15   things are quiet, it's okay tonight, you know, go home, we

16   don't need to replace him; would that be an appropriate

17   decision for a supervisor to make?

18       A.    Depending on what the protocol is, if they have

19   to contact their superior before they do so or not.  I

20   mean, again, I can't answer that.

21       Q.    I want you to assume that Mr. McKeython has told

22   his supervisors and specifically told Mr. Barnett that in

23   a situation where somebody needs to go home or gets sick

24   or doesn't show up for work, it's up to the supervisor to

25   make the decision as to whether to call somebody in or not

Shadday v. Omni Hotels
1:04-CV-1219-JDT-WTL

Fred Del Marva
12/9/2005

140

1      and replace that person, based on occupancy level and

2      events and a variety of factors.  Would you assume that

3      all to be true?

4           A.   It can, I mean it can happen.  Yeah, it can

5      happen.

6           Q.   Assuming that to be true, then is it appropriate

7      for a hotel security director to do something like that,

8      to tell his security manager, to say, you know, if these

9      things happen, it's up to you as to what to do?

10          A.   So he's leaving it up to the judgment of

11     Barnett?

12          Q.   I want you to assume that that was true.

13          A.   Right.  He can.  I mean as a security director,

14     you can do that.  Whether Barnett acted reasonably is

15     another story.  I mean as far as I'm -- I mean if that is

16     the circumstances, then Barnett is part of the fault, by

17     not replacing Jarquin.

18          Q.   And you make that opinion, number one, not

19     knowing the occupancy level of the hotel, correct?

20          A.   Yes, but it's not needed to make that opinion.

21          Q.   Because Ms. Shadday spent two or three hours

22     with a gentleman drinking and got assaulted; in other

23     words, there's an assault, so obviously the security level

24     is not high enough; is that what you're telling me?

25          A.   No.  I mean their protocol that night was to

141

1    have three security guards on there.  That was their

2    policy for that particular night, we're going to have

3    three security guards, period.

4        Q.    That was three people scheduled that night, I

5    think.

6        A.    And three people showed up.  The reason they had

7    that is because they felt that they needed that.  That's

8    the reason they had that; felt that they needed it.  And

9    even feeling that they needed three, allowed one to go

10   home, not replaced.  That's the bottom line.

11       Q.    But if they had three folks, it would be fine,

12   in your opinion?

13       A.    If they had three people, then I would feel that

14   the level of security was reasonable under the

15   circumstances and I wouldn't be sitting here today.

16       Q.    So in a nutshell, the reason you're here today

17   is because Mr. Jarquin got sick and went home?

18       A.    Is that they had assigned three people to

19   maintain security at the premises, one got sick an hour --

20   I mean there's testimony that he was halfway into his

21   shift and we felt that we didn't have to replace him.  He

22   wasn't.  He was one hour into his shift, and he should

23   have been replaced; and he wasn't, and but for that, it's

24   more likely than not that this happened.

25       Q.    One of your analyses on Page 3, you say that you

142

1    have -- based on your experience, background and training,

2    you conclude the level of the security and the standard of

3    care regarding security developed and implemented by this

4    defendant were unreasonable, careless, ineffective and

5    inadequate.

6            You're just talking about the level of security

7    on this particular evening; is that a fair statement, or

8    in general?

9        A.    Just on this particular evening.

10       Q.    And the reason for that is because there were

11   three folks scheduled and one of them got sick and one

12   went home?

13       A.    And one wasn't replaced, and the one that wasn't

14   replaced was the person who was responsible for the lobby.

15       Q.    What if it turns out that person wasn't

16   responsible for the lobby?

17       A.    Well, then everything in the deposition is wrong

18   then, all the testimony in the depositions are wrong.  If

19   somebody is going to come up in trial and say, no, I'm not

20   responsible for the lobby, I'm not supposed to be there,

21   then we have a problem.

22       Q.    Well, and I guess that's what I'm trying to get

23   to, because I think there's really a misunderstanding

24   about what it means to be posted in the lobby, and that

25   this is sort of my difficulty with this case.

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

143

1               What is your understanding that being posted in

2      the lobby means?  It means that the person is actually

3      standing right there in the lobby like a sentry?

4          A.    Correct.

5          Q.    What if that really means the person -- that's

6      sort of their station and they wander around the lobby?

7               You follow me?

8          A.    I understand.

9          Q.    Would that be a reasonable --

10         A.    Well, even wandering around the lobby is still a

11     posted position.  That's still a posted position.

12         Q.    And that's what is referred to in the security

13     industry.  When you say your post, it means sort of, you

14     know, you go and walk around and do your thing?

15         A.    Correct.  You don't have to stand five feet from

16     the front desk and that's your position and you can't

17     move.  Posted in the lobby means that the lobby is your

18     responsibility and you're allowed to roam around the lobby

19     area and that's your post.

20         Q.    And in fairness to you, you've not been to this

21     hotel.  So, you know, the lobby level is, you know,

22     there's a main lobby level and then there's the east and

23     west promenade and then there's some hallways and levels

24     below that.

25         A.    Correct.

144

1          Q.     So it would not be unreasonable, if someone is

2     posted in the lobby, to actually be out on patrol in these

3     areas; in other words, if you're posted in the lobby, you

4     might be back on the right side or the left side or down

5     on another level; is that true?

6          A.     Is the lobby another level?

7          Q.     I'm sorry?

8          A.     Is a lobby another level?  Is there another

9     level to the lobby?  I don't think so.  I mean the lobby

10    is the lobby.  The lobby is where the front desk is.

11         Q.     I think the hotel actually calls it a lobby

12    level, is the way they refer to it.

13         A.     What they call it and what it is could be

14    different things.  I mean a lobby is a lobby, and a lobby

15    is when you walk in and check in; that's the lobby area.

16    If there's a downstairs, that, in my opinion, is not the

17    lobby anymore.

18         Q.     I want you to assume that when the person is,

19    quote/unquote, posted in the lobby, their responsibility

20    is -- I'm going to get that map.  Do you know where that

21    map was?

22         A.     That was in the manual.

23         Q.     It's right here, actually.  It's on the back of

24    this.

25                I'm going to show you what's in Exhibit 2.  It's

145

1    labeled specifically as Barnett 9.  You've got -- you see

2    we've got a main lobby, you got a west lobby, an east

3    lobby, there's hallways over here; and then if you look

4    over here, they've got other floors that are down and off

5    of this.

6              I want you to assume that when you're assigned

7    to the lobby, that you are responsible for the restaurant

8    back here behind the lobby, the main lobby, the east

9    lobby, which is also called the east promenade, back

10   behind the east promenade, going down the hallway behind

11   the front desk, back out around the west lobby, the west

12   promenade, and then the lower levels.

13             Would it be unreasonable for a property like the

14   Omni Shoreham to have that as sort of a post or patrol,

15   whatever you want to call it, area?

16        A.    For that time of day, for 1:00 in the morning,

17   yes.

18        Q.    Why is that?

19        A.    Why?  Because there's really -- this is the most

20   vulnerable spot, is the main lobby area and the bar.

21   That's the most vulnerable spot, the front door, at that

22   time in the morning.

23        Q.    Even though there's a manager behind the desk,

24   people behind the desk, a PBX operator, a doorman, a

25   bellman, there's at least five or six employees in the

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                      12/9/2005

146

1    lobby; that's still the most vulnerable point?

2        A.    Correct.

3        Q.    So providing security --

4        A.    Now, the Regency Ballroom, that's not a

5    vulnerable spot at 1:00 in the morning.  I mean this is

6    just door check area.  There's nothing open there.

7    There's really no need for them to be there.

8              So I mean the spot that they had to surveil

9    would be the spot where people are going to be, and that

10   would be in the immediate main lobby and west lobby area.

11       Q.    Where is your understanding of where this

12   incident started?  Do you have any understanding as to

13   where it started?

14       A.    "Where" meaning from inside the bar to drinking

15   outside the bar to --

16       Q.    Where the sexual assault actually occurred.

17       A.    Just before -- in an area before the elevators.

18       Q.    So down the hall, somewhere down the hallway?

19       A.    Somewhere down the hallway, around the corner

20   from the main lobby.

21       Q.    So what's a hotel to do then, I guess?  I mean

22   are they to neglect these other areas where even though

23   they're locked up, people could be; they just don't patrol

24   those and just kind of leave them alone, since they should

25   be locked and no one should be there?

147

1      A.    I don't know.  I mean it depends on the hotel;

2  it depends on prior problems in that area.  Does the place

3  have to be monitored once an hour or once every two hours?

4  I don't know.  I mean I'm here to discuss the security in

5  the main lobby area and adjacent to the bar/restaurant and

6  the elevator banks.  I mean what's happening downstairs in

7  a banquet room, it's not my concern at this point.

8      Q.    Unless somebody would be down there or fall or

9  some wanderer would be down there?

10      A.    There would be no reason for anyone to go down

11  there.

12      Q.    Well, you know, Mr. Del Marva, based on your

13  experience, people go places they're not supposed to go in

14  hotels?

15      A.    I agree with you.

16      Q.    And part of the role of security is making sure

17  that either guests or people who aren't supposed to be in

18  areas when they're not supposed to be there aren't there?

19      A.    Correct.

20      Q.    You talk about the standard of care regarding

21  security developed and implemented by this defendant were

22  unreasonable, careless, ineffective, inadequate.  I think

23  that now we've clarified that statement to not really

24  be -- to clarify it, in that if there were three security

25  guards working, you would be okay with the situation.

148

1    It's just that because one got sick and went home, that's

2    your issue, really, correct, or no?

3        A.    Well, the issue would be that; the issue has to

4    do with, again, the surveillance camera outside the

5    elevator bank and the surveillance cameras inside the

6    elevator bank.

7              I mean if there was a surveillance camera

8    outside, if there was another guard in close proximity to

9    the lobby, where he should have been, would we be here

10   today?  I don't think so.

11       Q.    Well, in fact, what we do know is that

12   Mr. Barnett actually found Ms. Shadday on the first floor

13   immediately after this assault; is that a fair statement?

14             In her deposition she says she got off the

15   elevator and was on the phone with her boyfriend and the

16   guy told her to quiet down, correct?

17       A.    Yes.

18       Q.    And that's one floor up from where this assault

19   allegedly took place?

20       A.    Okay.  So what is that?  Is that a question?

21       Q.    Well, I guess that's what I'm getting at.  You

22   talk about people not being in close proximity.  The

23   gentleman is a floor away in a multifloor building.  I

24   mean does the hotel need to have a security officer on

25   every floor?

Shadday v. Omni Hotels                        Fred Del Marva
1:04-CV-1219-JDT-WTL                          12/9/2005

149

1       A.      No.   But I mean that's after the incident.   I

2   mean that's proactive security.   I mean reactive security.

3   We're looking at proactive, how to prevent something from

4   happening in the most reasonable way.   That's the whole

5   thing; it's prevention.   It's proactive policies,

6   procedures, training, hard equipment, cameras.   You have a

7   bar area that's serving people that are drunk.

8       Q.      Well, I guess that's my question.   Let's talk

9   about cameras.   Let's assume that there was a camera on

10  the video or watching the elevators, correct?

11      A.      Yes.

12      Q.      Mr. Rodriguez, according to Ms. Shadday, began

13  to sexually assault her in the hallway --

14      A.      Correct.

15      Q.      -- leading to the elevator, correct?

16      A.      Yes.

17      Q.      So even if there were cameras, some sexual

18  assault, vaginal penetration and feeling of breasts, would

19  have still occurred?

20      A.      In the hallway?

21      Q.      Yes, sir.

22      A.      According to the testimony, it might have

23  occurred.   It might not have if the security guard was

24  there.

25      Q.      I want to stay focused on security cameras,

150

1    because one of the things --

2         A.    Okay.

3         Q.    -- that you talk about is how security cameras

4    would have prevented this.

5         A.    Yes.

6         Q.    So my question is, assuming there's a security

7    camera there, it's not going to prevent it, correct?  It

8    would just allow someone to respond more quickly?

9         A.    Correct.

10        Q.    So some level of sexual assault would have

11   occurred even with a camera watching the elevators and on

12   the elevator?

13        A.    Possibly, yes.

14        Q.    You say possibly.

15        A.    I mean it's a hypothetical, so I can't say yes

16   for sure.

17        Q.    Now, one of the things you say in your analysis

18   is that both Officers Barnett and Del-Cid identified the

19   assailant as being intoxicated.

20        A.    Correct.

21        Q.    I would like you to go to the depositions and

22   look at the pages you've cited, because my reading of the

23   depositions, neither one of them say he was intoxicated.

24        A.    I believe Barnett on 53, 8 through 9, that

25   Mr. Rodriguez had been drinking and appeared to be

151

1      intoxicated.

2           Q.      I've got his transcript right here.

3           A.      Let me look at mine.

4           Q.      Do you have it?   Okay.

5           A.      Your question is:   "Did Mr. Rodriguez appear

6      intoxicated?"

7                   "You can tell that he had been drinking."

8                   If you can tell he had been drinking, you can

9      tell that he was intoxicated.   There's no other way of

10     telling somebody's intoxicated other than knowing that

11     he's been drinking and that he's intoxicated.   So this is

12     the way I read it.

13          Q.      It's an interpretation on your part, in other

14     words?

15          A.      Well --

16          Q.      And let's be honest.   These guys have had TIPS

17     training; and you know what TIPS training is, correct?

18          A.      Yes.

19          Q.      What is TIPS training?

20          A.      It's a responsible service of alcohol training.

21          Q.      And being intoxicated means something, doesn't

22     it?

23          A.      If you can tell that he had been drinking, the

24     only way you can tell that someone has been drinking is if

25     they are displaying signs of impairment; and the legal

1    terms in a dram shop, they were visibly intoxicated, he

2    was obviously intoxicated.  If you can tell that somebody

3    had been drinking, then it is visible to you that he's

4    intoxicated; and I can't explain it any different than

5    that.

6         Q.    And, in fact, Mr. Barnett goes on to say, "I

7    wasn't really paying attention to that," doesn't he?

8         A.    Well --

9         Q.    And so, basically, an assumption you make is

10   that Mr. Rodriguez was intoxicated?

11        A.    A question was asked of him.  He said that you

12   can tell that he had been drinking; and if you can tell

13   somebody is drinking, the only way you can tell is if it's

14   visible signs to you that he was drinking, and so he was

15   visibly intoxicated.

16        Q.    Now, in fairness, Mr. Del Marva, we're splitting

17   hairs; but you know we're splitting hairs for the right

18   reason.

19        A.    I don't think so.

20        Q.    There's a difference between having drank a

21   little bit and appearing to have drank a little bit and

22   being intoxicated, because you can serve -- as an

23   establishment, you can serve somebody who appears to have

24   been drinking, just so long as they're not intoxicated?

25        A.    You become intoxicated -- well, then we get into

153

1    a definition of intoxication, and that's a long whole

2    other thing.  The thing is visibly intoxicated or

3    obviously intoxicated, and if he could tell that he had

4    been drinking, this is the way I read it.  I mean it's up

5    to you, it's up to a jury, it's up to everyone who is

6    going to listen to this statement to make the

7    determination of what they feel about that.

8            And it's not the first time somebody got drunk

9    in their bar.  I mean it's not an unusual circumstance,

10   that nobody -- that this has ever happened before.  In his

11   testimony, that it has happened before, and that's the

12   reason why you have the -- supposed to have a security

13   person in an alcohol area during closing time.

14       Q.    Well, and in fairness, this is well after

15   closing time.  They called last call and then they go sit

16   outside of the bar and they continue to drink their

17   drinks; is that right?

18       A.    This is 1:30.  The bar closes at 2:00.  So it's

19   a half hour.

20       Q.    And, in fact, Ms. Shadday leaves the group

21   because she runs out of cigarettes?

22       A.    Correct.

23       Q.    Goes and gets another pack of cigarettes in her

24   room, correct?

25       A.    Correct.

154

1      Q.     Mr. Rodriguez doesn't follow her in any way; is

2   that right?

3      A.     That's right.

4      Q.     She returns back to the group to finish her

5   beer, right?

6      A.     Yes.

7      Q.     And then it's sometime after this that the

8   sexual assault occurs?

9      A.     Not much longer after this.  1:35 in the

10  morning.

11     Q.     Look at the incident report from the Metro PD.

12  Do you have that?

13     A.     Yeah, I believe I do.

14     Q.     I think you've actually got it marked.  If you

15  look, you've got a tab on it.

16     A.     Is this it?  Okay.

17     Q.     What is the time of the incident in there?

18     A.     According to this, it is 2:20 in the morning.

19  According to Tab 20 -- I'm sorry, Tab 12, it is 1:35 in

20  the morning when Barnett found the plaintiff sitting on

21  the floor.  So I would take 1:35 would be a correct time.

22  Time that the incident occurred, 1:20.  Time reported,

23  1:35.

24     Q.     The incident reports oftentimes are filled out

25  after the fact; is that true?

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

155

1        A.     They shouldn't be.  I mean they are.

2        Q.     What I mean by after the fact is, obviously, the

3    security officer isn't filling out the report instead of

4    taking care of Ms. Shadday?

5        A.     I agree with that.

6        Q.     He would have done this after he had called

7    Metro, after they had found Mr. Rodriguez, after he had

8    briefed Metro; then he would have sat down, correct?

9        A.     Correct.

10       Q.     Whereas the Police Department, they typically

11   use the time of dispatch as the time of the incident; is

12   that a fair way to look at it?

13       A.     See, they also have an hour of 6:55 in the

14   morning in the report.  I think the time is --

15       Q.     Are you looking at the emergency room records?

16       A.     No, this is the Metro Police Department.  It's

17   going to be controverted as far as actually what time it

18   happened.  As far as my opinion, I think it did happen

19   around 1:30, right after last call.  I don't know.

20       Q.     But you just told us a minute ago last call was

21   at 2:00, so this --

22       A.     No, I didn't say that.  I said the bar closes at

23   2:00.  I didn't say the last call was at 2:00.

24       Q.     Okay.

25       A.     So I can't be exact with the time; nor I don't

156

1    think anybody can be at this point.

2         Q.    One of the things that you said in your report

3    is, "It is the standard in the security industry that in

4    the event one of the scheduled officers becomes unable to

5    stay on his shift, a supervisor would be called to have

6    that officer replaced"?

7         A.    Correct.

8         Q.    Whose standard is that?

9         A.    Again, it's nothing written.  Based on the

10   thousands of depositions that I've read with regard to

11   security officers, that's a practice that's used; that if

12   somebody calls in, they can't come in or somebody comes in

13   and has to leave, that they be replaced.

14        Q.    Would that be a situation where like you've got

15   the security officers out in the field and they call their

16   supervisor to say, hey, Joe got sick, send another guy for

17   Joe; is that what you're saying?

18        A.    No.  You call the director of security at his

19   house and say, listen, this guy is sick, what should I do.

20        Q.    Earlier you told me it would be appropriate,

21   though, for a supervisor like Mr. Barnett to make the

22   call --

23        A.    Right.

24        Q.    -- as to whether to replace that person?

25        A.    Right.  So he should have called somebody to

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

157

```
 1    replace him or he should have called the director of

 2    security and say, hey, listen, you've got to come in

 3    yourself.  But he wouldn't do that because it's 12:00,

 4    12:30 in the morning.

 5         Q.    And, again, you don't know the occupancy level

 6    of the hotel, correct?

 7         A.    It was enough to require three security guards,

 8    that's all I know.

 9         Q.    You don't know the occupancy level of the hotel,

10    correct?

11         A.    Numberwise, no.

12         Q.    You don't know how many people were in the lobby

13    at the time that Mr. Jarquin got sick, correct?

14         A.    The exact number of people, no.

15         Q.    You don't know whether the bar was still open or

16    not, do you?

17         A.    The bar closed at 2:00 and -- open for business?

18         Q.    Yes, sir.

19         A.    No.  The last call was made already, so they

20    weren't open for business.

21         Q.    Don't know how many people were in the lobby or

22    maybe left back in the bar?

23         A.    They went to the lobby with five people.  There

24    was five people sitting in the area where the plaintiff

25    was sitting.
```

1      Q.      Just assume that there's five people.  I mean if

2   that's the only number of people in the lobby, you

3   wouldn't need a security guard necessarily stationed there

4   to watch them, would you?

5      A.      If you know that intoxication causes a

6   propensity for violence, as the security guards did know

7   that, then you would have somebody in that bar area at

8   closing time.

9      Q.      And I guess that's my question.  The bar had

10  already closed, though, had it not?

11     A.      I don't know if the doors were closed.  I know

12  the last call was made.  There's not one shred of evidence

13  that says that the doors were closed and the bar was

14  closed and everything.  There's no testimony to that

15  effect.

16     Q.      Ms. Shadday doesn't talk about that in her

17  deposition, about how they had walked out of the bar and

18  were actually seated; they had had last call and were

19  actually sitting out in the lobby in the Marquee Lounge

20  area with the doors closed?

21     A.      With the doors closed of the bar?

22     Q.      Well, if the doors weren't closed, I guess my

23  question would be why would you leave the bar area if they

24  hadn't told you to leave and the doors were still open?

25     A.      You would have to ask some of those five people

1    and Ms. Shadday, why they would walk out, other than they

2    said it was last call and they took their beer and walked

3    out.  So there was no other alcohol that was going to be

4    served to them at that time.

5        Q.    You obviously -- I think this is true.  You

6    believe that Mr. Rodriguez was overserved; is that a fair

7    statement?

8        A.    I don't know.  I don't have his blood alcohol.

9    I have no idea.  Was he intoxicated?  Yes.  Was he

10   observed to be intoxicated?  Yes.  Does that mean

11   overserved?  Yes.

12       Q.    Okay, well, you just said you don't know, and

13   then you said yes.

14       A.    Well, I don't know, I mean overserved to what

15   point.  I don't know to what level.

16       Q.    So it's possible that he could have appeared,

17   you know, that he had been drinking, like Mr. Barnett

18   says, and not been intoxicated, legally intoxicated?

19       A.    Legally intoxicated?

20       Q.    Yes, sir.

21       A.    I don't know.  That, I don't know.  If you're

22   talking legally intoxicated, I can't answer your question.

23       Q.    And legal intoxication is the level that dram

24   shop liability attaches; is that a fair statement?

25             In other words, if the legal limit here in

160

1    Arizona is .08 --

2         A.    No, that's not what -- that's incorrect.  Dram

3    shop has to do with the service to a visibly intoxicated

4    person or obviously intoxicated person.  It has nothing to

5    do with legal intoxication.

6         Q.    So, for example, if I have one beer, but I

7    appear to have been drinking and go out and get in a

8    wreck, even though I'm not legally intoxicated, the bar

9    that served me that one beer could potentially be

10   responsible?

11        A.    No, if your blood alcohol is not above the legal

12   limit where -- above a limit where somebody would deem you

13   as visibly intoxicated.

14        Q.    And that level is generally the level of legal

15   intoxication, true?

16        A.    Not necessarily.  Depends on the toxicologist,

17   but not necessarily.  Somebody could display signs of

18   impairment at lower levels.

19        Q.    Someone who doesn't drink as much, for example?

20        A.    Someone who has a tolerance or doesn't drink as

21   much, yes.

22        Q.    How about Ms. Shadday; do you feel that

23   Ms. Shadday was overserved by the hotel?

24              Well, actually, let's go back to Mr. Rodriguez.

25   Do you feel like he was overserved?  I mean I just need --

1    I don't know that you answered that question.

2         A.    It's not a toxicology -- it's not a dram shop

3    case.  I'm not going to render an opinion on whether he

4    was overserved or not.  Was he intoxicated?  Yes, and we

5    have testimony to that.  I'm not going to go anything

6    further than that, and --

7         Q.    Well, but there is no testimony, in my opinion,

8    that he's been intoxicated --

9         A.    All right.

10        Q.    -- because he was asked a direct question, "Was

11   he intoxicated," and the guy said, "You could tell he had

12   been drinking."

13        A.    Okay.  So, you know, that will -- I guess a jury

14   is going to determine whether or not that's -- you know,

15   where that's going.

16        Q.    But I need to understand something, because

17   you're making an assumption that he's intoxicated; in

18   other words, you're interpreting what Mr. Barnett says?

19        A.    Correct.

20        Q.    If Mr. Barnett had answered that question yes,

21   that's a whole different thing than saying you appear to

22   be intoxicated; do we agree on that?  Especially since

23   Mr. Barnett is a guy who has TIPS training, who knows what

24   intoxication means.

25        A.    But when it comes to that, I mean I think

162

1     Mr. Rodriguez testified that he was intoxicated and that

2     could be part of the reason for his conduct.  I mean

3     that's in his testimony, in his trial transcript or

4     wherever it is, I think; I mean that he was drinking and

5     that could have --

6         Q.   Do you have Mr. Rodriguez's testimony?  Because

7     I did not see any of that here in front of you.

8         A.   It could be in the criminal proceedings or in

9     the police interviews or whatever it was.  But I believe

10    that's something that has to do with that.  And there

11    again, that's why I go to the foreseeability of this type

12    of conduct and the reason why you should have a security

13    guard in that area at this particular time.

14        Q.   And the reason why a security guard should have

15    been in that area is because?

16        A.   Because you have a drinking environment, and

17    even the security guards say -- Barnett, 48, 6 through 18,

18    he has had to respond to guests who have had too much to

19    drink being disruptive.  So, you know, and I think even

20    Del-Cid also says something.

21        Q.   But in fairness, that's not uncommon at a hotel;

22    people go out on the town and come back drunk and are loud

23    and they have to tell them to calm down?

24        A.   Del-Cid, 40, 10 through 12 and 17 through 22,

25    when the Marquee Lounge closes, they specifically focus on

1   getting people safely to their rooms, especially when

2   they're drinking.  That's probable violence, and they try

3   to secure that area for that purpose.  And on this night

4   they didn't secure that area for this purpose.

5      Q.   Well, and I guess that's what I'm saying.  So

6   what is your assumption?  You're assuming that the bar --

7   when this happened, the bar had just closed; is that what

8   your assumption is?

9      A.   That they stopped serving alcohol at the bar at

10  that time, yes.

11     Q.   And then this assault occurred pretty quickly

12  after the bar closed?

13     A.   Half an hour, 45 minutes, an hour.

14     Q.   So security guard should be posted in the lobby

15  until everybody in the lobby disperses after the bar

16  closes?

17     A.   They're drinking in the lobby.  They're still

18  drinking alcoholic beverages in the lobby.  According to

19  them, it's foreseeable that this type of situation could

20  happen when people drink.  So it would be common sense to

21  stay there until the lobby is clear and these intoxicated

22  people have gone to their room.

23     Q.   And it's your opinion that the defendant --

24  since a supervisor wasn't called in this case, that the

25  Omni was reckless, careless, negligent?

164

```
 1        A.     I don't think I said that.  I mean I'll agree

 2    with you that if Barnett was given that duty, fine, you

 3    didn't have to call -- you could call yourself; you don't

 4    have to call the supervisor.

 5            But if you have nobody to call, then I think

 6    calling the supervisor would be a proper procedure and

 7    say, listen, this guy went home; what should I do, call

 8    somebody else or work it for two.

 9        Q.     And it would have been appropriate, for example,

10    if that call had been placed to, let's just say,

11    Ralphaello McKeython, to say, okay, well, are you busy; he

12    says no; well, then fine, use two.  That would have been

13    an okay thing to do?

14        A.     I don't know.

15        Q.     What would you have to know?

16        A.     I know that there was some concern with Mario

17    Jarquin that he was leaving, because they were waiting --

18    he had to be there for some checkout, which I didn't

19    understand in his deposition.

20            On his deposition, 11, 5 through 7, 15 through

21    16, 19 through 22, and Page 12, 1 through 3, he didn't

22    want to call off because he was supposed to have somebody

23    being checked out.  I'm assuming that he knew that he had

24    to be there because of something that was going on at the

25    hotel.
```

165

1      Q.    Your conclusions and opinions in this case,

2   we've talked about the one that we just found out about

3   this morning, which was the cameras?

4      A.    Yes.

5      Q.    So I guess we could add that as No. 5.

6            But the first one you've got listed on your

7   report is, it's your opinion that the level of security

8   that the defendant provided on the night of this incident

9   was unreasonable, and based on the totality of

10  circumstances, defendant had a duty to provide a level

11  greater than the one that existed, okay.  And I guess the

12  level greater that you're saying is, there should have

13  been three?

14     A.    Correct.

15     Q.    And just so we're clear, you also would have a

16  problem, if there were three, if that third security guard

17  was assigned to patrol the whole lobby level?

18     A.    At that particular time, within that time frame,

19  yes.

20     Q.    So there should have been three, and that third

21  person should have been planted in the lobby somewhere?

22     A.    In that bar area during that particular time,

23  yes.

24     Q.    And that third security guard should not only

25  have stayed planted in the lobby, in the bar area, he

166

1     should have stayed there until everybody in the lobby had

2     dispersed?

3          A.     Or until he felt that it was proper for him to

4     leave that area, which I can't give you an answer for

5     that.

6          Q.     Well, let's just run with that last statement

7     that you said, and it is, let's assume there's a security

8     guard in the lobby.  He stands there for 10 minutes,

9     15 minutes, observes the people coming out of the bar,

10    they all appear to be fine, they're not loud, they're not

11    causing any trouble, and he says I'm going to go do my

12    rounds now.  Would that be an appropriate thing to do?

13         A.     I don't know.  I mean I don't know -- if I see

14    people drinking, if I see people who I think are

15    intoxicated and I know from experience that this could

16    cause violent tendencies, I stay in that area.

17         Q.     People who are violent when they're drunk, it

18    just doesn't happen all of a sudden; you can kind of see

19    it coming, can you not, usually?  In other words, they're

20    usually loud, they're usually doing something to give you

21    maybe not an hour notice, but a little bit of notice that

22    they're maybe going to act up?

23         A.     Not necessarily.  When I take a defense case, I

24    mean it can be like a random act of violence, that the

25    hotel had no notice, no prior notice of anything, you

Shadday v. Omni Hotels                  Fred Del Marva
1:04-CV-1219-JDT-WTL                     12/9/2005

167

1   know, it just happened.  So it can happen, it can't.  I

2   mean I can't agree with your --

3        Q.    In all due -- and I guess that's my question.

4   Why is this, in your opinion, not a random act of

5   violence?  It's an unfortunate thing, no doubt, that

6   happened to Ms. Shadday.  But why is this case one that's

7   not a random act of violence?  Because you've read

8   Ms. Shadday's testimony, and she spent two, three hours

9   with this guy.  Never did he say or do anything

10  inappropriate, and all of a sudden he assaults her in the

11  hallway.

12       A.    When you talk about random acts of violence, I

13  mean it was a spur of the moment, random act of violence,

14  and then the most important phrase is that it could not

15  have been prevented; and as a defense expert, when the

16  circumstances arise, those will be my opinions.  However,

17  this could have been prevented.

18       Q.    And it could have been prevented by -- well, the

19  rape in the elevator could have been prevented by the

20  camera.  Some assault still would have occurred with a

21  camera, like you've said?

22       A.    Yes.

23       Q.    And so I guess then one of the other security

24  guards -- we not only have to have a guy posted in the

25  lobby; another person, assuming the cameras were in place,

168

1     would have had to have been assigned to the security

2     office, also, watching the cameras?

3        A.    According to their testimony -- and I'm not

4     going by anything other than their testimony, which says

5     that there's --

6        Q.    I'm not asking about what they say, okay.  Let's

7     not talk -- I want to talk about what your opinions are,

8     okay?

9        A.    I think we discussed that already.  You said

10    24/7, and I said I disagree, they don't have to be there

11    24/7.

12       Q.    Sometime between the hours of, say, five,

13    6:00 a.m. up to about 3:00 in the morning, somebody should

14    be sitting at the videocamera?

15       A.    I'm not saying that the lack of a security guard

16    inside the security offices monitoring the surveillance

17    camera contributed to the proximate cause.  I'm not saying

18    that.  I'm just -- that's the policy of the hotel, and

19    nobody was there.  That's all I can testify to.

20       Q.    Well, and we've talked about this before.  It's

21    not a policy of the hotel, Mr. Del Marva.  I mean you've

22    read the depositions, and nowhere is it written that

23    there's a security guard to be posted in the lobby; is

24    that true?

25       A.    Again, Mr. Jarquin on Page 12 --

169

1      Q.    Well, let's talk about that.

2      A.    Well, you're wrong.  Your answer, no, it's not

3  true.

4      Q.    Who sets the policy for a location?  I mean is

5  that something that, again -- I work at a grocery store.

6  Does the bag boy set the policy or does the boss set the

7  policy?

8      A.    There is no evidence in this case that tells me

9  who sets the policies.  They're saying that there's

10  generic policies and then they adapt them to local

11  requirements.  They didn't give me -- I mean other than

12  the manual, I have never seen any security manual.  I have

13  never seen a security policy and procedure book.

14          They exist.  I can guarantee you that somewhere

15  in the security office at this hotel, there is a manual

16  that says a security manual, a safety and security manual

17  or a risk management manual or policies and procedures.

18  There's something there.  Did we get them?  We never got

19  them.  Were they asked for?  I think they were.

20          So as far as the policies are concerned, I can

21  only go by the conduct and the testimony of the employees,

22  and that, to me, is the policy.

23      Q.    Okay.  And one of the people that you're relying

24  on is Mr. Jarquin; is that right?

25      A.    Yes.

Shadday v. Omni Hotels                         Fred Del Marva
1:04-CV-1219-JDT-WTL                            12/9/2005

170

1        Q.      And you've got a specific cite for his

2    deposition; is that right?

3        A.      More than one cite, yes.

4        Q.      Okay.  The one that I think you keep ignoring,

5    and I just want to bring it to your attention.

6        A.      Sure.

7        Q.      Because I noticed that this was not contained in

8    your summary either.

9                Page 39, if you start reading on Page 39 and

10   Page 8, when I started asking questions to try and clarify

11   the issues.

12       A.      You didn't clarify the issues.  You changed his

13   testimony.  I mean you basically changed his testimony.

14   His answers were different than what he testified to when

15   Mr. Townsend examined him.

16       Q.      So you believe that I've somehow misled -- I'm

17   trying to mislead the Court in the facts here; is that

18   what you're saying, sir?

19       A.      I'm not saying that.  I'm saying that

20   Mr. Townsend examined him, he gave one testimony.  You

21   examined him, he contradicted the testimony he gave to

22   Mr. Townsend.  That's all I'm saying.  I'm not saying you

23   mislead him or you intentionally misled him or anything

24   like that.  I know you wouldn't do something like that.

25   These are answers that came out of his mouth.

171

1        Q.      Well, then I guess my question becomes why did

2    you disregard that?  Because what's interesting is, in

3    Mr. Del-Cid's deposition he also talked about posting

4    didn't mean standing in the lobby; it also meant

5    patroling.  And what's interesting is, you've ignored that

6    in reaching your opinions, also.  Because in all due

7    respect, Mr. Del Marva, what I've seen is, you read the

8    depositions, and the stuff that supports your opinions is

9    summarized and contained in your report, but what doesn't

10   is sort of conveniently ignored.

11       A.      I don't think it's been conveniently ignored.  I

12   think based on my experience reading depositions, that

13   this is what more likely than not occurred; this is what

14   more likely than not their policies and procedures are;

15   and this is what more likely than not how they conducted

16   themselves at the time of the incident.

17       Q.      So, again, that would be an assumption you're

18   making?

19       A.      I'm not making an assumption.  It's my opinion

20   based on my experience of taking a consensus of

21   everything, and based on my opinion, is putting the

22   consensus together and saying this is what more likely

23   than not that occurred.

24       Q.      And even if the security guard, the policy was

25   that they didn't have to be posted like a sentry in the

1    lobby, you still believe that should have been a

2    requirement at this particular time?

3        A.    At the time -- at this particular time meaning

4    at the time of the assault and prior to the -- an hour

5    prior to the assault, at the time that the bar was

6    closing.

7        Q.    What we started to talk about a little bit ago

8    was, you also mentioned that the person posted in the

9    lobby, they didn't have to be there the whole time; you

10   would agree that they can leave and respond to calls and

11   do other things, right?

12       A.    Yes.

13       Q.    If the person was in the lobby and observed the

14   people who had left the Marquee Lounge, the bar is closed

15   and the people are sitting down and they're quietly

16   minding their own business talking, having a cigarette or

17   whatever, and he observed them for 10 minutes, 15 minutes,

18   20 minutes and saw that nobody was unruly, would it be

19   appropriate for that security guard to go on patrol or to

20   respond to a call or leave that area?

21       A.    Depending on what the protocol of the bar is.  I

22   mean my opinion is that the protocol should be, is wait

23   until all bar customers leave the lobby area before

24   leaving the lobby section as your posted position.  That

25   would be my position, because of the foreseeable problems

1    that could arise.

2        Q.    And when you say foreseeable problems, are you

3    just talking in vague generalities, or do you mean that

4    there's some higher incident of alcohol problems at this

5    hotel?

6        A.    Well, I mean foreseeable problems have to do

7    strictly with the bar issue and it's consumption of

8    alcohol and what that can cause.

9        Q.    The affidavit that was tendered in support of

10   the summary judgment or in response to the Omni summary

11   judgment motion, did you draft that or did someone else?

12       A.    If it's an affidavit, it's more likely the

13   lawyer drafted it, with my approval and my infeed.

14            MR. THORNBURG:   Go off the record a second.

15            (An off-the-record discussion ensued.)

16            MR. THORNBURG:   We can go back on.

17   BY MR. THORNBURG:

18       Q.    Conclusions and opinions, the second one that

19   you've got listed is, based on your review and analysis of

20   the circumstances and facts relevant to the injuries

21   sustained by the plaintiff, it's your opinion that the

22   defendant breached industry standards.

23            What industry standards did the Omni Shoreham

24   breach in regard to this incident?

25       A.    To provide a safe and secure environment, to

1    provide adequate security.

2         Q.    There are no specific industry standards; is

3    that right, I mean from the standpoint of you can't go to

4    a book and find a standard that might exist for, say, like

5    a mechanical press or something?

6         A.    You can't go to a book and say, you have to have

7    three security guards.  I mean there's no set number in a

8    book.  I mean the standard has to do with your individual

9    requirements, as the director of security stated in his

10   deposition, or somebody, one of the defendant's employees.

11   It's the individual requirement of the premises; and on

12   this particular night, the requirement was three security

13   guards.

14        Q.    It's possible this assault would have occurred

15   even if the three security guards were there; is that

16   right, if Mr. Rodriguez had merely waited until they got

17   on the elevator?

18        A.    Everything is possible.

19        Q.    So even if there were three security guards and

20   one was posted in the lobby, this thing still could have

21   happened?

22        A.    As an expert, I'm not supposed to testify with

23   regard to possibilities, only probabilities.  Is it more

24   likely than not that it could have been prevented with a

25   security guard in the lobby?  Yes.

**Shadday v. Omni Hotels**
**1:04-CV-1219-JDT-WTL**

**Fred Del Marva**
**12/9/2005**

175

1      Q.     It's also more likely than not that it could

2    have been prevented had Ms. Shadday returned to the lobby?

3      A.     After the first assault?

4      Q.     Yes, sir.

5      A.     It more likely than not would have been

6    prevented had she returned to the lobby, yes.

7      Q.     It's also more likely than not that had

8    Ms. Shadday merely yelled stop or screamed something, that

9    this would have -- the second assault would have been

10   prevented on the elevator?

11     A.     Only if there was somebody to hear her.

12     Q.     The other thing you say in Paragraph 2 of your

13   conclusions and opinions is that the defendant breached

14   their own standards.

15            What standards did the Omni -- what Omni

16   standards that are --

17     A.     Excuse me.  The standard that they breached was

18   that on that particular evening the standard of care that

19   they implemented for that night was to have three security

20   guards there, knowing that they needed the three security

21   guards; and even knowing that, deviated from their own

22   standard of care.

23     Q.     We'll never agree on this, but it would be

24   appropriate, though, if the guy on the ground, if the

25   boots on the ground, so to speak, had decided it's quiet

176

1    and we don't need three, go home, Mario, would you still

2    hold that same opinion?

3         A.    The guy who you're talking about is Barnett that

4    said go home, Mario.  That's the same guy who thought that

5    three was required for that day, and I wouldn't agree with

6    you with that statement.

7         Q.    Is it ever appropriate for a shift that has a

8    certain number of security guards to go one or two down

9    due to, you know, somebody getting sick, just lack of

10   need, quiet night; is it ever appropriate to do that?

11        A.    I don't think it would be appropriate, if you

12   schedule X amount of security guards, to have less.  When

13   you check into a hotel, you're assuming that you're

14   checking into a safe premises, especially an Omni,

15   especially that hotel; and the level of security should

16   not be determined by how much money the hotel is going to

17   make that evening.

18        Security should never be jeopardized to any

19   point that it's going to be less than what it should be.

20   I can see them cutting down on bellman, I can see them

21   cutting down on housekeepers and so on and so forth.  When

22   it comes to cutting down on security, that's a bad call.

23        Q.    You've owned restaurants and bars and

24   discotheques, that I'm assuming you have had bouncers; is

25   that right?

1      A.      Correct.

2      Q.      You ever have a situation where it's a quiet

3   night and you send one of your bouncers home early?

4      A.      Probably.  I'm sure that happened on occasion.

5   But that's not the Omni Hotel, and I didn't cater to

6   single women and it's a different circumstance, totally

7   different circumstances.

8      Q.      You're telling me that the bars you owned or

9   discotheques never catered to single women?

10     A.      I'm sorry, I don't know why I said that.  Not

11  that I'm catering to single women, but it's a -- no,

12  excuse me.  Thank you for catching it.  I didn't mean

13  that.  I mean women traveling alone has become a big

14  industry concern today, and this convention had to do with

15  a steelworkers union or something, and there was a lot of

16  women.

17     Q.      The Women of Steel Conference.

18     A.      And there was a lot of women in the hotel, and

19  under those circumstances I mean the level of security

20  should have been maintained the way they designed it on

21  that night.

22     Q.      The answer to my original question, though, is,

23  in the times that you've owned bars and discotheques, you

24  have sent bouncers home early?

25     A.      Yes.

178

1        Q.     Because it was slow; is that right?

2        A.     Yes.

3        Q.     I bet when you owned a bar or restaurant, you

4    had situations where one of your bouncers would come in

5    and maybe they would get sick and you would send them

6    home?

7        A.     Probably.

8        Q.     And in those situations, had there ever been a

9    time when you didn't replace that bouncer because it was

10   slow or because you just didn't need to do that?

11       A.     It could have happened.

12       Q.     In fact, it probably did happen, didn't it?

13       A.     Most likely.

14       Q.     In the time that you -- but because, I guess,

15   this is a hotel, it's different; they should never -- in a

16   situation like that, they should not be allowed to go

17   down; is that right?

18       A.     It's a hotel.  We can't generalize this hotel.

19   I mean this is not a Motel 6.  It's not a Radisson.  It's

20   a hotel that charges a decent fee for their rooms.  You

21   would expect a higher level of security checking into a

22   hotel like that than in another type of hotel, probably

23   even in the Marriott across the street.  I would expect a

24   different level of security, or the Four Seasons, you

25   would expect a different level of security.

Shadday v. Omni Hotels
1:04-CV-1219-JDT-WTL

Fred Del Marva
12/9/2005

179

1      Q.     Would you expect the Four Seasons to have more
2   or less security than the Omni?
3      A.     Depending on who was there that night.  I know
4   we had some dignitaries from Guatemala, so there was a
5   reason for special security; and I think Jarquin's
6   statement that they were checking out, I think -- I don't
7   know for sure, but I think it was like the Guatemala
8   people checking out that day.  I'm not certain of that.
9   But you have a level of security at that hotel that would
10   be higher on that particular night than probably any other
11   level in that area.
12      Q.     And which kind of leads me to my next issue,
13   which is, because the President of Guatemala was there,
14   there actually probably would have been several Secret
15   Service agents in the hotel --
16      A.     I'm sure.
17      Q.     -- in addition to the security officers?
18      A.     I agree with you.
19      Q.     And would it have been possible that since the
20   people that Ms. Shadday was sitting with were members of
21   the Presidential entourage, it's probably likely that
22   somebody from the Secret Service was in the lobby area;
23   would you agree with that statement, or not?
24      A.     And that's the same entourage that raped her by
25   the lobby.

Shadday v. Omni Hotels                           Fred Del Marva
1:04-CV-1219-JDT-WTL                             12/9/2005

180

1       Q.      Mr. Rodriguez.

2       A.      Rodriguez, so same entourage.  So I don't

3    believe there is a -- because of their level of

4    professionalism, divides them from anybody else, if you

5    can understand that one, and it's hard.  I'm getting a

6    little tired.

7       Q.      Do we need to take a break?

8       A.      No, I'm fine.

9               Because they were from -- I mean they were

10   dignitaries from Guatemala, doesn't necessarily mean that

11   a lesser level of security was required.

12      Q.      And I'm not meaning to imply that.  If I am, I

13   apologize.

14              What I'm saying is, it's certainly possible and

15   likely that a Secret Service officer would have been in

16   the lobby at the time this assault took place around the

17   corner?

18      A.      I have no idea.

19      Q.      Do you believe that the security officers at the

20   Omni, in general, in that they're special police officers

21   and the training they have, do you believe that their

22   qualifications and training is adequate?

23      A.      I believe they were required to -- I don't know.

24   I mean I know they're licensed by the District.

25      Q.      Let me ask it easier.

181

1            Do you intend to render an opinion that their

2    training and qualifications weren't adequate?

3        A.    No.

4        Q.    Make it real fast then.

5            I just want to talk about the crime statistics

6    stuff for a minute, because I really don't understand the

7    germaneness of that.  One of the things that you talk

8    about in your affidavit and the report is that the hotel

9    didn't do a crime analysis.  Just assume for the sake of

10   argument they did the analysis which you say they should

11   have, which is look at crime for a three-mile radius.

12   Would their security be any different than it was?

13           Do you follow what I'm asking?

14       A.    Yeah.  I mean what's germane --

15       Q.    Because the next question is, okay, well, so

16   what?  They didn't do it.  What's the big deal?  Unless it

17   changes something that they do.

18       A.    What's germane is that it's a practice to have a

19   tool or a mechanism in place that allows you to monitor --

20   I mean as director of security especially, allows you to

21   monitor the criminal activity on your premises, as well as

22   your surrounding areas, which was not done.  Even the vice

23   president of operations felt there was no need for that.

24           But that is -- and you ask any security expert,

25   and your security expert also will say that part of his

182

1      job is to look at the crime demographics in the area and

2      determine the foreseeability of crime and make a

3      determination on the level of security that should be at

4      the premises.  So it's important.  Do all hotels do it?

5      No.  Should they do it?  Yes.

6          Q.   If you're getting that information from another

7      source, though, is that equally valid?  In other words, if

8      you're meeting with the police routinely to find out crime

9      and runs and things like that, would that be an equally

10     good mechanism?

11         A.   The source that I use is better than local law

12     enforcement, because it takes into consideration 20 other

13     different -- first of all, this comes from -- part of it

14     is the FBI Unified Crime Index, local Police Department,

15     income, sociobehavioral things.  It takes in -- some of

16     the finest companies in the country use this CAP report.

17     So is it better than local?  Yeah, because it takes in

18     local and it takes other things, also, into consideration.

19              (An off-the-record discussion ensued.)

20     BY MR. THORNBURG:

21         Q.   One of the things that the Omni did, and you

22     mentioned this earlier, is that the main entity, the Omni

23     Corporation, sort of developed the security policies and

24     then shot those to the locals, and then the locals adopted

25     it to suit their needs?

Shadday v. Omni Hotels                          Fred Del Marva
1:04-CV-1219-JDT-WTL                             12/9/2005

                                                            183

 1        A.    Correct.

 2        Q.    It's okay to do that, and that's pretty standard

 3   in the industry, right?

 4        A.    Yes.

 5        Q.    You don't have a problem with the fact they've

 6   done it?

 7        A.    No, not at all.

 8        Q.    Have you ever set up a security program for a

 9   hotel like this one?

10        A.    Set up?

11        Q.    Yes, sir.

12        A.    I have never set up anything from the beginning.

13   I've always come in as a consultant to evaluate what they

14   had.  It takes too much time to set up from the beginning.

15   I don't have that time.

16        Q.    Come in after the fact and critique, offer

17   suggestions to improve or change, but never actually set

18   up and implement it?

19        A.    Correct.

20        Q.    Have you ever worked as a law enforcement

21   officer?

22        A.    No.

23        Q.    Now I've got a few questions about the summary

24   of your findings.  This is sort of, as I read it, kind of

25   the fact section of your report on Page 2.  One of the

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                         **12/9/2005**

184

1    things that you have got in your summary of findings,

2    second paragraph --

3        A.    On what page?

4        Q.    Summary of findings is on Page 2, second

5    paragraph.

6        A.    Okay, yes.  Go ahead.

7        Q.    Looks like it is the second to last sentence.

8    You've got, "Alfredo purchased two beers for the

9    plaintiff, who in my opinion would have been displaying

10   signs of intoxication"?

11       A.    Yes.

12       Q.    Are you saying that Alfredo Rodriguez would have

13   been displaying signs of intoxication or that Ms. Shadday

14   would have been displaying signs of intoxication?

15             And I'll tell you why.  We can maybe make this

16   real short.

17       A.    Where do you see this?  I'm sorry.

18       Q.    Let me point it out to you.  Right here, "Up

19   until the time," it's that sentence there.

20       A.    Okay.

21       Q.    Just read it, and I'll reask my question.

22       A.    "Alfredo had purchased two beers for the

23   plaintiff, who in my opinion would have been displaying

24   signs of intoxication."  I'm talking about the plaintiff.

25       Q.    Okay.  You are not offering any opinions in this

Shadday v. Omni Hotels                          Fred Del Marva
1:04-CV-1219-JDT-WTL                            12/9/2005

185

1    case that Mr. Rodriguez was overserved; is that true?

2        A.    No.

3        Q.    Do you intend to offer any opinions in this case

4    that Ms. Shadday was overserved?

5        A.    As far as liability with regard to dram shop

6    cases, no.

7        Q.    What is the significance then of putting in your

8    report that Ms. Shadday would have been displaying signs

9    of intoxication?

10       A.    Based on what she consumed in the period of time

11   that she consumed it, she would have been displaying signs

12   of intoxication at the bar.

13       Q.    The timeline on this is, they went to dinner,

14   she went to dinner with a group around 6:30 or so; is that

15   your understanding?

16       A.    Right, but she had no alcohol at that time.

17       Q.    That dinner lasted a couple hours?

18       A.    Correct.

19       Q.    So that would take them up to, say, 8:30?

20       A.    Correct.

21       Q.    And then she went up to her room, and she had

22   four beers in her room?

23       A.    They stopped to buy beer, she went up to her

24   room, which is a little -- I would say about 9:30.  So she

25   had four beers from 9:30 to -- what time did they get down

1      to the bar?  I don't recall.

2           Q.     Midnight, I think she said.

3           A.     So she had four beers in those three hours.

4      Then she went down and then she had three more beverages,

5      I believe.  So she had seven beverages within a four or

6      five-hour period of time.  Would she have been displaying

7      signs of impairment at the bar?  Yes.  Should they have

8      served her?  No.  Again, it doesn't go to the proximate

9      cause.

10          Q.     The bar didn't serve her, though; Mr. Rodriguez

11     bought her the drinks?

12          A.     He bought it for her, right.

13                 In the bar environment, when you see a woman, a

14     single woman, where you would more likely know that she's

15     with strangers, and you see that they're impaired, under

16     normal circumstances you offer some sort of assistance for

17     them to go up to their room.  That wasn't offered at all.

18     Again, this is just my opinions of the summary of findings

19     and --

20          Q.     Well, in fairness, though, Ms. Shadday, when she

21     went out to the lobby, she went up to the room on her own

22     and came back?

23          A.     For cigarettes, correct, correct.  So I mean I'm

24     not going to render an opinion on that the hotel was

25     reckless in the way they served her alcohol or served him

1    alcohol.

2        Q.    Do you say that they were negligent in the way

3    they served them alcohol?

4        A.    No, I'm not going to testify to that.

5        Q.    Now, one of the things you stated in the next

6    paragraph -- well, excuse me.  Yeah, in the next

7    paragraph.  Okay.  One of the things you put down is, "At

8    no time did hotel security or any other hotel employee

9    pass through that area --" I'm assuming that means the

10   lobby; is that correct?

11       A.    That's correct.

12       Q.    So at no time did hotel security or any other

13   hotel employee pass through the lobby to make observations

14   of intoxicated patrons consuming alcohol in the lobby.

15             My question is simple.  How do you know this?

16       A.    Because Jarquin was the only person supposed to

17   be at that position, and there's no testimony of anybody

18   else going through the lobby and taking his post at that

19   time.  There's no testimony to that.

20       Q.    But you don't talk about -- you're talking about

21   hotel employees, also, and the testimony in this case is

22   that there were people behind the desk, at least two, a

23   doorman and the folks out front.

24       A.    It should have been more specific and say

25   security.

188

1        Q.      And the basis for that statement is that

2   Mr. Jarquin says that he didn't go through the -- didn't

3   see her in the lobby; is that right?

4        A.      Mr. Jarquin said what, sir?

5        Q.      That he did not see this group in the lobby.

6        A.      He wasn't there, Jarquin.  He's the one that

7   went home.

8        Q.      The statement is incorrect then, "At no time did

9   hotel security or any hotel employee pass through the

10  area."  So what it should say is, it's your opinion that

11  at no time did hotel security pass through the area?

12       A.      Correct.

13       Q.      Because, in fact, there were other hotel

14  employees around?

15       A.      I don't know if they passed through the area.  I

16  know they were behind the front desk.  I don't know if

17  they passed through that area.

18       Q.      I'll tell you that where they were sitting at is

19  directly in front of the front desk; other side of the

20  lobby, but directly in front of the front desk.

21       A.      Okay.  The one you're reading doesn't contain my

22  supplement.

23       Q.      I was going to get to that in a second.  I need

24  that, though.

25               Couple questions I have for you is this:  Do you

189

1    have a problem with the fact that the hotel folks, the

2    security officers, don't wear uniforms?

3        A.    I do.

4        Q.    Okay.  They should wear uniforms, in your

5    opinion?

6        A.    There was no identifiable badges or nameplate or

7    anything, according to Jarquin.  According to the director

8    of security, they wear badges.  According to Jarquin, he

9    doesn't wear a badge, he doesn't wear anything.

10            Should they?  Some years back a lot of hotels

11   changed into plain clothes.  As a security expert, I

12   disagree with it.  It gets rid of all -- any deterrent

13   factors whatsoever.  I don't think it's right.  I think

14   they should have some identifiable information on them

15   showing that they are security.

16       Q.    And what should that be?  In a property that

17   you've described with this, it solicits the type of

18   clientele and so forth like this Omni Shoreham with

19   dignitaries, what type of uniform should the security

20   folks be dressed in?

21       A.    I don't have a problem with a suit or a sport

22   jacket or a blazer, a blazer with an emblem on it.  I mean

23   when according to defense, that nobody is in the

24   surveillance room, so nobody's really monitoring, so that

25   gets rid of some proactive ways, the only other thing is a

190

1    deterrent, and the deterrent is a security guard that you

2    can see is security, and that's the main deterrent.  Even

3    the vice president of operations testifies that forget

4    about surveillance; it's a person being there is the

5    deterrent, and we didn't have that because nobody was

6    identified as being security.

7         Q.    I think the context of that statement, though,

8    is just someone being there period, just a person, not

9    necessarily security.

10             So they should have a blazer with an emblem.

11   What type of an emblem?

12        A.    Something --

13        Q.    Like a badge-type sewn on?

14        A.    Something really -- it's a classy hotel.  I mean

15   something of style, something that's not going to, you

16   know, stick out that you need something 6 by 6.  Something

17   that just identifies them as Omni security or a nice brass

18   nametag that says "Barnett, Security," something that

19   identifies them as being an employee of security.

20        Q.    Well, they do wear nameplates that have their

21   names on them?

22        A.    According to Jarquin, they didn't.  He said he

23   doesn't have anything on his uniform.

24        Q.    I think that's a misunderstanding on your part.

25   I think what he was talking about was like a badge.

191

1          A.      Looks like his testimony had a lot of

2     misunderstandings, I guess.

3               He even says that after the incident, they

4     increased their security in the lobby.

5          Q.      Let's stay focused on the name badge thing.

6          A.      I'm focusing.

7               His deposition testimony, Page 22, 6 through 9,

8     "Do you wear any kind of security badge or anything that

9     would identify you as security?"

10              "No."

11         Q.      I want you to assume they wear nametags.  I mean

12    they all have on a nametag that worked at the hotel.  It's

13    got your name with a little Omni logo on it.

14         A.      Okay.  I'm assuming that.

15         Q.      And would that be appropriate, or does it have

16    to be something that says "Security"?  In other words, if

17    you have something on that identifies you as an employee

18    of the hotel.

19         A.      I like the word "Security."  In a drinking

20    environment by a bar, by a lounge area, I like the word

21    "Security."

22         Q.      It would be a truthful statement that if you

23    don't have "Security" on your name badge or some type of

24    thing, then folks that see you with a name badge on that

25    says "Omni" could assume that perhaps more people are in

192

1      security than, in fact, really are?

2          A.    I don't think so, unless you see a little old

3      lady with a mop and a bucket with a nametag on it.

4          Q.    The other thing you've got in your little

5      supplement is, you talk about the incident such as this

6      being foreseeable and more likely to occur when

7      intoxicated patrons are allowed to patronize the lobby

8      without being monitored.

9                I think we talked about this, but again, you're

10     assuming that the folks are intoxicated; is that right?

11     In other words, I know we're struggling with this

12     language, but --

13         A.    I believe the plaintiff and Rodriguez were

14     intoxicated, yes; and more likely than not, the people

15     that they were with, also, although there's no evidence to

16     that.

17         Q.    You also believe that the incident had become

18     more foreseeable and likely to occur when management

19     relies upon local police officers to be a deterrent inside

20     the premises.

21               How so?  How is the presence of a local police

22     officer in uniform, with a badge and a gun and a

23     walkie-talkie, how is that not a helpful thing for a

24     hotel?

25         A.    The testimony is that we have local police

193

1    officers come there, but the testimony is that they come

2    there for lunch or they come there for dinner.  They're

3    making it sound like we're using them as part of our

4    deterrent.  It's not happening that way.  They're

5    delegating this duty to them now, I mean we don't need any

6    security guards here because we have local law enforcement

7    come in there.  They don't stop in there all the time.

8        Q.    Well, how do you know that?  You've never

9    visited the property; you've never talked to anyone from

10   Washington, D.C.  It's an assumption that they never stop.

11       A.    Were they there that night?  No.  There's not

12   one shred of evidence to show that they made any kind of

13   check on that hotel, not one.

14       Q.    And there's no evidence to the contrary; that

15   they didn't stop by the hotel that night?

16       A.    There's not one shred of evidence to show that

17   they ever were in the hotel, other than testimony that

18   they come there to each lunch and dinner at the

19   commissary.

20       Q.    You say there's no evidence that they were there

21   or not -- that they were there that night; is that right?

22       A.    Correct.

23       Q.    There's also no evidence that they weren't there

24   that evening; is that right?

25       A.    Correct.

194

1      Q.     But we do know there would have been Secret

2    Service agents; we don't know how many, but we do know

3    there would have been Secret Service agents in the Omni

4    Shoreham Hotel that night, because the Guatemalan

5    President and his entourage were staying there; is that

6    true?

7      A.     I don't know that.

8      Q.     You believe that the Heads of State stay in the

9    United States without Secret Service protection?

10     A.     Maybe they had their own protection.  I don't

11   know.

12     Q.     Okay, let's go with that.  The Guatemalan

13   security -- he would have had his own security forces

14   there in addition to the Secret Service, true?

15     A.     Correct, correct.  Were they there in the lobby

16   that night?  I don't think so.

17     Q.     How do you know that?

18     A.     I don't know.  We don't know if they were there;

19   we don't know if they weren't there.

20     Q.     You also have listed when management depends on

21   untrained personnel to be their security eyes, events like

22   this become more foreseeable?

23     A.     Correct.

24     Q.     Is that what we're talking about in the employee

25   manual?

195

1       A.      Correct.

2       Q.      You believe it's inappropriate to have folks at

3   the Omni be the eyes and ears of the hotel and report

4   suspicious activity?

5       A.      I didn't say it's inappropriate.  I mean I think

6   I mentioned the janitors that have no radios, I mean

7   they're supposed to be their eyes.  They have no way of

8   communicating with them.

9       Q.      So every employee of the hotel, whether they're

10  in housekeeping or whatever, should have a walkie-talkie?

11      A.      No, I'm not saying they have to have a

12  walkie-talkie.

13      Q.      Well, explain what you mean by your last

14  statement.

15      A.      I think I've -- I can't explain it any clearer

16  than what I did.

17      Q.      It's inappropriate to have the hotel staff, all

18  of them, looking out for suspicious activity if you don't

19  provide them with some way to communicate?

20      A.      I'm not saying it's inappropriate.  I don't say

21  it's inappropriate.  I said it's foreseeable that

22  incidents like this can happen when you do.  I'm not

23  saying it's inappropriate.  I'm just giving the

24  foreseeability.

25      Q.      What about having 400 people -- wouldn't you

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                       **12/9/2005**

196

 1    agree that if the hotel staff were told not to report
 2    suspicious activity and just ignore it, that it would be
 3    more foreseeable that bad things would happen inside a
 4    hotel?
 5         A.    I don't think they would ignore it.  I mean I
 6    don't think it would be ignored.  That's not something
 7    that's done in the hotel industry.
 8         Q.    Well, but you believe that because Omni has a
 9    policy that says you are the eyes and ears of the hotel,
10    that everybody has a primary responsibility in security,
11    you think that that makes bad things to happen inside the
12    hotel more foreseeable?
13         A.    Correct.
14         Q.    As opposed to if that policy didn't exist and
15    people were to rely on their own common sense?
16         A.    It would make it more foreseeable -- I'm sorry,
17    you confused me there.
18         Q.    And I don't mean to.
19         A.    I understand that.
20         Q.    You believe that because there's a policy at the
21    Omni that tells the staff that one of their primary
22    responsibilities is the safety and security of guests,
23    that that policy makes it more foreseeable that sexual
24    assaults like this will happen?
25         A.    You use the word "primary responsibility."

197

1    There is no evidence to show that they instruct their 400

2    employees that it's their primary responsibility.  I mean

3    do you have testimony that they're saying it's primary?  I

4    don't see anything else that says it's primary.

5         Q.    Let's go to the employee manual, "Your Role in

6    Security."  First sentence, I will read it.  "As an

7    associate of Omni Hotels, one of your primary

8    responsibilities is the security of our guests, their

9    property, your fellow associates, and the property of the

10   hotel."

11        A.    Yes.

12        Q.    You just said that there's no evidence that

13   that's one of their primary responsibilities.  I would

14   suggest that their employee manual telling them it's one

15   of their primary responsibilities, that would be evidence

16   that it is.

17        A.    And I'll go back to my same opinion; is that I

18   don't have one shred of evidence that anybody at the hotel

19   has ever received this.  And on the record, I would like

20   you to provide the sign-off sheets of the employees

21   showing that this was given to them and they've read it

22   and understood it; and I would request Mr. Townsend to do

23   the same and request that in a supplement interrogatory or

24   document request.

25        Q.    But you believe that because this policy exists,

198

1      it's more foreseeable that sexual assaults like the one we

2      were talking about are more likely to happen?

3          A.    If you're going to rely on that, you have a

4      problem.  It's a nice policy.  It sounds very nice, all

5      right.  It's a proper wording of a policy.  Is it going to

6      prevent something like this from happening?  No.  Is it

7      going to be foreseeable that if you're going to delegate

8      these nondelegable duties to a janitor, to a bellman, to a

9      doorman, to a front desk person, that if something

10     happens, to call me, and only use that as a vehicle to

11     protect somebody, it's no good; and that's what they did

12     this particular night.

13         Q.    Well, in fact, that's not what they did this

14     night.  There were security guards working; isn't that

15     true?

16         A.    There was nobody in the lobby, and all we're

17     talking about is lobby staff.  But there was no security

18     in the lobby.  The only security in the lobby were the

19     people working behind the front desk, that's it.

20         Q.    And the doorman and the bellman?

21         A.    And the doorman and the bellman.  That's the

22     only security we had, and that's not security.  Those are

23     extra eyes.  That's not security.

24         Q.    But if they see something --

25         A.    These are untrained, unqualified people to

199

1     handle any security issues.

2          Q.     There would have been a night manager on duty;

3     that person would be trained in security to a certain

4     degree, would they not?

5          A.     There's no testimony that the MOD was trained.

6          Q.     Again, I just want to make sure I understand

7     this.  You believe that Omni's "Your Role in Security"

8     policy, instructing their associates that one of their

9     primary responsibilities is the security of their guests

10    and that they should report suspicious activity, that

11    makes sexual assaults more likely to occur?

12         A.     You're trying to put words in my mouth.  I'm not

13    saying that.

14             I'm saying that this is a good policy, all

15    right; but this doesn't circumvent having a security guard

16    in the lobby at this particular time.  So not having a

17    security guard in the lobby makes it more foreseeable.

18         Q.     And I want to talk about the delegable -- you

19    keep talking about nondelegable duties.  Where's the

20    evidence that Omni has delegated a security function, to

21    use your phrase, to all of its staff?

22             In other words, you've acknowledged this is a

23    good policy to have people report suspicious activity and

24    noise and things such as that.  Where is your -- what is

25    the basis for your statement that the Omni has delegated

200

1    the security function to folks?

2       A.    The vice president of operations testifies that

3    we have all these eyes; the general manager, we rely on

4    these people.   That's delegating the security to these

5    people.

6       Q.    That they're to keep their eyes open and report,

7    that's --

8       A.    That's delegating security responsibilities to

9    them.

10      Q.    So assuming that to be the case, then by

11   Mr. Carmello's testimony, there would have been 402

12   security officers on duty at the time?

13      A.    Exactly, and nobody saw this with the 400 of

14   them being there, and none of them were in the lobby area

15   where she was assaulted.

16      Q.    You would agree that a hotel can't have people

17   in every area of the hotel at every time?

18      A.    That's why you need security.   You can't rely on

19   nonsecurity personnel to be your security eyes.

20      Q.    Then you would agree that you can't have

21   security officers in every area of the hotel at all times?

22      A.    I agree with you.

23      Q.    And it would be unreasonable to expect a hotel,

24   no matter how many stars or diamonds or how few stars or

25   diamonds, to have a security officer in every area of the

Shadday v. Omni Hotels                          Fred Del Marva
1:04-CV-1219-JDT-WTL                            12/9/2005

201

1    hotel at all times?

2        A.    But we're not here to talk about every area of

3    the hotel at all times.  We're here to talk about one

4    particular time of day where they were not there that they

5    could have prevented this.

6        Q.    You also have a statement in here that when the

7    level of security is dictated by revenue.  Explain what

8    you mean by that.  What evidence do you have that the

9    level of the Omni Hotel's security is dictated by revenue?

10       A.    Well, the testimony of the vice president.  I

11   think his testimony displays a reckless disregard for the

12   safety of patrons when he testified that this one million

13   square foot hotel could be secured by one person, and that

14   would be during a 20 percent occupancy.  So the occupancy

15   is low, the revenue is low, so you have to keep the level

16   of security low.  It doesn't work that way.

17       Q.    Well, didn't you agree with me earlier that one

18   of the things you take into account is your occupancy

19   levels, and so the more people that are in the hotel, the

20   more security officers you should have?

21       A.    But there has to be a minimum, and I believe on

22   this night three people were the minimum.  He's talking

23   about one person.  I mean you can't get any more careless

24   and reckless than that testimony that he made.

25       Q.    Is there any evidence that the Omni Shoreham has

202

1    ever had one security officer on staff?

2         A.    Only the testimony of the vice president of

3    operation.

4         Q.    Which when he says that he starts out at one as

5    the minimum, and you go up from there based on the needs?

6         A.    And that he could run -- that one would be

7    sufficient under circumstances.

8         Q.    And you also mention in here "when management

9    knows there are a lot of mentally ill people that come

10   into the lobby and security has no presence in that area"?

11        A.    Correct.

12        Q.    What evidence do you have that a lot of mentally

13   ill people come into the lobby?

14        A.    That's from the deposition testimony.

15        Q.    Of who?  Do you remember?

16        A.    Barnett, 46, 10 through 13; that they have a lot

17   of people that just walk in off the street who may be

18   mentally ill or do not belong there at the hotel and that

19   they have to deal with.

20        Q.    You left out the "don't belong there" when you

21   put in here "mentally ill."  I mean he says a lot more

22   than mentally ill in his statement; would you agree with

23   that?

24        A.    I'm just reading his statement.  "We have a lot

25   of mentally ill or don't belong -- or that don't belong

203

1      there."  I mean it seems as if you're trying to say that

2      I've misread everything that these security officers have

3      testified to.

4          Q.    This supplement was completed last night, you

5      said; is that right?

6          A.    Yes.

7          Q.    I just have a few questions for you about

8      Exhibit No. 19.  We see here at various locations there

9      are numbers.  Do you know what those numbers signify?

10         A.    It doesn't signify -- I don't know exactly what

11     it signifies.  It's a code that is used by CAP.  It

12     could -- I don't know exactly what it signifies, and I

13     defer to them as far as the results of their survey is

14     concerned.

15         Q.    For example, if we look right here adjacent to

16     the hotel, there's a 30 and there's a 22.  You don't know

17     whether that's the crime level for the area or not?

18         A.    I questioned it one time.  I don't remember.  It

19     could be, though; it could be.

20         Q.    Just like we look at the Shoreham, the closest

21     number to the Shoreham and its color is one, one, two or

22     is this 112?

23         A.    Right.  It's a combination of all those numbers

24     that come up with the score.

25         Q.    Is the document that you're looking at, is that

Shadday v. Omni Hotels                    Fred Del Marva
1:04-CV-1219-JDT-WTL                        12/9/2005

204

```
 1    contained in this 2A exhibit?

 2        A.    No, no.

 3        Q.    What is the document you're looking at?

 4        A.    You mentioned earlier in the deposition that in

 5    my deposition summary, I have some things in black and

 6    some things in red.

 7        Q.    Uh-huh.

 8        A.    These are all the red issues.

 9        Q.    Did you take all the red out and submit it into

10    one document --

11        A.    Correct.

12        Q.    -- put it into one document?

13        A.    Correct.

14              MR. THORNBURG:  Go ahead and mark this as 2C.

15              (Deposition Exhibit No. 2C was marked for

16    identification.)

17    BY MR. THORNBURG:

18        Q.    Looking at the incidents, you've divided them

19    into pre and postincidents?

20        A.    I think so, yes.

21        Q.    You've got various tabs on pages.  Do the tabs

22    signify anything?

23        A.    It should signify the highlighted areas of what

24    the incidents were.

25        Q.    So, for example, one of them we see is an
```

```
1    incident from -- well, we've got this one as the first

2    one, for example, on here.

3         A.    Okay.

4         Q.    Which is a --

5         A.    I don't know if that's --

6         Q.    No, I'm sorry, this is a fourth-degree sexual

7    assault.

8         A.    At the premises.

9         Q.    Yeah, Karen Nicole Lombardi is the first one,

10   and you just have a sticky on that.

11        A.    Right, and that was another sexual assault at

12   the defendant's premises.

13        Q.    Then you've got the second one, which is this

14   incident.  You've got indecent exposure flagged, ADW

15   bottle, assault with a deadly weapon with a bottle; is

16   that right?

17        A.    Yes.

18        Q.    And then you have got a first-degree sexual

19   abuse, which is just a copy of a previous one?

20        A.    Correct.

21        Q.    What is the significance of the ones that you've

22   highlighted there?

23        A.    I mean the significance is that this happened at

24   the hotel, these incidents, this fourth-degree sexual

25   assault, another sexual assault, assault with a deadly --
```

206

1    this happened at the hotel prior to this incident, so this

2    is not -- we can't say that this hotel is a squeaky clean

3    hotel that had no prior problems with sexual assaults or

4    violent conduct; and that's the reason why a level of

5    security is needed at this hotel that would be greater

6    than one that is squeaky clean, if you can find a squeaky

7    clean one.

8        Q.    In fact, it's pretty unlikely to find a hotel

9    without some crime there, whether it be a theft or a rape

10   or something, correct?

11       A.    I would agree with you.

12       Q.    In the Howard University medical records for

13   Ms. Shadday, you have highlighted that her eye opening was

14   spontaneous, that her visual response was oriented and

15   that her motor response was obeys command, she has a score

16   of a 15; is that correct?

17       A.    Yes.

18       Q.    Why was that highlighted?

19       A.    I'm not going to render an opinion in that area.

20   I'm not a doctor or a toxicologist.

21       Q.    You were highlighting that because it would tend

22   to support or not support an opinion as to overserving,

23   which is not something you're going to talk about in this

24   case?

25       A.    I'm not going to be talking about that,

**Shadday v. Omni Hotels**                    **Fred Del Marva**
**1:04-CV-1219-JDT-WTL**                      **12/9/2005**

 1    correct.

 2               MR. THORNBURG:  I think we're done, believe it

 3    or not.

 4               THE WITNESS:  I'll waive signature.

 5               (The deposition concluded at 3:33 p.m.)

 6

 7

 8                              (Signature waived.)

 9                         FRED DEL MARVA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shadday v. Omni Hotels                     Fred Del Marva
1:04-CV-1219-JDT-WTL                           12/9/2005

                                                                    208

1    STATE OF ARIZONA    )
                         )  ss.
2    COUNTY OF MARICOPA  )

3

4            BE IT KNOWN that the foregoing deposition was

5    taken before me, JODY L. LENSCHOW, Certified Reporter

6    No. 50192 for the State of Arizona, and by virtue thereof

7    authorized to administer an oath; that the witness before

8    testifying was duly sworn by me; that the questions

9    propounded by counsel and the answers of the witness

10   thereto were taken down by me in shorthand and thereafter

11   transcribed under my direction; that a review of the

12   transcript by the witness was waived; that the foregoing

13   pages contain a full, true, and accurate transcript of all

14   proceedings and testimony had, all to the best of my skill

15   and ability.

16           I FURTHER CERTIFY that I am not related to nor

17   employed by any of the parties hereto and have no interest

18   in the outcome thereof.

19           DATED at Phoenix, Arizona, this 13th day of

20   December, 2005.

21

22

23

24                         JODY L. LENSCHOW, RMR, CRR
                           Certified Reporter
25                         Certificate No. 50192