UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MIRANDA SHADDAY, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) 1:04-cv-1219-JDT-WTL <br> OMNI HOTELS MANAGEMENT ) <br> CORPORATION, ) <br> ) <br> Defendant. ) | |

**ENTRY GRANTING DEFENDANT OMNI HOTELS MANAGEMENT CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 19)**[1]

In this action, Plaintiff Miranda Shadday seeks an unspecified amount of damages from Defendant Omni Hotel Management Corporation ("Omni") for its alleged negligence in failing to provide her reasonable security during her stay in one of its hotels, the Omni Shoreham Hotel (the "Shoreham"), from May 1 through May 4, 2004. During that stay, another hotel guest, Alfredo Rodriguez Mahuad, sexually assaulted and raped Ms. Shadday.

Ms. Shadday filed a complaint in Marion County Superior Court on June 21, 2004, and Omni subsequently removed the complaint to this court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. On May 20, 2005, Omni moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), seeking dismissal

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

of Ms. Shaaday's claim for damages. (Mot. Partial Summ. J. 1.) Omni contends that because Mr. Rodriguez's assault on Ms. Shadday was not foreseeable, it did not owe her any duty of care to prevent the assault. (*Id.*) Ms. Shadday responded to the motion on September 26, 2005, with a reply brief being filed on December 23, 2005. Ms. Shadday filed a surreply on January 11, 2006, in which she addresses an argument Omni purportedly first raised in its reply. Therefore, the motion for summary judgment is more than fully briefed and ripe for determination.

**I.   BACKGROUND**

Omni owns and operates hotels throughout the country, including the Shoreham, which is located at 2500 Calvert Street N.W., in Washington, D.C. (Compl. ¶ 1.) According to the Shoreham's manager, Francis Carmello, the hotel has approximately one million square feet of common area. (F. Carmello Dep. 13:16-18.) Omni touts the safety record of the Shoreham, and describes the area around the hotel as having one of the lowest crime rates in Washington, D.C. (Carmello Dep. 27:15-20.) The hotel employs a full time security manager who keeps in regular contact with the local chief of police (*id.* 39:1-19), and holds monthly meetings with the hotel security team (R. Barnett Dep. 5:13-15).

The Shoreham's security staff surveys the property three to four times per shift (*id.* 22:6-14), with each round taking approximately one hour to complete (*Id.* 22:6-14). When security staff members are not on patrol, they remain in the security office or the

main lobby.  (*Id.* 29:1-2.)  The Shoreham's security policies and procedures apparently are regularly reevaluated and changed, if necessary.  (Carmello Dep. 19:9-15.)

Ms. Shadday is a resident of the State of Indiana.  She works for Batesville Casket Company in Batesville (M. Shadday Dep. 18:9-11), and is a member of the Steel Workers of America Union (*Id.* 29:12-13).  Ms. Shadday was a guest at the Shoreham from May 1 through May 4, 2004 (Compl. ¶ 4), where she was attending a Women of Steel union conference (Shadday Dep. 33:16-19).  As expected, Ms. Shadday paints a different picture of the Shoreham's security.

Ms. Shadday points out that according to a member of the Shoreham's security staff, security guard Edwin L. Del-Cid, there normally are only three security guards working in the hotel between 11:00 p.m. and 7:30 a.m. (E. Del-Cid Dep. 16:10-14.)  One guard monitors the hotel lobby, while a second patrols the hotel and a third watches the video camera monitors.  (*Id.* 16:19-17:1.)  The Shoreham does not keep statistics of crimes that occur within the hotel.  (Carmello Dep. 39:19-22.)  However, its guards have testified that mentally ill people trespass on the property (Barnett Dep. 46:10-13) and try to sleep in the lobby.  (Del-Cid Dep. 23:6-14.)  Apparently numerous domestic disputes have occurred on the premises of the Shoreham, to which Mr. Del-Cid has responded occasionally.  (*Id.* 24:4-12.)  According to police statistics, two cases of sexual assault, fourteen cases of assault with a deadly weapon, forty-four cases of robbery, eighty-five cases of burglary, two hundred eighteen cases of theft, seventy-two cases of stolen cars and two hundred two cases of theft from automobiles occurred within a two

thousand foot range of the Shoreham during the three years prior to Ms. Shadday's stay there in May 2004. (Fred Del Marva Aff. ¶ 12.)

On May 1, 2004, Ms. Shadday checked into the Shoreham at about 5:30 p.m. (*Id.* 42:22-43:19.) Shortly thereafter, she went out to dinner with several other conference-attendees. After returning from dinner, at about midnight, Ms. Shadday went to a lounge in the first floor of the hotel, the Marquis, where she sat at the bar and ordered a drink. (*Id.* 59:13-14.) At that time, more than one hotel employee was working in the lounge. (*Id.* 62:10-13.)

Several other patrons also sat at the bar, including Mr. Rodriguez. (*Id.* 63:3-13.) Mr. Rodriguez is a Guatemalan citizen who was visiting Washington, D.C. with a contingent from Guatemala, including the President of that country. (Carmello Dep. 25:18-20.) Omni describes Mr. Rodriguez as an "apparently highly regarded attorney." (Def.'s Mot. Summ. J. 1.) At the bar, Mr. Rodriguez engaged Ms. Shadday in conversation (Shadday Dep. 63:3-13), and purchased her two drinks (*Id.* 63:25-64:6). Ms. Shadday testified that Mr. Rodriguez did not make her feel uncomfortable at the bar (*id.* 64:17-20), nor did they flirt (*Id.* 78:2-6). At no time did Ms. Shadday feel intoxicated. (*Id.* 76:10-14.)

The Marquis closed at approximately 1:00 a.m., so Ms. Shadday, Mr. Rodriguez and several other patrons congregated in the hotel lobby. (*Id.* 66:20-67:20.) At 2:00 a.m., Ms. Shadday went to her room for a brief period, leaving a partially consumed drink in the hotel lobby. (*Id.* 73:5-7.) When she returned, she recalls hearing a woman

4

say to Mr. Rodriguez, "oh, you're so naughty." (*Id.* 73:3-19.) Ms. Shadday finished her drink, and began to feel impaired, but not necessarily intoxicated. (*Id.* 76:23-77:11.) She decided to return to her room, and walked around the corner from where the group was sitting, and away from the front desk and several hotel employees. (*Id.* 84:9-12, 87:2-11.)

As Ms. Shadday approached the elevator, she encountered Mr. Rodriguez, who had left the group and was talking on his cell phone. (*Id.* 81:21-22.) He indicated that she should wait for him to finish his call, which she did. (*Id.* 82:5-20.) He then began to kiss and touch Ms. Shadday. (*Id.* 81:21-25.) Ms. Shadday apparently did not kiss Mr. Rodriguez back, and told him to stop. (*Id.* 81:24-25.) She tried to push Mr. Rodriguez back (*id.* 83:17-18), but it does not appear that she raised her voice because she didn't see anyone around (*Id.* 81:24-82:1, 84:7-8). At that point, Mr. Rodriguez unzipped Ms. Shadday's pants, placed his fingers inside her underwear and sexually assaulted her. (*Id.* 86:4-18.) She fought away from him and got into the hotel elevator. (*Id.* 87:18-19.) Mr. Rodriguez followed Ms. Shadday into the elevator, where he raped her. (*Id.* 89:16-19.)

Afterward, Ms. Shadday was able to exit the elevator on her floor, and immediately sat down in the hallway and called her fiancee. (*Id.* 94:7-95:3.) While security guard Richard Barnett was on routine patrol, he came upon Ms. Shadday yelling and screaming on her phone. (Barnett Dep. 40:7-17.) After learning of the situation, Mr. Barnett escorted Ms. Shadday to identify Mr. Rodriguez. (*Id.* 42:7-11.)

5

Mr. Rodriguez subsequently was arrested, and pled guilty to misdemeanor sexual abuse.

At the time of the assault, twenty employees were likely in the vicinity, including bell, valet, front desk and cleaning staff. (Carmello Dep. 12:5-15.) On that night, one of the Shoreham's three security guards on duty, Mario Jarquin, had become sick and was not performing his duties. (Del-Cid Dep. 12:7-16.) That left Mr. Barnett and Mr. Del-Cid patrolling the premises at the time of the incident, with no one monitoring the video cameras or the lobby. (*Id.* 11:15-19.) There were no security cameras in the areas where the assault occurred. (Barnett Dep. 33:15-17.)

As a result of Omni's alleged negligence, Ms. Shadday seeks damages for medical expenses, pain and suffering, mental anguish and emotional distress. (Compl. ¶ 7.)

## II.   STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn

therefrom, in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).

### III.    DISCUSSION

In its motion for partial summary judgment, Omni requests that the court dismiss Ms. Shadday's negligence claim. It contends that under Indiana's choice of law analysis, the substantive law of Washington, D.C., where the assault occurred, applies to the claim. And under District of Columbia law, in order for a hotel owner to be held liable for a criminal act committed by a third person on its premises, the act must have been foreseeable. Omni argues that Mr. Rodriguez's assault on Ms. Shadday was not foreseeable because it had no advance notice that that particular crime would occur on its premises. Omni therefore suggests that it did not owe Ms. Shadday any duty of care to prevent the assault, and can have no liability for her damages.

Ms. Shadday agrees that the substantive law of the District of Columbia applies to her negligence claim. However, as expected, she disagrees with Omni as to the final result of the application of that law. Ms. Shadday contends that under District of Columbia law, a hotel owner need not have actual knowledge that a particular crime previously had been committed on its premises for it to be foreseeable. Instead, it need only have an increased awareness of the danger of criminal acts on or near the premises. According to Ms. Shadday, Omni had or should have had such knowledge

7

before Mr. Rodriguez assaulted her, and therefore its failure to protect her from the assault was a breach of its duty of care to her.

Generally speaking, to bring a negligence claim, a plaintiff must establish (1) that the defendant had a duty to the plaintiff; (2) that the defendant breached that duty; and (3) that the breach of the duty was the proximate cause of injury to the plaintiff.  *See, e.g., Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1097-98 (D.C. 1994).  In its motion, Omni questions one of these essential elements of Ms. Shadday's negligence claim—that it had a duty to protect Ms. Shadday from Mr. Rodriguez's assault.

The law of the District of Columbia holds a hotel owner liable for an assault committed on one of its guests by a third party if the hotel owner breached a duty imposed by reason of the innkeeper-guest relationship.  *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477, 482 (U.S. App. D.C. 2002).  A hotel owner generally is bound to exercise reasonable care to protect its guests from an assault by a third party, whether a hotel employee, fellow guest or intruder, if the assault could, or in the exercise of reasonable care, should have been anticipated.  *Id.  See also, Hooks v. Washington Sheraton Corp.*, 578 F.2d 313, 315 (U.S. App. D.C. 1977).  The theory of liability has been described as follows:

> because the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated. However, there is no liability normally imposed upon the one having the power to

8

>act if the violence is sudden and unexpected provided that the source of the violence is not an employee of the one in control.

*Id.* at 483. In *Croce v. Hall* and *Battle v. George Washington University*, it was held that the only applicable standard to determine negligence liability under such circumstances is whether the owner of an establishment exercised reasonable care. 657 A.2d 307 (D.C. 1995); 871 F. Supp. 1459, 1461 n. 3 (D.D.C. 1994).

District of Columbia courts have held that liability for third party criminal activity depends upon a more "heightened" showing of foreseeability than would be required for mere negligence. *See Bailey v. District of Columbia*, 668 A.2d 817, 819 (D.C. 1995). *Bailey* provides a good demonstration of how the courts in the District of Columbia apply this standard. Ms. Bailey sued the District of Columbia for injuries she received from a random shooting as she was leaving a school. Despite her argument that there had been a high occurrence of shootings in and around the school that made her shooting foreseeable, the District of Columbia Court of Appeals sustained dismissal of Ms. Bailey's complaint because she "proffered no evidence of any shooting incidents, assaults, or other gun-related violence at any . . . event held at [the school]." *Bailey*, 668 A.2d at 820. In other words, a plaintiff must show that the risk of the type of injury suffered by her was foreseeable, not just that the prospect of criminal conduct was likely. *Id.*

Given this standard, the court concludes that Ms. Shadday has failed to demonstrate that Mr. Rodriguez's assault on her was foreseeable to Omni. First, there

9

is no direct evidence before the court of crimes having occurred at the Shoreham (assaults or otherwise) that should have put Omni on notice of potential future assaults. Citing the deposition testimony of Messrs. Barnett, Del-Cid and Carmello, Omni asserts that there had been no assaults, batteries, burglaries or thefts on the premises within ten years prior to the assault on Ms. Shadday.  (Mot. Summ. J. 16.)  It goes further to say that there had been "no previous sexual assaults in the [Shoreham's] common areas" (*id.*) in the same time period.  Ms. Shadday does not dispute these assertions.

Because there had been no past history of these crimes having occurred at the Shoreham, it would be unreasonable to expect Omni to have anticipated that such crimes would occur.  In this respect, the circumstances of the instant action are substantially different than those of the cases Ms. Shadday cites, *Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552 (U.S. App. D.C. 1992) and *District of Columbia v. Doe*, 524 A.2d 30 (D.C. 1978). In *Dominion Bank,* the United States Court of Appeals for the District of Columbia Circuit held that a female worker being raped and robbed in a commercial building was foreseeable because the landlord of the building had received "incessant notice of criminal activity," including theft, burglary, drug use and prostitution, in or around the building for nearly two and a half years.  In contrast, in the instant action the record reveals no complaints by hotel guests or patrons about the Shoreham's security or crimes on the premises.

And in *Doe*, the District of Columbia Court of Appeals held that a fourth-grade student being adducted from a school and raped was foreseeable given deficient school security, including an open rear gate, broken doors, a malfunctioning intercom and the

10

presence of adult males freely roaming throughout the school. 524 A.2d at 34. Conversely, in this case the Shoreham had no history of such serious security breaches, or threats from intruders. Indeed, it appears that the security the Shoreham had in place was adequate to respond to the types of incidents of which it had notice in the past. The Shoreham had security cameras installed throughout the hotel to monitor its common areas. It employed a full-time security manager and three guards during its evening shift of 11:00 p.m to 7:30 a.m. Those guards completed regular patrols of the hotel. (Pl.'s Ex. 5, General Order for the Security Department ¶ 14.) And even though one of the guards was unavailable because of illness on the night Mr. Rodriguez assaulted Ms. Shadday, which Omni does not dispute, this unavailability cannot be said to have created a foreseeable security risk, given that very little criminal activity had occurred at the hotel in the past.

Ms. Shadday points to one incident of assault at the Shoreham that reportedly occurred two or three years before Mr. Rodriguez's assault on her. A husband and wife had been fighting in their guest room and the wife informed security that her husband had raped her. (Barnett Dep. 43:19-44:8.) However, the record appears clear that that incident involved domestic violence, a dissimilar (albeit no less serious) type of crime that involves security concerns different than random acts of violence, such as the assault on Ms. Shadday. And the record reflects that the Shoreham was well aware and well-equipped to handle domestic disputes, as its security procedures specifically address those situations. (General Order for the Security Department ¶ 24.) Moreover, shortly after the incident was reported to Mr. Barnett, the victim withdrew her

allegations. (Barnett Dep. 56:22-57:3.) Whether true or not, this incident alone simply is not enough to establish foreseeability of the serious and violent assault Mr. Rodriguez perpetrated on Ms. Shadday. Similarly, while there has been testimony from Shoreham employees that homeless, mentally ill and/or intoxicated people would occasionally enter the hotel lobby, this alone is not criminal conduct of the sort that should have put the Shoreham on notice of potential serious criminal assaults such as rape.

The court recognizes that "evidence of previous sexual attacks in the building" is not essential to a factfinder's determination that Ms. Shadday's rape was foreseeable. *Doe*, 524 A.2d at 33. However, a plaintiff must then show at least some other indicators of foreseeability. Ms. Shadday attempts to do so by presenting the affidavit of Fred Del Marva, a purported expert in hotel security matters, in which he recounts crime statistics from the Washington, D.C. Metropolitan Police Central Crime Analysis Unit. (Del Marva Affidavit Ex. 4.) These include the number of crimes that occurred within a three-year period prior to Ms. Shadday's assault within a 2,000 foot radius of the Shoreham. Among those were two cases of sexual abuse, fourteen cases of assault with a deadly weapon, forty-four cases of robbery, eight-five cases of burglary, two hundred eighteen cases of theft, seventy-two cases of stolen cars and two hundred two cases of theft from automobiles. (*Id.* ¶ 12.) Also, Mr. Del Marva points to a "CRIMECAST" statistic that places the risk of rape at the Shoreham as three and a half times the national average. (*Id.*) Those numbers, Ms. Shadday suggests, demonstrate that Mr. Rodriguez's assault on her was foreseeable and that the Shoreham had inadequate security to prevent it.

Even accepting Mr. Del Marva's assertions as true, as the court must on Omni's motion for summary judgment, they are not enough to demonstrate foreseeability. District of Columbia courts have held that a defendant's location in a "criminally active environment" is insufficient, by itself, to meet the "heightened" foreseeability standard without evidence that the defendant's "employees or customers were more exposed to criminal victimization than others in the general population." *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425, 428-29 (D.C. 1993). There has been no such showing here. The lack of specific evidence as to specific instances of criminal activity at, or even near, the Shoreham is significant.

In sum, Ms Shadday has not satisfied the heightened standard of foreseeability a plaintiff must meet under District of Columbia law in order to hold one party responsible in damages for the criminal act of another. Accordingly, her negligence claim against Omni must be dismissed.

## IV.    CONCLUSION

For the reasons stated above, the court **GRANTS** Defendant Omni Hotels Management Corporation's Motion for Partial Summary Judgment (Docket. No. 19). An appropriate judgment will be entered.[2]

It is unfortunate that the outcome of this case could not be more favorable to Ms. Shadday, who undoubtedly suffered a great deal as a result of Mr. Rodriguez's actions.

---

[2] While Omni's motion is titled "Motion for Partial Summary Judgment," this Entry, which grants the motion in full, dismisses all of Ms. Shadday's claims.

However, when sitting in diversity the court's task is to apply the law of the District of Columbia as its own courts would apply it. Doing so compels this result, despite the harm inflicted on a sympathetic Indiana plaintiff.

ALL OF WHICH IS ENTERED this 13th day of March 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Robert B. Thornburg
Locke Reynolds LLP
rthornburg@locke.com

John F. Townsend III
Townsend & Montross
townsendmontross@aol.com